**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**ATHENS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex. rel.* Ralph D. Williams, BRINGING THIS ACTION ON BEHALF OF THE UNITED STATES OF AMERICA AND THE STATE OF GEORGIA, | CIVIL ACTION NO. 3:09-cv-130 (CDL) |

UNITED STATES OF AMERICA,
*ex. rel.* Ralph D. Williams,
BRINGING THIS ACTION ON BEHALF OF
THE UNITED STATES OF AMERICA AND
THE STATE OF GEORGIA,

          Plaintiffs and Relator,

v.

HEALTH MANAGEMENT ASSOCIATES, INC.;
MONROE HMA, LLC d/b/a WALTON REGIONAL
MEDICAL CENTER; JOHN DOE HOSPITALS
AFFILIATED WITH HEALTH MANAGEMENT
ASSOCIATES, INC.;
and
TENET HEALTHCARE CORPORATION and
its subsidiaries: TENET HEALTHSYSTEM GB, INC.
d/b/a ATLANTA MEDICAL CENTER and
SOUTH FULTON MEDICAL CENTER, n/k/a
ATLANTA MEDICAL CENTER-SOUTH CAMPUS;
NORTH MEDICAL CENTER, INC., d/b/a
NORTH REGIONAL HOSPITAL;
TENET HEALTHSYSTEM SPALDING, INC. d/b/a
SPALDING REGIONAL MEDICAL CENTER;
TENET HEALTHSYSTEM SGH, INC. d/b/a SYLVAN
GROVE HOSPITAL; HILTON HEAD HEALTH
SYSTEM, L.P. d/b/a HILTON HEAD HOSPITAL;
JOHN DOE HOSPITALS AFFILIATED WITH TENET
HEALTHCARE COPORATION;
and
HISPANIC MEDICAL MANAGEMENT, INC.
d/b/a CLINICA DE LA MAMA; CLINICA DE LA
MAMA, INC. d/b/a  CLINICA DE LA MAMA; and
CLINICA DE LA MAMA and CLINICA DE BEBE,
including their affiliated parent or successor corporations:
INTERNATIONAL CLINICAL MANAGEMENT
SERVICES, INC. and COTA MEDICAL
MANAGEMENT GROUP, INC.,

          Defendants.

CIVIL ACTION NO.
3:09-cv-130 (CDL)

**FILED UNDER SEAL**
**Pursuant to 31 U.S.C.**
**3730(b)(2)**

**DO NOT PUT IN PACER**
**OR SERVE**

JURY TRIAL DEMANDED

**<u>THIRD AMENDED COMPLAINT</u>**

1

This action is brought on behalf of the United States of America and the State of Georgia by Ralph D. Williams ("Williams", "Plaintiff-Relator" or "Relator") pursuant to the qui tam provisions of the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA"), and the Georgia False Medicaid Claims Act, O.C.G.A. §§ 49-4-168, *et seq.* ("Georgia FMCA"), and is premised on Defendants' knowingly submission of false or fraudulent claims for payment to state and federal government healthcare payors ("Government Payors") involving illegal kickbacks that Defendant hospitals paid to Defendant Clinica for the referral of Medicaid patients during the time period 1999 through the present day.

## JURISDICTION AND VENUE

1.

This court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 and pursuant to FCA 31 U.S.C. §§ 3729, *et seq.*, and 31 U.S.C. § 3730(b); and supplemental jurisdiction over claims arising under the Georgia False Medicaid Claims Act (Georgia FMCA), as provided under 28 U.S.C. § 1367(a). This court may exercise personal jurisdiction over Defendants and venue is appropriate in this district pursuant to 31 U.S.C. § 3732(a) and (b).

## THE PARTIES

2.

Plaintiff-Relator Williams is an individual and a resident of the State of Georgia.

3.

Plaintiff-Relator Williams is an accountant with more than thirty years of experience in hospital management in both the for-profit and not-for-profit sectors.

2

4.

Defendant Health Management Associates, Inc. ("HMA, Inc.") is a Delaware corporation, doing business in the Middle District of Georgia in Monroe, Walton County, Georgia. Its corporate headquarters are located at 5811 Pelican Bay Blvd., Suite 500, Naples, Florida 34108-2710. Service can be had on HMA, Inc., by serving its registered agent: CT Corporation Systems, at 1200 S. Pine Island Rd., Plantation, Florida 33324.

5.

Defendant HMA Monroe, LLC d/b/a Walton Regional Medical Center n/k/a/ Clearwater Regional Medical Center ("HMA Monroe"), is located in Monroe, Walton County, Georgia, and is a Georgia limited liability company and an affiliate of Defendant HMA, Inc., HMA Monroe's principal office located at 5811 Pelican Bay Blvd., Suite 500, Naples, Florida 34108-2710. Service can be had on HMA Monroe by serving its registered agent: CT Corporation Systems, 1201 Peachtree St., Atlanta, Georgia 30361.

6.

Defendants John Doe Hospitals, affiliated with HMA, Inc., ("HMA John Doe Hospitals") are hospitals across the United States that are owned and operated by entities that are subsidiaries or otherwise affiliated with and controlled by Defendant HMA, Inc. HMA, Inc., HMA Monroe and HMA John Doe Hospitals are collectively referred to as "HMA" or Defendant HMA" hereinafter.

7.

Defendant Tenet Healthcare Corporation ("Tenet") is a Nevada for-profit corporation doing business in the Middle District of Georgia. Its principal office address is 13737 Noel Road, Suite 100, Dallas, Texas 75240. Service can be had on Tenet Healthcare Corporation by

3

serving its registered agent:  CT Corporation Systems at 1201 Peachtree Street NE, Atlanta,
Georgia 30361.

8.

Defendant Tenet, through its subsidiaries and affiliates does business in Georgia as
Atlanta Medical Center (in Atlanta), North Fulton Hospital (in Roswell), Sylvan Gove Hospital
(in Jackson), Spalding Regional Medical Center (in Griffin), South Fulton Medical Center n/k/a
Atlanta Medical Center-South Campus (in East Point), and as Hilton Head Regional in Hilton
Head, South Carolina.  The principal address and headquarters for each of these Tenet hospitals
are located at 1445 Ross Avenue, Suite 1400, Dallas, Texas 75202.  Atlanta Medical Center,
North Fulton Hospital, South Fulton Medical Center and Sylvan Grove Hospital and the Tenet
subsidiaries directly operating them -- Tenet Health System GB, Inc., North Fulton Medical
Center, Inc., and Tenet Health System SGH, Inc. can be served via their registered agent:
CT Corporation Systems, 1201 Peachtree Street, N.E., Atlanta, Georgia 30361.  Tenet Health
System Spalding, Inc. d/b/a as Spalding Regional Medical Center can be served via its registered
agent:  Corporation Process Company, 180 Cherokee Street, N.E., Marietta, Georgia 30060.
Hilton Head Health System, L.P. d/b/a Hilton Head Hospital can be served via its registered
agent:  CT Corporation System, 2 Office Park Court, Columbia, South Carolina 29223.

9.

Tenet, through its subsidiaries and affiliates, also does business in Alabama, California,
Florida, Missouri, North Carolina, Pennsylvania, Tennessee and Texas.  Defendants John Doe
Hospitals Affiliated With Tenet Healthcare Corporation are hospitals outside of Georgia (other
than Hilton Head Hospital in South Carolina) that are owned and/or controlled by Defendant

4

Tenet. Tenet Healthcare Corporation and its subsidiaries and affiliated hospitals are collectively referred to hereinafter as "Tenet" or "Defendant Tenet."

10.

Defendants Hispanic Medical Management, Inc. d/b/a Clinica de la Mama and Clinica de la Mama, Inc. d/b/a Clinica de la Mama, at all relevant times, were Georgia corporations doing business in the Middle District of Georgia, with offices (clinics) in Norcross, Lawrenceville, Roswell, Smyrna, Plaza Fiesta (Chamblee) and Forest Park, Georgia and in Hilton Head, South Carolina. Hispanic Medical Management ("HMM") and Clinica de la Mama have affiliates and successor related entities. Relevant affiliates and successors include International Clinical Management Services, Inc. d/b/a Clinica de Bebe and Cota Medical Management Group, Inc. d/b/a Clinica de la Mama. International Clinical Management Services, Inc. can be served via its Registered Agent: Tracey Treadway, 15127 Jimmy Carter Blvd Norcross, Georgia 30093. Cota Medical Management Group, Inc. can be served via its Registered Agent: Bradford Scott Bootstaylor, 550 Peachtree Street, Atlanta, Georgia 30308. HMM, Clinica de la Mama and their affiliates and successors are collectively referred to hereinafter as "Clinica" or "Defendant Clinica".

## DEFENDANTS' KICKBACK SCHEME

11.

Defendant Clinica recruits pregnant, undocumented Hispanic women to its prenatal clinics with the well-publicized slogan, "we care about your health, not your immigration status." Clinica directs this vulnerable and malleable population of patients who will be Medicaid beneficiaries when they deliver their babies, from its clinics to the HMA and Tenet Hospitals ("Defendant Hospitals") who pay for the referrals. The Defendant Hospitals intentionally pay

5

illegal kickbacks for Clinica Medicaid patient referrals and submit false or fraudulent claims for

payment to Medicaid for obstetric services provided to Clinica patients.

12.

Although undocumented aliens are not eligible for regular Medicaid coverage, the

Medicaid program includes Emergency Medical Assistance ("EMA") that provides payment to

healthcare providers for emergency services provided to eligible undocumented aliens.

13.

EMA provides payment for healthcare services provided to otherwise eligible,

undocumented aliens when such care and services are necessary for the treatment of an

emergency medical condition.

14.

Child birth is considered an emergency condition under the Medicaid program.

15.

A child born to a woman approved for EMA for her delivery is eligible for Newborn

Medicaid.

16.

 Federal and state laws prohibit hospitals from paying for referrals of Medicaid patients.

When hospitals do so they are no longer eligible to submit claims or receive funds from

Medicare or Medicaid.

17.

Relator's FCA and Georgia FMCA claims against Defendants are based on the false or

fraudulent submission of claims for payment by the Hospital Defendants to Medicare or

6

Medicaid ("Government Payors") for medical services provided by the Hospital Defendants to
Clinica-referred patients as particularly described below.

## RELATOR'S FEDERAL CLAIMS

## THE FEDERAL ANTI-KICKBACK STATUTE

18.

Paying or accepting remuneration for arranging for care under federally funded
healthcare programs is expressly prohibited by the Medicare and Medicaid Patient Protection
Act, 42 U.S.C. §1320a-7b(b) ("Anti-Kickback Statute" or "AKS").

19.

Participation in Medicare is conditioned on compliance with the AKS. Thus, claims
submitted by a noncompliant hospital that is paying illegal remuneration in violation of the AKS
are false claims which are actionable under the FCA.

20.

The AKS prohibits any person or entity from offering, paying, soliciting, making or
accepting payment to induce or reward any person for referring, recommending or arranging for
federally-funded medical services, including services provided under the Medicare and Medicaid
programs.

21.

In pertinent part, the AKS states:

(b) Illegal remuneration

(1)      whoever knowingly and willfully solicits or receives any remuneration (including
any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in
kind --

(A)     in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B)     in return for purchasing , leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2)     whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person --

(A)     to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B)     to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility , service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

AKS, 42 U.S.C. § 1320a-7b(b).

22.

The AKS arose out of congressional concern that payments to entities who can steer or

direct patients, such as Clinica, could influence healthcare decisions and result in goods and

services being provided that are medically unnecessary, of poor quality, or even harmful to a

vulnerable patient population.  To protect the integrity of the program from these difficult to

detect harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any

form, regardless of whether the particular kickback gave rise to over utilization of federal

healthcare services or poor quality of care.

8

23.

First enacted in 1972, Congress strengthened the AKS in 1977 and 1987, to ensure that

kickbacks masquerading as legitimate transactions did not evade its reach.  *See* Social Security

Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-

Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid

Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

24.

The Hospital Defendants' provision of remuneration in exchange for Defendant Clinica's

recruiting, referring, directing and arranging for Medicaid beneficiaries to deliver their babies at

the Defendants' hospitals as described in this Third Amended Complaint constitutes an illegal

inducement under the Anti-Kickback Statute.

## FEDERAL FALSE CLAIMS ACT

25.

The federal False Claims Act imposes liability on persons or entities who submit or cause

to be submitted false or fraudulent claims to federal government funded programs, including but

not limited to Medicare and Medicaid, 31 U.S.C. §§ 3729, *et seq.*

26.

Relator, on behalf of the government plaintiffs, is asserting pre- and post-FERA[1] FCA

claims against the Defendants for their respective violations of the FCA during the applicable

---

[1] Relator's action covers conduct during the period 1999 to present.  The False Claims Act was
amended in 2009 by the Fraud Enforcement and Recovery Act of 2009, Public Law 111-21
("FERA").  Relator's allegations about conduct prior to the effective date of FERA, May 20,
2009, are brought under the FCA pre-FERA, while allegations about conduct after that date are
brought under the FCA as amended by FERA.

time periods before and after the FERA amendments. Thus, the following versions of the FCA

are relevant and applicable to this Complaint.

27.

The pre-FERA federal false claims statute provides in pertinent part:

31 U.S.C. § 3729.  False claims

(a)  Liability for certain acts.  Any person who –

(1)  knowingly presents, or causes to be presented, to an officer or
employee of the United States Government . . . a false or fraudulent claim
for payment or approval;

(2)  knowingly makes, uses, or causes to be made or used, a false record or
statement to get a false or fraudulent claim paid or approved by the
Government;

(3)  conspires to defraud the Government by getting a false or fraudulent
claim allowed or paid;

. . . .

is liable to the United States Government for a civil penalty of not less than
$5,000 and not more than $10,000, plus 3 times the amount of damages which the
Government sustains because of the act of that person…..

The post-FERA Amendments to the federal FCA, in pertinent part, provide:

31 U.S.C. § 3729. False claims (a) Liability for certain acts.  (1) In general.
Subject to paragraph (2), any person who—

(A)  knowingly presents, or causes to be presented, a false or fraudulent
claim for payment or approval;

(B)  knowingly makes, uses, or causes to be made or used, a false record
or statement material to a false or fraudulent claim;[2]

(C)  conspires to commit a violation of subparagraph (A), (B), (D), (E),
(F), or (G);

---

[2] A material fact is one capable of influencing the government's decision to pay the claim. *See
United States ex rel. Hutcheson v. Blackstone Medical, Inc.*, 647 F.3d 377, 394 (1st Cir. 2011).

. . . .

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

28.

Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by

the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg.

47099, 47103 (1999), the False Claims Act civil penalties were adjusted to $5,500 to $11,000 for

violations occurring on or after September 29, 1999.

29.

For purposes of the False Claims Act:

(1) the terms "knowing" and "knowingly" –

  (A) mean that a person, with respect to information –

    (i) has actual knowledge of the information;

    (ii) acts in deliberate ignorance of the truth or falsity of the information; or

    (iii) acts in reckless disregard of the truth or falsity of the information, and

  (B) require no proof of specific intent to defraud.

31 U.S.C. § 3729(b).

## RELATOR'S GEORGIA CLAIMS

30.

The Defendant Hospitals, other than the HMA John Doe Hospitals, the Tenet John Doe

Hospitals and Hilton Head Hospital (collectively the "Georgia Defendant Hospitals"), have been

enrolled as providers in the Georgia Medicaid Program during all times relevant to this action.

11

31.

The Georgia Medical Assistance Act, O.C.G.A. § 49-4-146.1(b), the Georgia Medicaid

regulations and the Georgia provider participation agreement prohibit providers like the Georgia

Defendant Hospitals from paying for referrals of Medicaid patients particularly described below.

## GEORGIA PROHIBITS KICKBACKS TO INDUCE REFERRALS

32.

Obtaining Medicaid funds by "any fraud scheme or device" is a crime in Georgia.

The Georgia Medical Assistance Act (MAA), O.C.G.A. § 49-4-146.1(b), makes it unlawful

to:

> obtain, attempt to obtain, or retain for himself, herself, or any other person
> any medical assistance or other benefits or payments under this article, or
> under a managed care program operated, funded, or reimbursed by the
> Georgia Medicaid program, to which the person or provider is not entitled, or
> in an amount greater than that to which the person or provider is entitled,
> when the assistance, benefit, or payment is obtained attempted to be obtained,
> or retained, by:
>
> (A) Knowingly and willfully making a false statement or false representation;
>
> (B) Deliberate concealment of any material fact; or
>
> (C) Any fraudulent scheme or device; . . .

MAA, O.C.G.A. § 49-4-146.1(b).

33.

Each claim for healthcare services provided to Clinica patients (and attempts to

obtain Disproportionate Share Hospital ("DSH") funds related thereto, *see infra.* pp. 34-37)

submitted by HMA or Tenet constitutes a violation of the MAA because it involves an

attempt by the Georgia Defendant Hospitals to obtain Medicaid funds by a fraudulent

scheme.

12

34.

As Medicaid providers, the Georgia Hospital Defendants are required to execute the

State's Medicaid Provider Agreement called a "Statement of Participation". *See, e.g.,*

"Statement of Participation" executed by Defendant HMA Monroe at ¶¶ 2A & 4K, attached

hereto as Exhibit I.[3]

The Statement of Participation states in relevant part:

2.      PROVIDER'S OBLIGATIONS

A.      Legal Compliance.  Provider shall comply with all of the Department's
        requirements applicable to the category(ies) of service which Provider
        participates under this Statement of Participation, including Part I, Part II
        and the applicable Part III manuals.

35.

The Part I Policies and Procedures for Medicaid/PeachCare for Kids (Ga. Dept. of

Community Health, Division of Medicaid) ("Part I Manual") states, in part, that providers shall:

[n]ot contact, provide gratuities or advertise "free" services to Medicaid or
PeachCare for Kids members for the purpose of soliciting members' requests for
services . . . Any offer or payment for remuneration, whether direct, indirect,
overt, covert, in cash or in kind, in return for the referral of a Medicaid or
PeachCare for Kids member is prohibited.

*See* relevant pages of Part I Manual, particularly including Chapter 100, p. I-19, sec. 106

"General Conditions of Participation," para. E, attached hereto as Exhibit "J".

36.

By executing the "Statement of Participation," the Georgia Defendant Hospitals

acknowledged and represented that they shall "comply with all of the department requirements

---

[3] Similar provisions have been included in Statements of Participation since at least 1978.  *See,
e.g.,* Exhibit N.

applicable to the categories of service offered by the provider, including (the "Part I Manual").

*See, e.g.*, Exhibit I hereto.

37.

The Georgia Defendant Hospitals are subject to Georgia's Medicaid Provider Agreement

and the Provider's obligations made a part thereof, as set forth above and *infra.*

38.

The referenced Part I Manual provision prohibits payments (kickbacks) made in

exchange for referral of patients, and said prohibition of kickbacks is a condition of participation

in the state Medicaid program. *See* Exhibits "I" and "J".

## THE GEORGIA FALSE MEDICAID CLAIMS ACT

39.

The Georgia False Medicaid Claims Act, O.C.G.A. §§ 49-4-168, *et seq.*, is

substantively similar to the federal FCA and imposes liability on any person who:

(a)  knowingly presents, or causes to be presented, a false or fraudulent claim for
payment or approval to the state;

(b)  knowingly makes, or causes to be made or used, a false record or statement to
get a false or fraudulent claim paid or approved by the state; or

(c)  conspires to defraud the state by getting a false claim allowed or paid.

O.C.G.A. § 49-4-168.1(a)(1)-(3).

## MEDICARE PROGRAM

40.

In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare

program, to pay for the costs of certain healthcare services.  42 U.S.C. §§ 426, 426A.

14

41.

The Centers for Medicare and Medicaid Services ("CMS") is an agency of HHS and is directly responsible for the administration of the Medicare program.

42.

Medicare has several parts, including Part A, which is primarily for hospital-based charges (hereinafter referred to as "Medicare Part A"). The Medicare Part A program authorizes payment for hospital in-patient care, including obstetrical deliveries. 42 U.S.C. §§ 1395c-1395i-4.

43.

Providers who participate in Medicare Part A must periodically sign and submit to CMS an application for participation in the Medicare program, to wit, a Hospital Insurance Benefit Agreement (Form HCFA-1561), under which each hospital agrees "to conform to the provisions of Section 1866 of the Social Security Act and applicable provisions in 42 CFR, Parts 405, 466, 420, and 489."

44.

Each of the Hospital Defendants has executed and submitted to CMS a Hospital Insurance Benefit Agreement (Form HCFA-1561).

45.

Providers who participate in Medicare Part A must periodically sign and submit to CMS Form 855A – Medicare Enrollment Application – Institutional Providers.

46.

Each of the Hospital Defendants executed and submitted to CMS a CMS Form 855A – Medicare Enrollment Application – Institutional Providers. By executing and submitting CMS

15

Form 855A, each of the Hospital Defendants expressly certified to CMS as follows: "I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions **(including but not limited to, the Federal anti-kickback statute** and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare." (Emphasis added.)

47.

As a necessary condition to payment by Medicare, CMS requires hospitals to submit on an annual basis a form CMS-2552, more commonly known as the "Hospital Cost Report". *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20; *see also* 42 C.F.R. § 405.1801(b)(1).

48.

At all times relevant to this Complaint, each of the Hospital Defendants were required to submit Hospital Cost Reports to CMS. Each Hospital Cost Report contains an express certification that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

49.

The Hospital Cost Report Certification is a preface to the cost report's certification, where the following warning appears:

MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND

16

ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY
RESULT.

This advisory is followed by the actual certification language itself:

CERTIFICATION BY OFFICER OR ADMINISTRATOR OF PROVIDER(S)

I HEREBY CERTIFY that I have read the above statement and that I have
examined the accompanying electronically filed or manually submitted cost report
and the Balance Sheet and Statement of Revenue and Expenses prepared by
[name of facility, ID number of facility] for the cost reporting period beginning
[date] and ending [date] and that to the best of my knowledge and belief, it is a
true, correct and complete statement prepared from the books and records of the
provider in accordance with applicable instructions, except as noted. I further
certify that I am familiar with the laws and regulations regarding the provision of
the health care services, and that the services identified in this cost report were
provided in compliance with such laws and regulations. (This is followed by:
signature of facility's officer, title and date).

50.

Hospital Cost Reports submitted by the Hospital Defendants were, at all times material to

this Third Amended Complaint signed by their respective authorized employees (including

employees of its various predecessors), usually a hospital official who attested, among other

things, to the certification quoted above.

**MEDICAID PROGRAM**

51.

The Medicaid Program is a joint federal-state program that provides health care benefits

for certain groups, primarily the poor and disabled. Medicaid providers submit claims for

payment to states, which pay the claims and then seek partial reimbursement from the federal

government.

17

52.

In Georgia, provider hospitals participating in the Medicaid program submit claims for

hospital services rendered to Medicaid beneficiaries to the Georgia Department of Community

Health for payment.

**FACTS**

**HMA'S FRAUD SCHEME WITH CLINICA**

53.

Defendant HMA operates over seventy (70) hospitals across the United States, three (3)

of which are in Georgia:  Defendant HMA Monroe in Monroe, East Georgia Regional Medical

Center in Statesboro and Barrow Regional Medical Center in Winder.

54.

Defendant HMA Monroe also operates a seventy-seven (77) bed hospital and a fifty-eight

(58) bed nursing home in Monroe, Georgia.

55.

Between April 2009, and October 2009, Defendant HMA employed Relator Williams as

its Chief Financial Officer.  His job responsibilities brought him into regular contact with

corporate level executives and personnel from other HMA affiliated hospitals across the country.

Relator's job duties required that he have familiarity with HMA, Inc.'s nation-wide corporate

goals, practices, policies and procedures on a daily basis.

56.

Under a contract purportedly for Spanish interpreter services, Defendant HMA Monroe

paid Clinica to recruit, direct and manage pregnant undocumented Hispanic women from the

18

Clinica prenatal clinic in Lawrenceville, Georgia to Defendant HMA Monroe for delivery of their babies.

57.

Defendant HMA Monroe regularly and routinely billed or presented claims to Medicaid for obstetrical services they provided to the patients referred to them by Clinica pursuant to the agreement between said Defendants.

58.

Defendant HMA Monroe knowingly, intentionally and repeatedly conspired with Clinica to obtain referrals of Medicaid beneficiaries and submitted false or fraudulent claims to Medicaid for Clinica referred obstetrical deliveries.

59.

Defendant HMA Monroe CEO Gary Lang and Relator Williams' predecessor, then-CFO Jeff Grimsley, sought and obtained approval from HMA, Inc. Divisional Senior Vice President (Brad Jones) and Divisional Vice President of Finance (Bob Stiekes) to enter into the agreement with Clinica. *See* Memorandum dated April 2, 2008 from Lang and Grimsley to Jones and Stiekes, attached hereto as Exhibit A.

60.

Defendant HMA Monroe CEO Lang and CFO Grimsley truthfully told HMA corporate personnel that the purpose of the Clinica Agreement was to "grow OB service line volume." Exhibit A at 1.

61.

CEO Lang and CFO Grimsley's request for approval of the contract states, "Clinica has contracts with two Tenet Health facilities (Atlanta Medical Center and North Fulton

19

Hospital) to provide the delivery of services for their patients. The option to provide an alternative delivery site in the form of Defendant Walton Regional (a/k/a Defendant Monroe) was very attractive to Clinica and its patients and families." Exhibit A at 1. The memorandum also states that there is an agreement involving two Defendant HMA Monroe obstetricians "through which on-site clinic support and hospital deliveries will be provided by them in support of this relationship." *Id.*

62.

Although the language of the written contract provides for payment to Clinica for "interpreter services," such pretextual services were not the primary reason why or the basis upon which HMA Monroe entered into the agreement and paid remuneration to Clinica under the agreement. *See* Exhibit B, March 27, 2008, HMA Monroe-Clinica "Services Agreement" ("Agreement"). The written contract was a sham agreement that was designed to conceal the underlying financial motive, which was the purchasing of Clinica referrals by Defendant HMA Monroe.

63.

HMA, Inc.'s corporate personnel approved the Clinica contract. *See* Email dated April 17, 2008 and Corporate Office Contract Review Summary Sheet, attached hereto as Exhibit C.

64.

The Clinica – HMA Monroe Agreement was shielded from corporate legal review. The Corporate Office Contract Review Summary Sheet, completed as part of the application for approval of the Agreement, was filled out by Defendant HMA Monroe to indicate that legal review was not required. Exhibit C, page 3 of 3.

20

65.

Prior to and at the time HMA Monroe entered into the Agreement with Clinica, HMA, Inc. was keenly aware that Defendant Clinica recruited pregnant, undocumented Hispanic women and referred them for delivery in exchange for money to hospitals, such as Tenet's Hilton Head Hospital. HMA, Inc., furthermore, was directly aware that Clinica recruits pregnant, undocumented aliens, who will be Medicaid beneficiaries when they deliver their babies, into specific prenatal clinics operated and controlled by Clinica, where the patients see doctors with admitting privileges at the hospital that has contracted with Clinica to receive the Obstetric ("OB") referrals.

66.

Notwithstanding its knowledge, HMA Monroe entered into a sham agreement with Clinica to financially induce Clinica to refer and direct undocumented, pregnant Hispanic women who were about to be eligible for EMA benefits/Medicaid to HMA Monroe.

67.

One of Relator's duties as CFO of Defendant HMA Monroe was to monitor contracts and approve payment of invoices.

68.

Defendant HMA and Defendant HMA Monroe used a computerized contract monitoring system that flagged expiration dates and other important information about its contracts. The Defendant HMA Monroe CFO was responsible for inputting contractual information into the system.

69.

Relator found a hard copy of the HMA Monroe-Clinica contract in his desk drawer when he commenced working at Defendant HMA Monroe in April 2009.

70.

The Clinica contract had not been input into the HMA contract monitoring system. The failure to place this contract in the system was unusual and outside of normal business practices.

71.

Defendant HMA Monroe CEO Gary Lang and CFO Jeff Grimsley created and submitted to HMA corporate a financial feasibility analysis in support of their request for approval of the Clinica contract. The financial feasibility analysis lays out the explicit reason for the contract, the expectation that payments to Clinica will result in a significant increase in deliveries at Defendant HMA Monroe. Each payment to Clinica from Defendant HMA Monroe was paid for with EMA/Medicaid reimbursements. *See* HMA, Inc. Financial Feasibility Analysis for "Clinica de la Mama Hispanic Maternity Program," attached hereto as Exhibit D. Interpreter services, a cost center if actually existent, are not even mentioned in the Defendant HMA Monroe feasibility analysis. Patient referrals increase deliveries and profits. Conversely, interpreter services provided to delivering patients who are already at the hospital do not increase the number of deliveries or profits.

72.

Defendant HMA Monroe documented the purpose of the agreement in the expectation of reaping a 56.2% rate of return on their $1,878,000 investment in Defendant Clinica's "Hispanic Maternity Program." Exhibit D at 1. This unambiguous projection quantifying the ill-gotten gains expected to be paid with EMA/Medicaid dollars as a result of the referrals being purchased

22

pursuant to the kickback scheme clearly sets forth the motive behind the bogus contractual relationship with Clinica. To Defendants, the payment of kickbacks made business sense. The more referrals they bought, the more profit there was to be made.

73.

With the Clinica kickback scheme, the hospital buying the referred Medicaid beneficiaries obtains increased revenue from the Medicaid-covered deliveries and the physicians earn professional fees for the deliveries, as well as other benefits available under the three-party relationship tied to increased Medicaid utilization generated by Clinica referrals.

74.

Because the remuneration for the hospital depends on patient referrals, Clinica closely tracks the number of deliveries for each of the pregnant Government beneficiaries it refers to Defendant hospitals. Samples of such records of deliveries at Defendant HMA Monroe are included in Exhibit H hereto, discussed below. Under the business model used by Defendants, Clinica, the kickback recipient, would track and document OB deliveries it refers to Defendant HMA Monroe and all other HMA John Doe Hospitals.

75.

In his position at Defendant HMA Monroe, Relator Williams was able to review the Clinica Agreement and investigate whether Clinica was in fact actually providing the interpreter services expressly called for in its contract with Defendant HMA Monroe. Per his investigation, which included discussions with knowledgeable Defendant HMA Monroe employees, Relator could not confirm that interpreter services were being provided by Clinica as called for by the provisions in the written contract.

23

76.

Director of Nursing Services, Sharon Queen, told Relator that Defendant HMA Monroe used AT&T interpreter services via telephone when a need arose for interpreter services. She did not use the 24-hour interpreter services called for in the Clinica contract. She was not familiar with Clinica personnel. *See* August 20, 2009 email exchange between Erica Zygler and Sharon Queen, attached as Exhibit F.

77.

Relator specifically asked Director of OB Services, Erica Zygler, why Defendant HMA Monroe needed Clinica for interpreter services. Zygler replied, "I think this is a question for Sharon [Director of Nursing] or Gary [CEO]. The contract was negotiated prior to my role as manager. I have never seen the contract." *See* August 20, 2009 email exchange between Erica Zygler and Relator, attached hereto as Exhibit G.

78.

Zygler also informed Relator that Defendant HMA Monroe had not had any interpreters since July 16, 2009. *See* Exhibit G.

79.

Relator also spoke to Human Resources personnel, and they likewise had no knowledge of Clinica personnel rendering interpreter services to patients at Defendant HMA Monroe.

80.

Relator eventually discovered that Defendant HMA Monroe paid Defendant Clinica between $15,000 and $20,000 each month as remuneration for referring pregnant Hispanic EMA/Medicaid beneficiaries to Defendant HMA Monroe for government subsidized deliveries.

24

*See* Agreement, Exhibit B hereto. *See also* Exhibit E hereto, April 23, 2009 email showing 34 "Clinica deliveries" since January 1, 2009.

81.

Defendants HMA, Inc., HMA Monroe and Clinica were knowingly violating the AKS.

82.

Under the fraudulent scheme with Clinica, HMA received increased revenue from Medicaid-covered deliveries (plus additional DSH revenues and other government funds discussed hereafter). The OB physicians with admitting privileges at HMA hospitals saw patients at Clinica locations and were paid professional fees for the Clinica-referred deliveries (as well as any other benefits available) under the three-way financial relationship among Clinica, HMA and the physicians. The net impact of the HMA-Clinica scheme was to increase Medicaid utilization and dollars paid to HMA hospitals to the detriment of the Medicaid program and the American taxpayers.

83.

Relator directly questioned Lang about the Defendant HMA Monroe-Clinica Agreement. Lang informed Relator that he came to Defendant HMA Monroe from his marketing job at a Tenet hospital in Hilton Head, South Carolina that had the same contract with Clinica. Lang also indicated that Clinica referrals generated large volumes of Medicaid deliveries for Tenet. HMA cloned its kickback model from Tenet for one primary reason, it worked. The demonstrable and anticipated increase in revenues achieved by buying referrals of Medicaid patients is reflected in the 56.2% rate of return expected directly to Defendant HMA Monroe from purchased Clinica referrals as discussed above.

84.

Relator confirmed with Defendant Clinica that it entered into contractual arrangements with Tenet's Atlanta Medical Center and North Fulton Hospital. Mr. Lang indicated that Clinica referrals generated large volumes of Medicaid deliveries for Tenet. HMA expected and received increases in its deliveries as well due to Clinica referrals.

85.

Clinica was paid to bring pregnant Medicaid beneficiaries to Defendants HMA and HMA Monroe. The notion of paying Clinica for hourly interpreter services as described in the written contract between the parties was a hoax and proves that all parties to these arrangements conspired to violate the AKS. Interpreter services are a cost center to a hospital. They do not generate a "56.2% rate of return" on investment capital.

86.

Relator told CEO Lang that the Defendant HMA Monroe arrangement with Clinica violated the AKS because payments to Clinica were financial inducements to bring Medicaid beneficiaries to Defendant HMA Monroe for OB delivery services which caused false claims that were ultimately submitted to and paid for by Medicaid.

87.

CEO Lang initially tried to defend the arrangement with Clinica but told Relator he would discuss it with HMA, Inc. legal staff.

88.

Soon thereafter, Relator received for processing a cover letter and "final invoice" to Defendant HMA Monroe from Clinica. *See* Letter from Tracey Cota to CEO Gary Lang, dated August 6, 2009, with enclosures, attached hereto as Exhibit H.

26

89.

Because its remuneration from the hospital depends on patient referrals, Clinica closely tracked the number of deliveries for each of the Medicaid beneficiaries it refers to Defendant hospitals. The "final invoice" referenced above includes a report entitled "Schedule of Deliveries by Hospital" for August 2009 and September 2009. *See* Exhibit H, pp. 6-10 (patient identification redacted). The report includes patient names, Medicaid approval status, estimated delivery dates and which of the five Clinica clinics would be managing the Clinica patient referred to Defendant HMA Monroe. *Id.* The "Final Invoice" also includes a report entitled "Deliveries by Month Hospital." Exhibit H, pp. 11 and 19. That report shows Clinica patient names and dates of OB deliveries at Defendant HMA Monroe in June and July 2009. *Id.*

90.

The "final invoice" dated August 6, 2009 includes purported time records for Clinica personnel working at Defendant HMA Monroe: Fully 238.75 hours of time was billed for the 18 day period of July 1, 2009 through July 18, 2009. *See* Exhibit H, p. 2. That is an average of 13.26 hours of each day covered by the invoice during which Clinica personnel were allegedly providing interpreter services at Defendant HMA Monroe. Similarly, the partial invoice, dated July 8, 2009, includes purported time records for Clinica personnel at Defendant HMA Monroe for June 2009: 412.50 hours of time was billed for the 30 day month of June. *See* Exhibit H, p. 13. That is an average of 13.75 hours a day during which Clinica personnel were purportedly providing interpreter services at Defendant HMA Monroe. Despite these time entries, Relator could not confirm that any Clinica employees were even on the premises at Defendant HMA Monroe during the times in question.

27

91.

Not long after Relator voiced his concerns regarding the fraudulent nature of the HMA arrangement with Clinica to CEO Lang, Defendant HMA sent its Divisional CFO Bob Stiekes to Monroe, Georgia. Mr. Stiekes terminated Relator's employment without providing any reason for the termination. HMA and Defendant HMA Monroe had been receiving substantial revenue from Medicaid reimbursements for the referral of deliveries under its unlawful scheme with Clinica. Relator's objections to that business practice threatened HMA's profits derived from the Clinica referrals and heightened the risk of exposure of HMA's illegal kickback scheme with Clinica.

92.

HMA, Inc. and Defendant HMA Monroe had been bringing in substantial revenue from Clinica referrals and they projected even greater profits to continue into the future.

93.

Medicaid pays between $2,854 (well baby normal delivery) and $4,550 (well baby C-section) for each delivery without medical complications.

94.

Due to Relator's protestations to HMA management about the illegality of the Clinica relationship and purchased referrals, Defendant HMA, Inc. retaliated against Relator by firing him.

**FALSE OR FRAUDULENT CLAIM SUBMITTED BY HMA MONROE ("HMA")**

95.

Since at least 2008, Defendant HMA Monroe regularly and routinely presented claims to Medicaid for the OB services provided to the patients illegally referred by Clinica.

28

96.

Patient "HMA1"[4] is a Medicaid beneficiary who was referred to Defendant HMA

Monroe by Clinica. Defendant HMA Monroe paid Clinica for the referral of Patient HMA1.

Clinica directed Patient HMA1 to Defendant HMA Monroe where she delivered her baby.

Defendant HMA Monroe submitted a claim for its services related to the delivery of Patient

HMA1's baby to Georgia Medicaid on June 22, 2009 in the amount of $10,160.77. Georgia

Medicaid paid $4,872.36 on that false claim on July 13, 2009.

## TENET'S FRAUD SCHEME WITH CLINICA

97.

Like the HMA-Clinica scheme described above, since at least as early as 2006, under

contracts purportedly for Spanish interpreter and other services, Tenet paid Defendant Clinica to

recruit pregnant undocumented Hispanic women and refer them to Tenet hospitals for their

deliveries at public (Medicaid) expense.

98.

The essential purpose of the Tenet relationship with Clinica was to garner

reimbursements/payments from Medicaid (plus DSH payments and Medicare DRG payment

add-ons as described above and *infra*) for the services Tenet hospitals provided to Clinica-

referred patients.

---

[4] To protect confidential patient information, patient names in this Third Amended Complaint
have been replaced with acronyms reflecting the Defendant hospital that submitted the false
claim, such as "HMA1" for HMA Monroe Patient 1. The actual patients' names, patient account
numbers, and claim numbers are maintained by the Georgia Department of Community Health
and can be made available to the Court under seal by that Department.

99.

Tenet's corporate offices and individual facilities worked together to knowingly and intentionally pay for referrals of Medicaid beneficiaries from Clinica for obstetrical services provided at Tenet hospitals.

100.

Relator came to understand this illegal business model whereby Tenet hospitals purchased referrals of Medicaid beneficiaries from Clinica, during his employment as Chief Financial Officer at Defendant HMA Monroe between April 2009 and October 2009.

101.

In the summer of 2009, Relator's direct supervisor at Defendant HMA Monroe, CEO Gary Lang, told Relator in his office at Defendant HMA Monroe that Lang had joined Defendant HMA Monroe from Tenet's Hilton Head Hospital in 2007. Before that, Mr. Lang was with Tenet's Atlanta Medical Center. Lang also told Relator that those Tenet hospitals, as well as Tenet's North Fulton Hospital, had a referral relationship with Clinica. Lang said those Tenet hospitals obtained significantly increased numbers of Medicaid patients as a result of Clinica referrals of pregnant undocumented Hispanic women. Lang told Relator that his experience with the Clinica business model at Tenet is why he wanted to bring it to Defendant HMA Monroe.

102.

Relator then personally confirmed with Defendant Clinica that it had contractual arrangements with Tenet's Atlanta Medical Center and North Fulton Hospital, just as Gary Lang had reported. Relator also confirmed Clinica's relationship with Tenet's Hilton Head Hospital.

30

103.

Tenet has knowingly violated the AKS by paying Clinica for its recruited stream of Medicaid-eligible patients.

## SPECIFIC FALSE OR FRAUDULENT CLAIMS SUBMITTED TO MEDICAID BY TENET

104.

Pursuant to its unlawful business arrangements with Clinica, Tenet hospitals have submitted tens of thousands of false or fraudulent claims to Georgia Medicaid. The following eleven (11) examples from the thousands of false and fraudulent claims for Clinica patients submitted to Medicaid by Defendant Tenet.

### FALSE OR FRAUDULENT CLAIMS SUBMITTED BY ATLANTA MEDICAL CENTER ("AMC")

105.

Patient "AMCP1" is a Medicaid beneficiary who was referred to AMC by Clinica. AMC paid Clinica for the referral of Patient AMCP1. Clinica directed Patient AMCP1 to AMC where she delivered her baby. On August 20, 2010, Defendant AMC submitted a claim for its services related to the delivery of patient AMCP1's baby to Georgia Medicaid in the amount of $10,264.80. On September 27, 2010, Georgia Medicaid paid $3,078.66 to AMC on that false claim.

106.

Patient "AMCP2" is a Medicaid beneficiary who was referred to AMC by Clinica. AMC paid Clinica for the referral of Patient AMCP2. Clinica directed Patient AMCP2 to AMC where she delivered her baby. On July 11, 2012, Defendant AMC submitted a claim for its services related to the delivery of patient AMCP2's baby to Georgia Medicaid in the amount of

31

$13,654.26. On September 3, 2012, Georgia Medicaid paid $3,444.40 to AMC on that false claim.

107.

Patient AMCP3 is a Medicaid beneficiary who was referred to AMC by Clinica. AMC paid Clinica for the referral of Patient AMCP3. Clinica directed Patient AMCP3 to AMC where she delivered her baby on October 10, 2011. Defendant AMC submitted a claim for its services related to the delivery of patient AMCP3's baby to Georgia Medicaid in the amount of $21,310.18. On October 10, 2011, Georgia Medicaid paid $5,058.77 to AMC on that false claim141.

108.

Patient AMCP4 is a Medicaid beneficiary who was referred to AMC by Clinica. AMC paid Clinica for the referral of Patient AMCP4. Clinica directed Patient AMCP4 to AMC where she delivered her baby. On December 9, 2008, Defendant AMC submitted a claim for its services related to the delivery of patient AMCP5's baby to Georgia Medicaid in the amount of $40,998. On January 12, 2009, Georgia Medicaid paid $5,445.33 to AMC on that false claim.

109.

Patient "AMCP5" is a Medicaid beneficiary who was referred to AMC by Clinica. AMC paid Clinica for the referral of Patient AMCP5. Clinica directed Patient AMCP5 to AMC where she delivered her baby. On January 10, 2005, Defendant AMC submitted a claim for its services related to the delivery of patient AMCP5's baby to Georgia Medicaid in the amount of $6,382.71. On January 10, 2005, Georgia Medicaid paid $3,127.06 to AMC on that false claim.

FALSE OR FRAUDULENT CLAIMS SUBMITTED BY
NORTH FULTON HOSPITAL ("NFH")

110.

Patient "NFP1" is a Medicaid beneficiary who was referred to NFH by Clinica. NFH
paid Clinica for the referral of Patient NFP1. Clinica directed Patient NFP1 to NFH where she
delivered her baby. On January 6, 2010, Defendant NFH submitted a claim for its services
related to the delivery of patient NFP1's baby to Georgia Medicaid on 1/06/2010 in the amount
of $9,481.00. Georgia Medicaid paid $2,731.01 on that false or fraudulent claim to NFH.

111.

Patient NFP2 is a Medicaid beneficiary who was referred to NFH by Clinica. NFH paid
Clinica for the referral of Patient NFP2. Clinica directed Patient NFP2 to NFH where she
delivered her baby. On December 10, 2004, Defendant North Fulton submitted a claim for its
services related to the delivery of patient NFP2's baby to Georgia Medicaid in the amount of
$10,052.22. On December 13, 2004, Georgia Medicaid paid $3,878.38 on that false claim to
NFH.

112.

Patient NFP3 is a Medicaid beneficiary who was referred to NFH by Clinica. NFH paid
Clinica for the referral of Patient NFP3. Clinica directed Patient NFP3 to NFH where she
delivered her baby. On June 24, 2009, Defendant NFH submitted a claim for its services related
to the delivery of patient NFP3's baby to Georgia Medicaid in the amount of $30,108.40. On
August 3, 2009, Georgia Medicaid paid $4,173.95 on that false claim to NFH.

113.

Patient NFP4 is a Medicaid beneficiary who was referred to NFH by Clinica. NFH paid
Clinica for the referral of Patient NFP4. Clinica directed Patient NFP4 to NFH where she

delivered her baby. On June 11, 2010, Defendant NFH submitted a claim for its services related to the delivery of patient NFP4's baby to Georgia Medicaid in the amount of $16,761.60. On July 19, 2010, Georgia Medicaid paid $2,731.01 to NFH on that false claim to NFH.

114.

Patient NFP5 is a Medicaid beneficiary who was referred to NFH by Clinica. NFH paid Clinica for the referral of Patient NFP5. Clinica directed Patient NFP5 to NFH where she delivered her baby. On March 12, 2008, Defendant North Fulton submitted a claim for its services related to the delivery of patient NFP5's baby to Georgia Medicaid in the amount of $11,947.30. On May 5, 2008, Georgia Medicaid paid $3,878.38 to North Fulton on that false claim to NFH.

### FALSE OR FRAUDULENT CLAIM SUBMITTED BY SPALDING REGIONAL HOSPITAL ("SR")

115.

Patient "SRP1" is a Medicaid beneficiary who was referred to SR by Clinica. SR paid Clinica for the referral of Patient SRP1. Clinica directed Patient SRP1 to SR where she delivered her baby. On March 23, 2009, Defendant SR submitted a claim for its services related to the delivery of patient SRP1's baby to Georgia Medicaid in the amount of $9,459.27. On May 11, 2009, Georgia Medicaid paid $2,683.67on that false claim to SR.

## IN ADDITION TO MEDICAID PAID CLAIMS, THE HOSPITAL DEFENDANTS FRAUDULENTLY OBTAINED AND RETAINED DISPROPORTIONATE SHARE HOSPITAL PROGRAM FUNDS

116.

HMA and Tenet have unlawfully received additional public funds for indigent care based on their purchased, increased treatment of Medicaid patients directed to their hospitals from Clinica patient referrals under the federal Disproportionate Share Hospital (DSH)

34

program. The Medicare and Medicaid programs make additional funds available to "disproportionate share hospitals" to provide financial assistance to those hospitals that serve a large number of Medicaid recipients and/or other low income patients.

117.

The federal government distributes federal DSH funds or allotments to each state based on a statutory formula. The states then distribute their portion of the DSH funding among qualifying hospitals. For example, in 2009, Georgia received approximately $270,000,000 in its DSH allotment from the federal government. (http://www.hhs.gov/recovery/cms/dshstatesmap.html.)

118.

Each state has its own organization for managing DSH program funds. In Georgia, the DSH program is operated under an umbrella program, the Georgia Indigent Care Trust Fund, managed by the Georgia Department of Community Health.

119.

Each state is required to publish a plan of how it will determine which hospitals get DSH payments and its formula for calculating DSH payments to be equitably paid to those qualifying hospitals. States' definitions of what is a qualifying hospital must include hospitals that meet one or more of the three statutory minimum criteria: (1) provision of obstetrical care; (2) increased utilization by Medicaid patients, and (3) number of Medicare patients receiving Supplemental Security Income payments.

120.

In addition to the lump sum payment, a disproportionate share hospital can also qualify for a percentage increase in the amount it is reimbursed by Medicare for services billed on a diagnosis related group ("DRG") basis.

121.

To the extent HMA or Tenet unlawfully garners more Medicaid patients due to buying Medicaid referrals from Clinica, the states in which each does provider business get more federal DSH funds, which increased funds are in turn supplemented by the states and distributed to HMA and Tenet hospitals. In essence, the Clinica referrals generate immediate Medicaid payments for OB services, as well as a wrongly inflated allocation of DSH and other government healthcare funding for HMA and Tenet. The kickback scheme benefits the Hospital Defendants in numerous ways.

122.

The financial incentive for HMA and Tenet to induce referrals of Medicaid patients includes much more than the Medicaid reimbursements for deliveries. Millions of dollars of additional DSH money and increased Medicare reimbursement are also ill-gotten gains obtained by HMA and Tenet directly as a result of the increased OB volumes generated by Clinica referrals.

123.

The Defendant Hospitals fraudulently achieved eligibility for and unlawfully received and retained DSH funds based on their false claims for services rendered to purchased referrals of Medicaid patients from Clinica. The following are examples of receipt of DSH funds by Defendant Hospitals:

Tenet's Atlanta Medical Center (AMC) received DSH payments totaling $2,859,485 in

SFY 2006 from the Georgia Indigent Care Trust Fund.

AMC received a DSH payment of $3,468,698 in SFY 2007 from the Georgia Indigent

Care Trust Fund.

AMC received a DSH payment of $5,345,611 in SFY 2010 from the Georgia Indigent

Care Trust Fund.

Tenet's North Fulton Regional Hospital received a DSH payment of $104,446 in SFY

2008 from the Georgia Indigent Care Trust Fund.

Tenet's North Fulton Regional Hospital received a DSH payment of $289,431in SFY

2010 from the Georgia Indigent Care Trust Fund.

HMA Monroe received a DSH payment of $484,367 in SFY 2008 from the Georgia

Indigent Care Trust Fund.

http://dch.georgia.gov/indigent-care-trust-fund

124.

As a condition of receipt of DSH funds, providers must, among other things,

continue participation in the Medicare program and comply with Department rules, policies

and procedures. Rules, Department of Community Health, Medical Assistance, ch. 111-3-

6.03(4).

## COUNT I

## THE PRESENTMENT OF FALSE OR FRAUDULENT CLAIMS
## IN VIOLATION OF THE FEDERAL FALSE CLAIM ACT
## AND THE ANTI-KICKBACK STATUTE
### (As to the Hospital Defendants and Clinica)

125.

Plaintiff-Relator incorporates herein by reference the facts set forth above in

paragraphs 11 - 124.

126.

Relator, on behalf of the government plaintiffs, is asserting pre and post FERA[5] FCA

claims against the Defendant Hospitals for their respective violations of the FCA during the

applicable time periods before and after the FERA amendments. Thus, the pre-amendment

and amended versions of the FCA are relevant and applicable to this Complaint.

127.

As Medicaid providers, the Defendant Hospitals are liable under the FCA (and State

FMCA) because they knowingly submitted to a state Medicaid program false or fraudulent

claims that are prohibited by 42 U.S.C. §§ 1320, *et seq*. The Defendant Hospitals, in concert

with Defendant Clinica, which facilitated such claims, did in fact submit false or fraudulent

claims to the government for payment when they repeatedly certified that each claim submitted

complied with federal and state law and, accordingly, did not violate the Anti-Kickback Statute,

the False Claims Act or Georgia's Medicaid Provider regulations.

---

[5] On May 20, 2009, the False Claims Act was amended pursuant to Public Law 111-21, the
Fraud Enforcement and Recovery Act of 2009 ("FERA"). Section 3729(a)(1)(B) was formerly
Section 3729(a)(2), and is applicable to this case by virtue of Section 4(f) of FERA, while
Sections 3279(a)(1) and 3279(a)(3) of the statute prior to FERA, and as amended in 1986,
remain applicable here.

128.

Defendants HMA and Tenet, along with Defendant Clinica, knowingly caused the

submission of the above-referenced and other false or fraudulent claims, the submission of false

records or statements to get the false or fraudulent claims paid, or otherwise conspired to defraud

the federal and state government by getting the false or fraudulent claims paid.

129.

Defendant Hospitals, furthermore, violated the AKS by paying kickbacks camouflaged as

interpreter service payments and management fees to Defendant Clinica, and Defendant Clinica

violated the AKS by soliciting or receiving the kickback payments from the Defendant Hospitals.

130.

Compliance with federal and state healthcare laws and regulations, including the AKS, is

a condition of payment by the Medicaid program.

131.

Defendant Hospitals repeatedly certified compliance with the AKS and compliance with

the AKS was, and is, a condition of the federal government's disbursement of funds under

Medicare and Medicaid.

132.

Defendant Hospitals, however, repeatedly and falsely certified compliance with the AKS

and thereby submitted false or fraudulent claims to Government Payors for OB services

associated with purchased referrals from Defendant Clinica. Defendant Clinica facilitated and

caused the submission of the Defendant Hospitals' false claims.

133.

In seeking payment from Medicaid in violation of the AKS, Defendants HMA and Tenet, in turn, violated the FCA because the federal government paid money to Defendants HMA and Tenet that it otherwise would not have paid had it known of Defendants' statutory violations.

134.

Whereas compliance with the AKS is, and was, a condition for participation in Medicare and Medicaid, once Defendants violated the AKS they were no longer eligible for reimbursements from those Government Payors. Nonetheless, Defendants continued to submit false or fraudulent claims to those Payors on a daily basis and to retain ill-gotten payments derived from the false or fraudulent claims.

135.

Where, as here, a provider, disqualified from participating in the Medicare and Medicaid programs because it violated the AKS persists in presenting claims for payment it knows the government does not owe, the provider is liable under the FCA for submission of those false claims because the provider knowingly asks the government to pay amounts it does not owe. Defendants' violation of the AKS, and the corresponding submission of claims for which payment was known by Defendants not to be owed, make Defendants' claims for payment false or fraudulent under the FCA. (*See* representative examples above).

136.

By virtue of submitting these claims, the Hospital Defendants knowingly presented, and the Clinica Defendants knowingly caused to be presented, false or fraudulent claims for payment in violation of the FCA, because said claims were for reimbursement for services rendered to patients illegally referred by Defendant Clinica, which received kickbacks for the patient

40

referrals. (See representative examples above).  Moreover, Defendants conspired to get the false claims allowed or paid.

137.

Defendant Hospitals repeatedly fraudulently certified compliance with the AKS and FCA.  This fraudulent misrepresentation was material as compliance with these statutes was, and is, a condition of the federal government's payment of funds under Medicare and Medicaid.

138.

Each claim submitted to the government by Defendants HMA and Tenet, including the specific claims referenced above, was required to be accompanied by a certification that Defendants have complied with all applicable laws and regulations, including but not limited to the AKS and the Georgia statutes and regulations set out in Count II *infra.*  By filing the referenced claims and falsely certifying compliance with those laws and regulations, Defendants are liable under the FCA for presenting a false or fraudulent claim for payment or approval. Likewise, Defendant Clinica facilitated and caused the payment of these false claims by the Defendant Hospitals.  Other false certifications of the Hospital Defendants' compliance with the AKS and FCA are more specifically set out below in Count II.

139.

As shown above, Defendants knowingly presented or caused to be presented false and fraudulent claims for payment to federally-funded health insurance programs, in violation of 31 U.S.C. § 3729(a)(1) (as amended, 31 U.S.C. § 3729(a)(1)(A)).

140.

As shown above, Defendants, furthermore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, made, used, caused to be made, or caused to be used, false or fraudulent records and statements to get false or fraudulent claims paid or approved in violation of, *inter alia*, 31 U.S.C. § 3729(a)(2) (as amended, 31 U.S.C. § 3729(a)(1)(B)).

141.

As shown above, Defendants' presentment of said false or fraudulent claims to the government was not the result of Defendants' mere disregard of government regulations or Defendants having improper internal policies. Even if that were the circumstances of Defendants' presentment of false or fraudulent claims to the government (which it was not), Defendants, nonetheless, knowingly asked the government to pay amounts it did not owe and then intentionally retained the ill-gotten payments thereafter.

142.

As a direct and proximate result of Defendants' presentment of false or fraudulent claims for payment and submission of false or fraudulent records to get false or fraudulent claims paid, the United States has suffered actual monetary damages and is entitled to recover actual and treble damages plus a civil monetary penalty for each false or fraudulent claim paid.

42

## COUNT II

## THE PRESENTMENT OF FALSE OR FRAUDULENT CLAIMS
## IN VIOLATION OF THE GEORGIA FALSE MEDICAID CLAIMS ACT
### (As to the Georgia Defendant Hospitals and their parents and affiliates, and Defendant Clinica)[6]

143.

Plaintiff-Relator incorporates herein by reference the facts set forth above in

paragraphs 11 - 142.

### DEFENDANTS' FALSE CERTIFICATIONS OF MEDICAID COMPLIANCE

144.

Each claim submitted to the government by Defendants HMA and Tenet, such as the

specific (false or fraudulent) claims referenced above, was, as required, subject to a certification

of compliance with all applicable state and federal laws and regulations.

145.

The Defendant Hospitals each repeatedly certified compliance with Georgia's Medicaid

Provider Agreement, and compliance with said Provider Agreement was, and is, a condition of

the state government's payment of funds under Medicaid.

146.

Defendant Hospitals, however, repeatedly falsely certified compliance with the State

Medicaid Provider Agreement and thereby submitted false or fraudulent claims to Government

Payors for OB services associated with illegal purchased referrals from Defendant Clinica.

---

[6] Tenet's Hilton Head hospital is located in South Carolina and false claims submitted at that site had no impact on Georgia Medicaid.

147.

The Georgia Medicaid provider agreement documents constituting and containing (false) certifications submitted to the government by Defendants HMA and Tenet include each Defendant's respective executed "Statement of Participation," "Attestation of Compliance - Appendix K," "Power of Attorney for Electronic Claims Submission" and "Electronic Funds Transfer Agreement." *See* examples of each attached as Exhibits "I", "K", "L" and "M", respectively. As part of the Provider Enrollment Application process, Medicaid providers, such as Defendants, are required to execute these contracts/agreements to participate in and submit claims to the Medicaid program, and said documents are a part of each provider's Medicaid Enrollment Application and Enrollment File.

148.

The particular provisions in the above specified contracts/agreements that are the basis for the Georgia Defendant Hospitals' false certifications, and the basis for their corresponding claims for payment affected by their kickback for patient referral schemes, are particularly described above.

149.

It is a Georgia Department of Community Health requirement that hospital providers, *inter alia*, not pay kickbacks for referrals of Medicaid patients. Section 106 (General Conditions of Participation) of the Part I Manual provides:

As general conditions of participation, all enrolled providers must:

* * * *

B)      Comply with all State and Federal laws and regulations related to furnishing Medicaid/PeachCare for Kids service.

* * * *

44

E)      Not contact, provide gratuities or advertise "free" services to
Medicaid or PeachCare for Kids members for the purpose of soliciting
members' requests for services.  Any activity such as obtaining a list of
Medicaid or PeachCare for Kids members or canvassing neighborhoods
for direct contact with Medicaid or PeachCare for Kids members is
prohibited.  **Any offer or payment for remuneration, whether direct,
indirect, overt, covert, in cash, in kind, in return for the referral of a
Medicaid** or PeachCare for Kids **member is also prohibited.**  . . . .

F)      Allow Medicaid or PeachCare for Kids members the opportunity
to choose freely among available enrolled providers.  . . . .

G)      Not engage in any act or omission that constitutes or results in over
utilization of services.

\* \* \* \*

J)      . . . nor submit false or inaccurate information to the Division
relating to costs, claims or assigned certification numbers for services
rendered.

\* \* \* \*

L)      Accept responsibility for every claim submitted to the Division
that bears provider's name or Medicaid/PeachCare for Kids provider
number.  . . . .

\* \* \* \*

HH)    Be responsible for the integrity and accuracy of its representations
and the Division may reasonably rely upon the representations and
certifications made by the provider, without first making an independent
investigation or verification.

\* \* \* \*

MM)   Not intentionally or knowingly order, refer, or prescribe an[y] item
and/or service that allows a false or fraudulent claim to be presented for
payment by Medicaid.

*See* excerpts from Part I Manual, Chapter 100, p. I-19, sec. 106 "General Conditions of

Participation", attached hereto as Exhibit "J" (emphasis added).

150.

Notwithstanding the Hospital Defendants' execution of the "Statement of Participation" which is intended to certify Defendants' compliance with the provisions quoted in the above paragraph, Defendants did not comply with all state and federal laws, specifically including the FCA and Georgia FMCA (and the Part I Manual), when:

(a) the Defendants utilized their patient referral kickback scheme which resulted in the steering of pregnant Medicaid patients to Defendant Hospitals and the submission of false or fraudulent claims to the government, in violation of Part I, ¶ 106(B) and (E);

(b) the Hospital Defendants paid Defendant Clinica for patient referrals, and Defendant Clinica accepted payment for referrals to the Hospital Defendants, in violation of Part I, ¶ 106(E);

(c) the Hospital Defendants conspired with Defendant Clinica to facilitate canvassing of neighborhoods for direct contact with pregnant putative Medicaid members, in violation of Part I, ¶ 106(E);

(d) the Hospital Defendants conspired with Defendant Clinica to deny patients freedom to choose among available providers through Clinica's unilateral referral and direction of patients to specific Defendant Hospitals, in violation of Part I, ¶ 106(F);

(e) the Defendants engaged in conduct that resulted in over-utilization of Medicaid services (DSH funds), in violation of Part I, ¶ 106(G); and/or

(f) the Defendants submitted false claims in violation of Part I, ¶ 106(L) and (MM).

As such, the Hospital Defendants' certifications contained in and made a part of their respective "Statements of Participation" were false. *See, e.g.,* Exhibit "I", "Statement of Participation" executed by Walton Regional/ HMA.

46

151.

Part I at Section 106.1 "Compliance with 42 U.S.C. § 1396(a)(68)," further requires as a condition of a Provider's participation that Providers certify compliance with Section 6032 of the Federal Deficit Reduction Act (DRA). *See* Exhibit "J", and, for example, the "Attestation of Compliance - Appendix K" executed by Spalding Regional, attached hereto as Exhibit "K".

152.

The Attestation of Compliance represents and certifies the Provider has read Sec. 6032 of the DRA and maintains written policies and procedures detailing:  federal and state laws imposing civil or criminal penalties for false claims and statements; information about whistleblower protections under laws such as the State FMCA; and procedures to detect and prevent fraud and abuse in federal programs. *See* Exhibits "J" and "K".

153.

Notwithstanding Defendants' execution of the Attestation of Compliance, which is intended to certify Defendants' compliance with its instructions, Defendants violated the very federal and state statutes and regulations they, by their certifications, specifically and unequivocally agreed to conform to and abide by, when Defendants employed and acted upon their patient referral kickback scheme.  As such, Defendants' certifications contained in and made a part of their respective Attestations of Compliance, were false.

154.

The Defendant Hospitals presented claims for payment to the government, like the claims identified herein, via an electronic claims submission process.  The government then pays those claims via electronic funds transfer ("EFT").

47

155.

The Defendant Hospitals employ a third party "Billing Service," such as Emdeon

Business Services ("Emdeon"), to undertake and process the electronic Medicaid claims

submission. In order for the billing service to undertake and process electronic claims

submissions for the hospitals, and in order for the government to accept those electronic claims

submissions for payment, the hospitals are required to execute a "Power of Attorney for

Electronic Claims Submission." *See, e.g.,* Powers of Attorney for Electronic Claims Submission

executed by Spalding Regional on June 23, 2009, Sylvan Grove on June 3, 2009, and Atlanta

Medical Center on June 23, 2005 and June 3, 2009, attached as Exhibit "L".

156.

The government will accept electronic claims submissions from a billing service on

behalf of a hospital only if the provider hospital has authorized the billing service to submit the

claim and only if the hospital explicitly acknowledges and remains responsible and liable for the

lawfulness and veracity of the claim, by first submitting an executed Power of Attorney for

Electronic Claims Submission ("Power of Attorney").

157.

Each of the Defendant Hospitals, therefore, has executed a Power of Attorney and has

submitted same to the Georgia Department of Community Health, Division of Medical

Assistance. The Power of Attorney authorizes the Billing Service to "act as Provider's

authorized agent for purposes of signing on behalf of Provider the certification statement herein

in connection with each Computer Media Input submission of medical assistance claims:

> I hereby certify that all information contained on and submitted by Computer
> Media Input is true, accurate, and complete . . . . Furthermore, I understand and
> acknowledge that the Department will rely on this certification in the payment of
> medical assistance, which payment will be made from state and federal funds, and

48

that the submission of any false claims, information or documents or the
concealment of any material facts is a crime under federal and state laws."

Exhibit "L".

158.

Furthermore, by executing the Power of Attorney, Defendant Hospitals acknowledged

and accepted that the Power of Attorney "in no way limits or discharges the ultimate

responsibility and liability of Provider for the truthfulness . . . of any and all medical assistance

claims submitted . . . and in no way forecloses the application of penalties that may be assessed

under the False Claims Act and other applicable federal and state laws. Exhibit "L".

159.

Notwithstanding Defendants' execution of the Power of Attorney, which represents and

certifies the Providers' claims submitted to the government for payment are true and are

otherwise not false or fraudulent claims or the product of concealed material facts, Defendants'

electronic claims submissions, like those identified above, are not true and are indeed false or

fraudulent, in that Defendants' claims are the deceptive product of concealed material facts, i.e.,

Defendants' claims arise from Defendants' patient referral kickback scheme prohibited by the

AKS and state regulations referenced above. As such, Defendants' certifications contained in

and made a part of their respective Powers of Attorney, were false.

160.

Providers, such as Defendant Hospitals, who receive payment of claims under the

Medicaid program in Georgia must execute an "Electronic Funds Transfer Agreement" ("EFT

Agreement"). *See, e.g.*, EFT Agreement forms executed by Spalding regional on March 15,

2007, June 27, 2007 and June 29, 2011, Sylvan Grove on June 27, 2007 and Walton Regional,

attached hereto as Exhibit "M".

49

161.

Pursuant to the EFT Agreement, Providers must agree to certain terms and conditions,

including:

> Acceptance of Funds.  Provider agrees that evidence of credit to the proper
> account by Payee's bank pursuant to an EFT is sufficient to show acceptance of
> medical assistance payments under the Medicaid program within the meaning of
> the Official Code of Georgia annotated, Section 49-4-146.1(b)(2).  Provider
> certifies by such acceptance that Provider presented the claims for the services
> shown on the Remittance Advice issued by the Department, and that the services
> were rendered by or under the supervision of Provider.  Provider understands that
> payment will be from federal and state funds and that any falsification, or
> concealment of a material fact, may be prosecuted under federal and state laws.

Exhibit "M".

162.

By executing the EFT Agreement and accepting funds from the government, the

Defendant Hospitals represent and certify that the government's payments were not made based

on falsified reports or documents or concealed material facts.  O.C.G.A. § 49-4-146.1(b)(2).

163.

Notwithstanding Defendants' execution of the EFT Agreement and acceptance of

government funds, and Defendants' representations made a part thereof, Defendants' claims

presented to the government were violative of O.C.G.A. § 49-4-146.1(b)(2) and otherwise based

on concealed facts, in that Defendants' claims arise from Defendants' patient referral kickback

scheme prohibited by the AKS and state regulations referenced above.  As a result, the

government electronically transferred funds for claims that it did not legally owe.  As such,

Defendants' certifications contained in and made a part of their respective EFT Agreements,

were false.

164.

In addition, every hospital participating in the Medicaid program is required to submit an Annual Hospital Cost Report that further certifies the hospital's compliance with federal and state Medicaid laws and regulations.

165.

The aforesaid documents (Exhibits "I", "J", "L" and "M") (and the mandatory Annual Hospital Cost Reports completed by the Defendant Hospitals) all include Defendant Hospitals' false certifications, and are a part of and otherwise apply to each claim for payment submitted to the government and each payment by the government.

166.

Thus, Notwithstanding Defendants' repeated certifications of compliance, Defendants violated the very federal and state statutes and regulations they, by their certifications, agreed to conform to and abide by, when Defendants employed and acted upon their patient referral kickback scheme. As such, Defendants' certifications were false.

167.

Defendants' false certifications and corresponding tainted claims for payment misled the government in that the government believed Defendants' claims for payment for Obstetric (OB) services rendered to Defendants' patients, complied with federal and state statutes and regulations, as certified by Defendants' execution of the Statement of Participation, Attestation of Compliance, Power of Attorney and EFT Agreement forms. The government was unaware that said certifications were false and that Defendants' claims for payment violated the federal FCA and Georgia FMCA.

51

168.

Defendants were responsible for the "integrity and accuracy" of their respective claims

and certifications and the government had the right to rely upon Defendants' representations.

*See* Georgia Department of Community Health, Part I Policies and Procedures for

Medicaid/PeachCare for Kids, at ¶ 106(HH), Exhibit "J".

169.

Defendants' representations that their claims for payment were in compliance with

federal and state statutes and regulations and did not involve kickbacks prohibited by the AKS or

Georgia regulations were knowing misrepresentations of material fact.

170.

Defendant Clinica, by entering into the sham "services agreements," agreed to accept and

did accept remuneration that included, as a component, payment for patient referrals. Clinica

accepted the referral payments and directed patients to the Hospital Defendants. In so doing,

Defendant Clinica knowingly caused the Hospital Defendants to submit claims for Medicaid

payments in violation of the Georgia FMCA.

171.

As a result of the government being misled by Defendants' false certifications and

corresponding tainted claims for payment, Defendants benefited financially, as the government

paid those claims and paid additional funds under the DSH and DRG programs, because of the

inflated number of indigent pregnant patients serviced by Defendants.

172.

In seeking payment from Medicaid in violation of O.C.G.A. § 49-4-146.1(b) and

Georgia's Medicaid Provider Agreement, Defendants HMA and Tenet, in turn, violated the State

52

FMCA because the state government paid money to Defendants HMA and Tenet that it otherwise would not have paid had it known of Defendants' said violations.

173.

Whereas compliance with said state statutes, regulations and agreements is, and was, a condition for participation in Georgia's Medicaid program, once Defendants violated same, they were no longer eligible for reimbursements from state Government Payors, yet Defendants continued to submit false claims to those state Payors on a daily basis.

174.

As shown above, Defendants, moreover, knowingly presented or caused to be presented false or fraudulent claims for payment to state-funded health insurance programs, in violation of the Georgia FMCA.

175.

As shown above, Defendants, furthermore, in reckless disregard or in deliberate ignorance of the truth or falsity of the information involved, made, used, caused to be made, or caused to be used, false or fraudulent records and statements to get false or fraudulent claims paid or approved in violation of O.C.G.A. § 49-4-168.1(a)(3).

176.

As shown above, Defendants violated the Georgia Medical Assistance Act by:

(a)     knowingly and willfully making false statements or false representations to the state to obtain Medicaid payments;

(b)     deliberately concealing the material facts of their kickback/ referral arrangement to obtain Medicaid payments; and/or

53

(c)     using a fraudulent scheme or device – referral payments that violated the AKS

and the requirements of the state Medicaid Manual, Part I – to obtain Medicaid payments.

177.

As a direct and proximate result of Defendants' presentment of false or fraudulent claims

for payment and submission of false or fraudulent records to get false or fraudulent claims paid,

the State of Georgia has suffered actual monetary damages and is entitled to recover actual and

treble damages plus a civil monetary penalty for each false claim.

## COUNT III

### CIVIL CONSPIRACY
### (As To All Defendants)

178.

Plaintiff-Relator incorporates herein by reference the facts set forth above in

paragraphs 11 - 177.

179.

The FCA subjects to civil liability any person who knowingly presents, or causes to

be presented, to the government a false or fraudulent claim for payment or approval, as well

as any person who <u>conspires</u> to defraud the government by presenting a false or fraudulent

claim for payment or getting a false or fraudulent claim paid. *See* 31 U.S.C. § 3729(a)(3)

(pre-FERA) and 31 U.S.C. § 3729(a)(1)(C) (post-FERA).

180.

Defendants HMA, Tenet and Clinica each had a duty to comply with federal and

state statutes and regulations in connection with the presentment of claims for payment to

the government, and otherwise to not present or cause to be presented claims for payment

that are violative of the AKS or Georgia's Medicaid Provider Agreement.

181.

As shown above, Defendants have conspired together to actively disregard and/or violate federal and state statutes and regulations in the presentment of claims to the government for payment.

182.

Defendants HMA and Tenet were financially motivated to enter into the contracts with Clinica to induce Clinica to refer pregnant patients to the Defendant Hospitals. The consideration paid by Defendant Hospitals to Clinica under the "services agreements" was for unlawful patient referrals. The referral payments violated the AKS, FCA and Georgia FMCA.

183.

The referral relationships between HMA/Clinica and Tenet/Clinica were formed for the purpose of defrauding the government by getting false or fraudulent Medicaid claims allowed and paid.

184.

Defendants HMA and Clinica, and Tenet and Clinica acted in concert with the specific intent of conspiring for their mutual profit and gain to the detriment of the taxpayers of the United States and the State of Georgia in violation of 31 U.S.C. § 3729(a)(3) (and as amended 31 U.S.C. § 3729(a)(1)(c)) and O.C.G.A. § 49-4-168.1(a)(3), respectively.

185.

The foregoing conspiracy directly and proximately caused the government to pay claims submitted by the Hospital Defendants that it otherwise would not have paid, had it known of Defendants' unlawful kickback arrangement. These conspiracies caused the Government Payors to suffer damages in amounts to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Relator Williams prays for judgment and relief against Defendants Health Management Associates, Inc., Monroe HMA, LLC d/b/a Walton Regional Medical Center, John Doe Hospitals Affiliated with Health Management Associates, Inc.; and Tenet Healthcare Corporation and its subsidiaries: Tenet HealthSystem GB, Inc. d/b/a Atlanta Medical Center and South Fulton Medical Center, n/k/a Atlanta Medical Center –South Campus; North Fulton Medical Center, Inc. d/b/a North Fulton Regional Hospital; Tenet Health System Spalding, Inc. d/b/a Spalding Regional Medical Center; Tenet Health System SGH, Inc. d/b/a Sylvan Grove Hospital; Hilton Head Health System, L.P. d/b/a Hilton Head Hospital and John Doe Hospitals Affiliated with Tenet Healthcare Corporation; and Hispanic Medical Management, Inc. d/b/a Clinica de la Mama, Clinica de la Mama, Inc. d/b/a Clinica de la Mama, and Clinica de la Mama and Clinica de Bebe, including their Affiliated Parent or Successor Corporations, as follows:

(a)     Defendants be ordered to cease and desist from presenting and/or causing the submission of any more false or fraudulent claims to the government or in any way from otherwise violating 31 U.S.C. §§ 3729, *et seq.* and O.C.G.A. §§ 49-4-168, *et seq.*

(b)     that judgment be entered in favor of Plaintiff-Relator Williams, the United States of America and the State of Georgia and against Defendants on Counts I, II and III and in the actual amount of each and every false or fraudulent claim and so multiplied (trebled) as provided by 31 U.S.C. § 3729(a), plus a civil penalty of not less than Five Thousand, Five Hundred ($5,500.00) dollars nor more than Eleven Thousand ($11,000.00) Dollars per claim, as provided by 31 U.S.C. § 3729(a), to the extent such multiplied civil

penalties shall fairly compensate the United States of America and the State of Georgia for

losses resulting from Defendants' violations of federal and state statutes and regulations,

together with penalties for specific claims to be identified at trial after full discovery;

(c)     that Plaintiff-Relator Williams, the United States and the State of Georgia be

awarded the maximum amount allowed pursuant to the federal False Claims Act, the Anti-

Kickback Statute, the Georgia False Medicaid Claims Act, and Rules of Georgia

Department of Community Health as cited and referenced herein;

(d)     that judgment be granted for Plaintiff-Relator Williams, the United States and

the State of Georgia and against Defendants for any and all allowable costs, including, but

not limited to, court costs, expert fees and all attorneys' expenses and fees incurred in the

prosecution of this qui tam action;

(e)     that Plaintiff-Relator Williams, the United States and the State of Georgia be

entitled to any and all other relief that they are entitled to, whether by law or equity.

### DEMAND FOR JURY TRIAL

Plaintiff-Relator hereby requests a trial by jury of all issues triable by jury.

Respectfully submitted, this $\underline{29}^{TH}$ day of ___$MAY$___, 2013.

**WILBANKS & BRIDGES, LLP**
**Marlan B. Wilbanks**
Georgia Bar No. 758223
Email: mbw@wilbanks-bridgeslaw.com
**Tyrone M. Bridges**
Georgia Bar No. 081500
Email: tmb@wilbanks-bridgeslaw.com
**Susan S. Gouinlock**
Georgia Bar No. 303217
Email: ssg@wilbanks-bridgeslaw.com

57

Monarch Plaza, Suite 1075
3414 Peachtree Road, NE
Atlanta, GA 30326
(404) 842-1075

**POPE, McGLAMRY, KILPATRICK,
MORRISON & NORWOOD, P.C.**
**C. Neal Pope**
Georgia Bar No. 583769
**Wade H. (Trip) Tomlinson**
Georgia Bar No. 714605
**George W. (Wally) Walker**
Georgia Bar No. 548316
1111 Bay Avenue, Suite 450
P.O. Box 2128 (31902-2128)
Columbus, Georgia 31901-5268
(706) 324-0050
Fax (706) 327-1536
efile@pmkm.com

**R. Timothy Morrison**
Georgia Bar No. 525130
**Jay F. Hirsch**
Georgia Bar No. 357185
**Kimberly J. Johnson**
Georgia Bar No. 687678
3455 Peachtree Road, N.E., Suite 925
P.O. Box 191625 (31119-1625)
Atlanta, Georgia 30326-3243
(404) 523-7706
Fax (404) 524-1648
efile@pmkm.com

***COUNSEL FOR RELATOR***