# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### ATHENS DIVISION

UNITED STATES OF AMERICA,
*ex. rel.* Ralph D. Williams,
BRINGING THIS ACTION ON BEHALF OF
THE UNITED STATES OF AMERICA AND
THE STATE OF GEORGIA,

                    Plaintiffs and Relator,

v.

HEALTH MANAGEMENT ASSOCIATES, INC.;
MONROE HMA, LLC d/b/a WALTON REGIONAL
MEDICAL CENTER; JOHN DOE HOSPITALS
AFFILIATED WITH HEALTH MANAGEMENT
ASSOCIATES, INC.;
and
TENET HEALTHCARE CORPORATION and
its subsidiaries: TENET HEALTHSYSTEM GB, INC.
d/b/a ATLANTA MEDICAL CENTER and
SOUTH FULTON MEDICAL CENTER, n/k/a
ATLANTA MEDICAL CENTER-SOUTH CAMPUS;
NORTH MEDICAL CENTER, INC., d/b/a
NORTH REGIONAL HOSPITAL;
TENET HEALTHSYSTEM SPALDING, INC. d/b/a
SPALDING REGIONAL MEDICAL CENTER;
TENET HEALTHSYSTEM SGH, INC. d/b/a SYLVAN
GROVE HOSPITAL; HILTON HEAD HEALTH
SYSTEM, L.P. d/b/a HILTON HEAD HOSPITAL;
JOHN DOE HOSPITALS AFFILIATED WITH TENET
HEALTHCARE COPORATION;
and
HISPANIC MEDICAL MANAGEMENT, INC.
d/b/a CLINICA DE LA MAMA; CLINICA DE LA
MAMA, INC. d/b/a CLINICA DE LA MAMA; and
CLINICA DE LA MAMA and CLINICA DE BEBE,
including their affiliated parent or successor corporations:
INTERNATIONAL CLINICAL MANAGEMENT
SERVICES, INC. and COTA MEDICAL
MANAGEMENT GROUP, INC.,

                    Defendants.

CIVIL ACTION NO.
3:09-cv-130 (CDL)

**FILED UNDER SEAL**
**Pursuant to 31 U.S.C.**
**3730(b)(2)**

**DO NOT PUT IN PACER**
**OR SERVE**

STATE OF GEORGIA'S
COMPLAINT IN
INTERVENTION

## COMPLAINT IN INTERVENTION OF THE STATE OF GEORGIA

1

The State of Georgia intervenes in this action to recover losses from false claims and fraudulent certifications submitted to the State Medicaid program as a result of the fraudulent course of conduct of Defendants Health Management Associates, Inc.; Monroe HMA, LLC d/b/a Clearview Regional Medical Center (f/k/a Walton Regional Medical Center); Tenet Healthcare Corporation and its subsidiaries, including: Tenet Healthsystem Gb, Inc. d/b/a Atlanta Medical Center and South Fulton Medical Center, n/k/a Atlanta Medical Center-South Campus; North Fulton Medical Center, Inc., d/b/a North Regional Hospital; Tenet HealthSystem Spalding, Inc. d/b/a Spalding Regional Medical Center; Tenet HealthSystem SGH, Inc. d/b/a Sylvan Grove Hospital (collectively referred to as "Defendant Hospitals" or the "Hospital Defendants"); and Hispanic Medical Management, Inc. d/b/a Clinica De La Mama; Clinica De La Mama, Inc. d/b/a Clinica De La Mama; and Clinica De La Mama and Clinica Del Bebe, including their affiliated parent or successor corporations: International Clinical Management Services, Inc. and Cota Medical Management Group, Inc. (collectively Clinica). Defendants violated the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), the Georgia False Medicaid Claims Act, the Georgia Medical Assistance Act, and the common law of Georgia.

Beginning as early as 2000, Defendant Hospitals entered into written contracts with the Clinica defendants for services including translation, management, consulting, marketing, and other services, but their true aim was the recruitment and referral of undocumented immigrant women who would be eligible for emergency Medicaid services when they gave birth. By knowingly entering these contracts with the purpose of receiving patient referral services, Defendant Hospitals violated federal and state law and submitted false certifications to the State Medicaid program that they were in compliance with such federal and state laws, including the Anti-Kickback Statute. Defendant Hospitals' claims to the State Medicaid program for patients

illegally recruited and referred from Clinica resulted in the State's payment of tens of thousands of ineligible Medicaid claims over the course of more than a decade.

## NATURE OF THE ACTION

1.   The State of Georgia ("Georgia" or the "State") brings this action to recover treble damages and civil monetary penalties under the Georgia False Medicaid Claims Act, O.C.G.A. §§ 49-4-168, *et seq.* ("Georgia FMCA") and the Georgia Medical Assistance Act, OCGA § 49-4-146.1(b), and damages and other monetary relief under other Georgia statutory and common laws as more particularly described below.

2.   In this action, the State will specifically describe the fraudulent scheme pursuant to which the hospital defendants enter into sham contracts and other financial arrangements with the Clinica defendants.  The Defendants purportedly entered into contracts for interpreter, management, consulting, and marketing services, and for hosting a Graduate Medical Education program for certain residents of Defendant Tenet, but these contracts were and are vehicles for illegal kickbacks paid to the Clinica defendants as remuneration for the recruitment and referral of Georgia Medicaid patients to hospitals owned and controlled by Defendants.  This conduct violated the Georgia FMCA, the federal Anti-Kickback Statute, 42 § 1320a-7b(b), and the Georgia Medical Assistance Act, O.C.G.A. § 49-4-146.1(b), as well as Georgia's rights under fraud and breach of contact theories.

3.   As a direct, proximate, and foreseeable result of the defendants' fraudulent course of conduct as set forth above and herein, the Hospital Defendants have submitted tens of thousands of false and fraudulent claims to Georgia Medicaid seeking payment for Clinica patients'

deliveries and healthcare rendered to their newborns during the time period 2000 through the present day, as detailed below.

4.  As a direct, proximate and foreseeable result of Defendants' fraudulent course of conduct as set forth above and herein, Defendants submitted false certifications to the Georgia Medicaid program that they were in compliance with all relevant laws, including compliance with the Anti-Kickback Statute and applicable Georgia laws.  Defendants then submitted or caused to be submitted tens of thousands of false claims to Georgia Medicaid  which claims were  ineligible for payment as a result of the Defendants' fraudulent kickback schemes and false certifications of compliance.

## JURISDICTION AND VENUE

1.

This court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 and § 1345 and pursuant to the federal False Claims Act, or "FCA", 31 U.S.C. §§ 3729, *et seq.*, and 31 U.S.C. § 3730(b); and supplemental jurisdiction over state law claims, including claims under the Georgia False Medicaid Claims Act (Georgia FMCA), as provided under 28 U.S.C. § 1367(a).  This court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. §3732(a) and because Defendants HMA Monroe, LLC, Tenet Healthcare Corporation, and Hispanic Medical Management, Inc. transact business within the Middle District of Georgia. Venue is appropriate in this district pursuant to 31 U.S.C. § 3732(a) and because Defendants HMA Monroe, LLC, Tenet Healthcare Corporation, and Hispanic Medical Management, Inc. and/or its affiliated entities as described below transact business in this District.

## THE PARTIES

2.

This case was originally filed by Relator Ralph D. Williams on December 1, 2009, under the federal False Claims Act, 42 U.S.C. 3729, *et. seq.*  On September 18, 2012, Relator Williams amended his *qui tam* complaint to add the State of Georgia as a plaintiff under the Georgia FMCA, O.C.G.A. § 49-4-168 *et seq*.

3.

On May 31, 2013, Georgia filed its notice of election to intervene in Relator Williams' FMCA action, pursuant to O.C.G.A. § 49-4-168.1(a)(3) and 168.2(c)(4)(A).  With this pleading, Georgia intervenes against the defendants below.

4.

Defendant Health Management Associates, Inc. ("HMA, Inc.") is a Delaware corporation, doing business in the Middle District of Georgia in Monroe, Walton County, Georgia.  Its corporate headquarters are located at 5811 Pelican Bay Blvd., Suite 500, Naples, Florida 34108-2710.  Service can be had on HMA, Inc., by serving its registered agent:  CT Corporation Systems, at 1200 S. Pine Island Rd., Plantation, Florida 33324.

5.

Defendant HMA Monroe, LLC d/b/a Clearwater Regional Medical Center (f/k/a Walton Regional Medical Center) ("HMA Monroe"), is located in Monroe, Walton County, Georgia, and is a Georgia limited liability company and an affiliate of Defendant HMA, Inc.  HMA Monroe's principal office is located at 5811 Pelican Bay Blvd., Suite 500, Naples, Florida 34108-2710.  Service can be had on HMA Monroe by serving its registered agent:  CT Corporation Systems, 1201 Peachtree St., Atlanta, Georgia 30361.

6.

Defendant Tenet Healthcare Corporation ("Tenet") is a Nevada for-profit corporation doing business in the Middle District of Georgia. Its principal office address is 13737 Noel Road, Suite 100, Dallas, Texas 75240. Service can be had on Tenet Healthcare Corporation by serving its registered agent: CT Corporation Systems at 1201 Peachtree Street NE, Atlanta, Georgia 30361.

7.

Defendant Tenet, through its subsidiaries and affiliates does business in Georgia as Atlanta Medical Center (in Atlanta), North Fulton Hospital (in Roswell), Sylvan Gove Hospital (in Jackson), Spalding Regional Medical Center (in Griffin), and South Fulton Medical Center n/k/a Atlanta Medical Center-South Campus (in East Point). The principal address and headquarters for each of these Tenet hospitals is 1445 Ross Avenue, Suite 1400, Dallas, Texas 75202. Atlanta Medical Center, North Fulton Hospital, and Sylvan Grove Hospital and the Tenet subsidiaries directly operating them – Tenet Health System GB, Inc., North Fulton Medical Center, Inc., and Tenet Health System SGH, Inc. can be served via their registered agent: CT Corporation Systems, 1201 Peachtree Street, N.E., Atlanta, Georgia 30361. Tenet Health System Spalding, Inc. d/b/a as Spalding Regional Medical Center can be served via its registered agent: Corporation Process Company, 180 Cherokee Street, N.E., Marietta, Georgia 30060.

8.

Tenet Healthcare Corporation and its subsidiaries and affiliated hospitals are collectively referred to hereinafter as "Tenet" or "Defendant Tenet."

9.

Defendants Hispanic Medical Management, Inc. d/b/a Clinica de la Mama and Clinica de la Mama, Inc. d/b/a Clinica de la Mama, at all relevant times, were Georgia corporations doing business in the Middle District of Georgia, with offices (clinics) in Norcross, Lawrenceville, Roswell, Smyrna, Plaza Fiesta (Chamblee) and Forest Park.  Hispanic Medical Management ("HMM") and Clinica de la Mama have affiliates and successor related entities. Relevant affiliates and successors include International Clinical Management Services, Inc. d/b/a Clinica de Bebe and Cota Medical Management Group, Inc. d/b/a Clinica de la Mama. International Clinical Management Services, Inc. can be served via its Registered Agent:  Tracey Treadway, 15127 Jimmy Carter Blvd Norcross, Georgia  30093.  Cota Medical Management Group, Inc. can be served via its Registered Agent:  Bradford Scott Bootstaylor, 550 Peachtree Street, Atlanta, Georgia  30308.  HMM, Clinica de la Mama and their affiliates and successors are collectively referred to hereinafter as "Clinica" or "Defendant Clinica."

**DEFENDANTS' KICKBACK SCHEME**

10.

Defendant Clinica recruited undocumented, pregnant Hispanic women to its prenatal clinics.  Clinica directed this population whose deliveries (and their newborns' care) were paid for by Medicaid as described below to HMA's Clearwater Regional Hospital and the Tenet Hospitals (the "Defendant Hospitals").  These patient referrals, described by Tenet's Southern Regional corporate office as part of the "Georgia inventory," were and are the direct, proximate, and foreseeable result of the kickbacks knowingly and intentionally paid by the Defendant Hospitals to Clinica for these Medicaid patient referrals.  Exhibit A, E-mail from Holly Lanzner to Kristy Waters, Feb. 23, 2007.  Despite knowingly engaging in this kickback scheme in direct

violation of the Anti-Kickback Statute, the Medicare provider agreement, and the Medicare and Medicaid rules of participation, Defendant Hospitals submitted claims for reimbursement for which they were not eligible and certified to Georgia that they were and would continue to comply with all of those laws and obligations.  Defendant Hospitals, therefore, knowingly submitted false, fraudulent, and ineligible claims for payment to Georgia Medicaid for obstetrical services provided to these referred Clinica patients and for services rendered to those patients' infants.

## THE ANTI-KICKBACK STATUTE

### 11.

The federal Anti-Kickback Statute (AKS) prohibits any person or entity from knowingly and willfully offering, paying, soliciting, making or accepting payment to induce or reward any person or entity for referring, recommending or arranging any good or item for which payment may be made in whole or in part by a federal health care program, which includes any State health program such as the Georgia Medicaid (a federally-funded medical service) or health program funded in part by the federal government.  42 U.S.C. §§ 1320a-7b(b) and 1320a-7b(f).

### 12.

In pertinent part, the AKS states:

(b) Illegal remuneration

(1)     whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind --

(A)     in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B)     in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item

for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2)    whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person --

(A)    to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B)    to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).

13.

Georgia Medicaid is a Federal Health Care Program under the AKS, subjecting

Defendants to liability under the AKS and Georgia laws that incorporate compliance with that

statute. 42 U.S.C. § 1320a-7b(f)(2).

14.

In addition to criminal penalties, a violation of the AKS can also subject the perpetrator

to exclusion from participation in federal health care programs (42 U.S.C. §1320a-7(a)), civil

monetary penalties of up to $50,000 per violation (42 U.S.C. §1320a-7a(a)(7)), and three times

the amount of remuneration paid, offered, solicited, or received, regardless of whether any part

of the remuneration is for a lawful purpose. 42 U.S.C. §1320a-7a(a).

15.

The AKS arose out of congressional concern that remuneration given to entities such as

Clinica  that can steer or direct patients could influence healthcare decisions, corrupt the medical

decision-making process, and result in goods and services being provided that are medically

unnecessary, of poor quality, or even harmful to a vulnerable patient population.  To protect the

integrity of health care programs, Congress enacted a prohibition against the payment of

kickbacks in any form, regardless of whether the particular kickback gave rise to over utilization

of federal healthcare services or poor quality of care.

16.

First enacted in 1972, Congress strengthened the AKS in 1977, 1987, and 2010 to ensure

that kickbacks masquerading as legitimate transactions did not evade its reach.  *See* Social

Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b,

Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and

Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93; Patient Protection

and Affordable Care Act, Pub. L. No. 111-148, § 6402(f)(2), 42 U.S.C. §§ 1320a-7b(h).

## THE MEDICAID PROGRAM

17.

The Medicaid Program is a joint federal-state program that provides health care benefits

for certain groups, including the poor and disabled.  The Medicaid program was created in 1965

in Title XIX of the Social Security Act and covered approximately 47 million individuals in

2010, including children, the aged, blind, and/or disabled, and people who are eligible to receive

federally assisted income maintenance payments.

18.

Emergency Medical Assistance is the part of the Medicaid program that provides coverage for emergency conditions, including child birth for undocumented aliens.

19.

Medicaid providers submit claims for payment to states, which pay the claims and then seek partial reimbursement from the federal government.

20.

In Georgia, provider hospitals participating in the Medicaid program submit claims for hospital services rendered to Medicaid beneficiaries to the Georgia Department of Community Health for payment either directly or through a State designee such as a fiscal intermediary or managed care organization.

21.

Although undocumented aliens are not eligible for regular Georgia Medicaid coverage, undocumented aliens are eligible for certain types of Emergency Medical Assistance ("EMA") pursuant to 42 U.S.C. §1396b(v) and O.C.G.A. § 50-36-1(d)(2).

22.

Georgia EMA provides payment for healthcare services provided to otherwise eligible undocumented aliens when such care and services are necessary for the treatment of an emergency medical condition as defined in 42 U.S.C. §1396b(v)(3) pursuant to O.C.G.A. § 50-36-1(d)(2).

23.

Emergency labor and delivery by undocumented, otherwise eligible aliens, is considered an emergency medical condition under the Medicaid program pursuant to 42 U.S.C. §1396b(v)(2) and §1396b(v)(3).

24.

A child born to a woman approved for EMA for her delivery is eligible for Newborn Medicaid.  Thus, the referrals of Clinica patients based on the kickback scheme resulted in unlawful and fraudulent claims to Georgia EMA for the deliveries and to Georgia Newborn Medicaid for the newborns' care.

25.

Federal law, as well as the provider agreements entered into between the Hospital Defendants and the State, prohibits hospitals from paying for referrals of Medicaid patients. When hospitals pay for such referrals, they are no longer eligible to submit claims or receive funds from Georgia Medicaid. Claims tainted by such kickback schemes are false claims as a matter of law.

26.

On an annual basis, as early as 2000, the Defendant Hospitals have falsely and expressly certified to Georgia Medicaid that they were in compliance with the Medicare and Medicaid Patient Protection Act, 42 U.S.C. § 1320a-7b(b) (also known as the "Anti-Kickback Statute" or "AKS").

27.

Claims submitted to Georgia Medicaid by a hospital that is in violation of the AKS are false claims which are actionable under the GA FMCA and actionable as fraud, false representations, and breaches of contract under other Georgia laws.

28.

The Defendant Hospitals have been enrolled as providers in the Georgia Medicaid Program during all times relevant to this action.

**THE MEDICARE PROGRAM**

29.

In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services.  42 U.S.C. §§ 426, 426A.

30.

The Centers for Medicare and Medicaid Services ("CMS") is an agency of the Department of Health and Human Services and is directly responsible for the administration of the Medicare program.

31.

The Medicare program requires numerous certifications and attestations from participating providers, all of which were completed by Defendant Hospitals.

32.

Medicare has several parts, including Part A, which is primarily for hospital-based charges (hereinafter referred to as "Medicare Part A").  The Medicare Part A program authorizes payment for hospital in-patient care, including obstetrical deliveries.  42 U.S.C. §§ 1395c-1395i-4.

**Hospital Insurance Benefit Agreement**

33.

Providers who participate in Medicare Part A must periodically sign and submit to CMS an application for participation in the Medicare program, known as the Hospital Insurance Benefit Agreement (Form HCFA-1561), under which each hospital agrees "to conform to the provisions of Section 1866 of the Social Security Act and applicable provisions in 42 CFR, Parts 405, 466, 420, and 489."

34.

Each of the Hospital Defendants has executed and submitted to CMS a Hospital Insurance Benefit Agreement (Form HCFA-1561).

**Medicare Enrollment Application for Institutional Providers**

35.

Providers who participate in Medicare Part A must periodically sign and submit to CMS Form 855A – Medicare Enrollment Application – Institutional Providers.

36.

Each of the Hospital Defendants executed and submitted to CMS a CMS Form 855A – Medicare Enrollment Application – Institutional Providers.  By executing and submitting CMS Form 855A, each of the Hospital Defendants expressly certified to CMS as follows:  "I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (*including but not limited to, the Federal anti-kickback statute and the Stark Law*), and on the

14

provider's compliance with all applicable conditions of participation in Medicare." (Emphasis added.)

37.

Since compliance with the AKS, the Medicaid rules, and Georgia state law are conditions of payment of Medicaid funds, once the Defendant Hospitals were no longer in compliance, they were not eligible to receive Medicaid funds and their claims for such funds were false claims.

38.

False certifications of compliance submitted by the Hospital Defendants to Medicaid are false statements made to receive Medicaid funds and render those providers' claims for reimbursement false claims.

**Cost Report Certifications**

39.

As a necessary condition to payment by Medicare, CMS requires hospitals to submit on an annual basis a form CMS-2552, more commonly known as the "Hospital Cost Report". *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20; *see also* 42 C.F.R. § 405.1801(b)(1).

40.

At all times relevant to this Complaint, each of the Hospital Defendants was required to submit Hospital Cost Reports to Georgia Medicaid in addition to CMS. Each Hospital Cost Report contains an express certification that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

41.

The Hospital Cost Report Certification is a preface to the cost report's certification, where the following warning appears:

15

MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, *IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.*

CMS-2552 (emphasis added).

42.

This advisory is followed by the actual certification language itself:

CERTIFICATION BY OFFICER OR ADMINISTRATOR OF PROVIDER(S)
I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by [name of facility, ID number of facility] for the cost reporting period beginning [date] and ending [date] and that to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of the health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations. (This is followed by: signature of facility's officer, title and date).

Form CMS-2552.

43.

Annually, as required by Georgia Medicaid, each of the Defendant Hospitals has submitted its Cost Report to Georgia Medicaid, knowingly falsely certifying compliance with the AKS and other federal and state statutes and regulations.

44.

Hospital Cost Reports submitted by the Hospital Defendants were, at all times material to this Complaint in Intervention, signed by their respective authorized employees (including employees of their various predecessors).

45.

16

Those Cost Reports contained false certifications of compliance with the AKS to Georgia because the Hospital Defendants were participating in the referral kickback schemes with Clinica.

46.

The Cost Reports submitted to Georgia also constitute false reports to Georgia because they failed to show disallowed costs paid to Clinica for referrals of Medicaid patients.

### The Georgia Provider Agreement

47.

As Medicaid providers, the Georgia Hospital Defendants were and are required to enter into contracts with the State called, "Statements of Participation", commonly referred to as provider agreements.  *See, e.g.,* Exhibit B, Statement of Participation executed by Defendant HMA Monroe at ¶¶ 2A & 4K.

48.

The provider agreements entered into by the Defendant Hospitals mandate compliance with the Georgia Medicaid rules that prohibit paying or accepting, directly or indirectly, kickbacks for referrals.  The agreements state in relevant part:

2.      PROVIDER'S OBLIGATIONS

A.      Legal Compliance.   Provider shall comply with all of the Department's requirements applicable to the categor(ies) of service which Provider participates under this Statement of Participation, including Part I, Part II and the applicable Part III manuals."  *See, e.g.*, Exhibit B.

**Georgia Medicaid Policies and Procedures**

49.

The Georgia Department of Community Health prohibits hospital providers from,

*inter alia*, paying kickbacks for referrals of Medicaid patients. Exhibit C, Georgia

Department of Community Health (DCH), Part I Policies and Procedures for

Medicaid/PeachCare for Kids, Chapter 100, p. I-19, "General Conditions of Participation",

at ¶ 106(E). Section 106 (General Conditions of Participation) of the Part I Manual provides:

As general conditions of participation, all enrolled providers must:


B)      Comply with all State and Federal laws and regulations related to

furnishing Medicaid/PeachCare for Kids service.

50.

The AKS is a 'Federal law related to furnishing Medicaid services.'

51.

The Part One Manual also specifies that: "E) . . . Any offer or payment for

remuneration, whether direct, indirect, overt, covert, in cash, in kind, in return for the

referral of a Medicaid or PeachCare for Kids member is also prohibited."  Exhibit C,

Georgia Department of Community Health (DCH), Part I Policies and Procedures for

Medicaid/PeachCare for Kids, Chapter 100, p. I-19, "General Conditions of Participation",

at ¶ 106(E).

52.

The DCH rules also require that providers:

F)      Allow Medicaid or PeachCare for Kids members the opportunity to
choose freely among available enrolled providers.  . . . .

G)      Not engage in any act or omission that constitutes or results in over utilization of services.

* * *

J)      . . . nor submit false or inaccurate information to the Division relating to costs, claims or assigned certification numbers for services rendered.

* * *

L)      Accept responsibility for every claim submitted to the Division that bears provider's name or Medicaid/PeachCare for Kids provider number.  . . .

* * *

HH)   Be responsible for the integrity and accuracy of its representations and the Division may reasonably rely upon the representations and certifications made by the provider, without first making an independent investigation or verification.

* * *

MM)   Not intentionally or knowingly order, refer, or prescribe an[y] item and/or service that allows a false or fraudulent claim to be presented for payment by Medicaid.

*Id.*

### Attestations of Compliance

53.

Part I at Section 106.1 "Compliance with 42 U.S.C. § 1396(a)(68)," further requires as a condition of a Provider's participation that Providers certify compliance with Section 6032 of the Federal Deficit Reduction Act (DRA).  *See* Exhibit C.  *See also*, *e.g.*, Exhibit D, Spalding Regional Medical Center's Attestation of Compliance, Dec. 20, 2012. All of the Defendant Hospitals were required to complete similar Attestations of Compliance during this time period.

54.

The Attestation of Compliance represents and certifies the Provider has read Section

6032 of the DRA and maintains written policies and procedures detailing federal and state

laws imposing civil or criminal penalties for false claims and statements, information about

whistleblower protections under laws such as the Georgia FMCA, and procedures to detect

and prevent fraud, waste, and abuse in federal programs.  *See* Exhibit D.

55.

Because of their kickback schemes with Clinica for patient referrals, the Hospital

Defendants' certifications contained in and made a part of their respective Attestations of

Compliance were false.

**Electronic Funds Transfer Certifications of Compliance**

56.

The Defendant Hospitals presented claims for payment to Medicaid via an electronic

claims submission process.  The government then pays those claims via electronic funds

transfer ("EFT").

57.

Providers, such as Defendant Hospitals, who receive payment of claims under the

Medicaid program in Georgia, must execute an "Electronic Funds Transfer Agreement"

("EFT Agreement").  *See, e.g.*, Exhibit E, EFT Agreement forms executed by Spalding

regional on March 15, 2007, June 27, 2007 and June 29, 2011, Sylvan Grove on June 27,

2007 and Walton Regional.

58.

Pursuant to the EFT Agreement, Providers must agree to certain terms and conditions, including:

Acceptance of Funds.  Provider agrees that evidence of credit to the proper account by Payee's bank pursuant to an EFT is sufficient to show acceptance of medical assistance payments under the Medicaid program within the meaning of the Official Code of Georgia annotated, Section 49-4-146.1(b)(2).  Provider certifies by such acceptance that Provider presented the claims for the services shown on the Remittance Advice issued by the Department, and that the services were rendered by or under the supervision of Provider.  Provider understands that payment will be from federal and state funds and that any falsification, or concealment of a material fact, may be prosecuted under federal and state laws.  Exhibit E.

59.

By executing the EFT Agreement and accepting funds from the government, the Defendant Hospitals represent and certify that the government's payments were not made based on falsified reports or documents or concealed material facts.  O.C.G.A. § 49-4-146.1(b)(2).

60.

Because of their kickback schemes with Clinica for patient referrals, the Hospital Defendants' certifications contained in and made a part of their respective EFT Agreements and acceptance of government funds are false.  As a result, the Hospital Defendants used false statements to obtain payment of government funds.

**Power of Attorney Certifications**

61.

The Defendant Hospitals employ a third party "Billing Service," such as Emdeon
Business Services ("Emdeon"), to undertake and process the electronic Medicaid claims
submission.  In order for the billing service to undertake and process electronic claims
submissions for the hospitals, and in order for the government to accept those electronic
claims submissions for payment, the hospitals are required to execute a "Power of Attorney
for Electronic Claims Submission."  *See, e.g.,* Exhibit F, Powers of Attorney for Electronic
Claims Submission executed by Spalding Regional on June 23, 2009, Sylvan Grove on
June 3, 2009, and Atlanta Medical Center on June 23, 2005 and June 3, 2009.

62.

The government will accept electronic claims submissions from a billing service on
behalf of a hospital only if the provider hospital has authorized the billing service to submit
the claim and only if the hospital explicitly acknowledges and remains responsible and
liable for the lawfulness and veracity of the claim, by first submitting an executed Power of
Attorney for Electronic Claims Submission ("Power of Attorney").

63.

Each of the Defendant Hospitals has executed such Power of Attorney and has
submitted same to the Georgia Department of Community Health, Division of Medical
Assistance.  The Power of Attorney authorizes the Billing Service to "act as Provider's
authorized agent for purposes of signing on behalf of Provider the certification statement
herein in connection with each Computer Media Input submission of medical assistance
claims:

22

I hereby certify that all information contained on and submitted by Computer Media Input is true, accurate, and complete . . . .   Furthermore, I understand and acknowledge that the Department will rely on this certification in the payment of medical assistance, which payment will be made from State and Federal funds, and that the submission of any false claims, information or documents or the concealment of any material facts is a crime under federal and state laws." *Id.*

64.

Furthermore, by executing the Power of Attorney, Defendant Hospitals acknowledged and accepted that the Power of Attorney "in no way limits or discharges the ultimate responsibility and liability of Provider for the truthfulness, completeness and accuracy of any and all medical assistance claims submitted . . . and in no way forecloses the application of penalties that may be assessed under the False Claims Act and other applicable federal and state laws. *Id.*

65.

Notwithstanding the Hospital Defendants' execution of the Power of Attorney, which represents and certifies the Providers' claims submitted to the government for payment are true and are otherwise not false or fraudulent claims or the product of concealed material facts, the Hospital Defendants' electronic claims submissions, like those identified above, are not true and are indeed false or fraudulent.  Thus due to their kickback schemes with Clinica for patient referrals, the Hospital Defendants' certifications contained in and made a part of their respective Powers of Attorney and acceptance of government funds are false. As a result, the Hospital Defendants submitted false claims to Medicaid and used false statements to obtain payment of government funds.

66.

The aforesaid documents (Exhibits D, E, and F) and the mandatory Hospital Cost Reports submitted by the Defendant Hospitals all include Defendant Hospitals' false certifications.  Those false statements were used to obtain Medicaid funds from Georgia.

67.

Once the Hospital Defendants were no longer eligible to participate in Medicare or Medicaid due to their paying kickbacks to Clinica in violation of the AKS, the provider agreements and Georgia law, all claims to Medicaid tainted by the kickback scheme were false claims submitted to Georgia.

**THE GEORGIA FALSE MEDICAID CLAIMS ACT**

68.

The Georgia False Medicaid Claims Act, O.C.G.A. §§ 49-4-168, *et seq.*, is substantively similar to the federal False Claims Act, 31 U.S.C. §§3729-33 and imposes liability on any person who:

(1) Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

(3) Conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid;

O.C.G.A. § 49-4-168.1(a)(1)-(3).  "Knowingly" is in turn defined as requiring "no proof of specific intent to defraud and mean that a person, with respect to information:

(A) Has actual knowledge of the information;

(B) Acts in deliberate ignorance of the truth or falsity of the information; or

(C) Acts in reckless disregard of the truth or falsity of the information.

O.C.G.A. § 49-4-168.

Similar to the federal False Claims Act, any person or entity that violates the Georgia False Medicaid Claims Act is liable for a civil penalty of not less than $5,500 and not more than $11,000 for each false or fraudulent claim, plus three times the amount of damages which the Georgia Medicaid program sustains because of the act of such person.  O.C.G.A. § 49-4-168.1(a).

## GEORGIA MEDICAL ASSISTANCE ACT

69.

Obtaining Medicaid funds through a willful false statement or representation, the deliberate concealment of any material fact, or the use of any fraudulent scheme or device is both a crime and a civil violation in Georgia.  The Georgia Medical Assistance Act (the "MAA"), O.C.G.A. § 49-4-146.1(b), makes it unlawful to:

(1)  obtain, attempt to obtain, or retain for himself, herself, or any other person any medical assistance or other benefits or payments under this article, or under a managed care program operated, funded, or reimbursed by the Georgia Medicaid program, to which the person or provider is not entitled, or in an amount greater than that to which the person or provider is entitled, when the assistance, benefit, or payment is obtained attempted to be obtained, or retained, by:

(A)  Knowingly and willfully making a false statement or false representation;

(B)  Deliberate concealment of any material fact; or

(C)  Any fraudulent scheme or device; or

(2) For any person or provider knowingly and willfully to accept medical assistance payments to which he or she is not entitled or in an amount greater than that to which he or she is entitled or knowingly and willfully to falsify any report or document required under this article.

25

O.C.G.A. § 49-4-146.1(b).

70.

The MAA provides for civil penalties for violations of subsection (b), quoted above:

> ***In addition to any other penalties provided by law***, each person violating subsection (b) of this Code section shall be liable to a ***civil penalty*** equal to the greater of (1) three times the amount of any such excess benefit or payment or (2) $ 1,000.00 for each excessive claim for assistance, benefit, or payment. Additionally, interest on the penalty shall be paid at the rate of 12 percent per annum from the date of payment of any such excessive amount, or from the date of receipt of any claim for an excessive amount when no payment has been made, until the date of payment of such penalty to the department.

O.C.G.A. § 49-4-146.1(d) (emphasis added).

71.

To obtain Medicaid reimbursements, each Hospital Defendant knowingly and willfully made false statements and representations to Georgia Medicaid in violation of O.C.G.A. § 49-4-146.1(b)(1)(A).

72.

To obtain Medicaid reimbursements, each Hospital Defendant deliberately concealed the material fact that it was paying kickbacks to obtain the Clinica patients and their newborns, in violation of O.C.G.A. § 49-4-146.1(b)(1)(B).

73.

To obtain Medicaid reimbursements, each Hospital Defendant conducted a fraudulent scheme in paying kickbacks to Clinica under the guise of contractual payments for interpreter services and billing Georgia Medicaid for services to the illegally referred patients and their newborns, in violation O.C.G.A. § 49-4-146.1(b)(1)(C).

## GEORGIA PHYSICIAN LICENSURE STATUTE

### 74.

Georgia law provides that the Georgia Composite Medical Board may refuse

licensure to or discipline a physician who

> [k]nowingly maintained a professional connection or association with any
> person who is in violation of this chapter or the rules or regulations of the
> board; or knowingly aided, assisted, procured, or advised any person to
> practice pursuant to this chapter contrary to this chapter or to the rules and
> regulations of the board; or knowingly performed any act which in any way
> aids, assists, procures, advises, or encourages any unlicensed person or entity
> to practice pursuant to this chapter; or *divided fees or agreed to divide fees
> received for professional services with any person, firm, association,
> corporation, or other entity for bringing or referring a patient*;

O.C.G.A. § 43-34-37(a)(9).

## HMA'S FRAUDULENT SCHEME WITH CLINICA

### 75.

Defendant HMA operates over seventy (70) hospitals across the United States, three (3)

of which are in Georgia:  Defendant HMA Clearview in Monroe, East Georgia Regional Medical

Center in Statesboro and Barrow Regional Medical Center in Winder.

### 76.

Defendant HMA Monroe operates a seventy-seven (77) bed hospital and a fifty-eight (58)

bed nursing home in Monroe, Georgia.

### 77.

Between April 2009, and October 2009, Defendant HMA employed Relator Williams as

its Chief Financial Officer.  His job responsibilities brought him into regular contact with

corporate level executives and personnel from other HMA affiliated hospitals across the country.

Relator's job duties required that he have familiarity with HMA, Inc.'s nation-wide corporate goals, practices, policies, and procedures on a daily basis.

78.

Under a contract for translation and eligibility services, Defendant HMA Monroe paid Clinica to recruit, direct, manage, and refer pregnant undocumented Hispanic women from the Clinica prenatal clinic in Lawrenceville, Georgia to Defendant HMA Monroe for delivery of their babies and care for their newborns.  Exhibit G, Services Agreement between HMA Monroe, Inc. and Hispanic Medical Management, Inc., Mar. 24, 2008.

79.

Defendant HMA Monroe regularly and routinely billed or presented claims to Medicaid for obstetrical services provided to the patients referred by Clinica and paid for under the agreement between said defendants.

80.

Defendant HMA Monroe knowingly and intentionally conspired with Clinica to obtain referrals of Medicaid beneficiaries and submitted false or fraudulent claims to Medicaid for Clinica referred obstetrical deliveries.

81.

Defendant HMA Monroe CEO Gary Lang and Relator Williams' predecessor, then-CFO Jeff Grimsley, sought and obtained approval from HMA, Inc. Divisional Senior Vice President (Brad Jones) and Divisional Vice President of Finance (Bob Stiekes) to enter into the agreement with Clinica.   *See* Exhibit H, Memorandum from Lang and Grimsley to Jones and Stiekes, Apr. 2, 2008.

82.

Defendant HMA Monroe CEO Lang and CFO Grimsley truthfully told HMA corporate personnel that the purpose of the Clinica Agreement was to "grow OB service line volume." *Id.* at 1.

83.

Although the language of the written contract provides for payment to Clinica for "Translation Services" and "Eligibility Determination Services" such services were not the primary reasons why HMA Monroe entered into the agreement and paid remuneration to Clinica under the agreement. *See* Exhibit G at A-1. The Agreement was designed to conceal the underlying financial motive, which was the purchasing of Clinica referrals by Defendant HMA Monroe.

84.

HMA, Inc.'s corporate personnel approved the Clinica contract. *See* Exhibit I, Email from Patricia Costello to Gary Lang and Kathy Malcolm, Apr. 17, 2008.

85.

Prior to and at the time HMA Monroe entered into the Agreement with Clinica, HMA, Inc. was aware that Defendant Clinica recruited pregnant, undocumented Hispanic women and referred them for delivery in exchange for remuneration to hospitals, and expected the same result for HMA.

86.

Notwithstanding its knowledge, HMA Monroe entered into a sham Services Agreement with Clinica to financially induce Clinica to refer and direct women who were about to be eligible for EMA benefits/Medicaid to HMA Monroe.

87.

One of Relator's duties as CFO of Defendant HMA Monroe was to monitor contracts and approve payment of invoices.

88.

Defendant HMA and Defendant HMA Monroe used a computerized contract monitoring system that flagged expiration dates and other important information about its referral contracts. The Defendant HMA Monroe CFO was responsible for inputting contractual information into the system.

89.

Relator found a hard copy of the HMA Monroe-Clinica Agreement in his desk drawer when he commenced working at Defendant HMA Monroe in April 2009.

90.

In his position at Defendant HMA Monroe, Relator Williams reviewed the Clinica Agreement and investigated whether Clinica was in fact actually providing the interpreter services expressly called for in its contract with Defendant HMA Monroe.  Per his investigation, which included discussions with knowledgeable Defendant HMA Monroe employees, Relator could not confirm that interpreter services were being provided by Clinica as called for by the provisions in the written Agreement.

91.

Director of Nursing Services, Sharon Queen, told Relator that Defendant HMA Monroe used AT&T interpreter services when a need arose for interpreter services.  She did not use the 24-hour interpreter services called for in the Clinica contract. *See* Exhibit J, Email from Sharon Queen to Bill Williams and Erica Zygler, Aug. 20, 2009.

92.

Director of OB Services, Erica Zygler, informed Relator that Defendant HMA Monroe had not had any interpreters from the time period July 16, 2009 to August 20, 2009, and she had never seen the contract.  Exhibit K, Email from Erica Zygler to Bill Williams, Aug. 20, 2009.

93.

Relator also spoke to Human Resources personnel, and they likewise had no knowledge of Clinica personnel rendering interpreter services to patients at Defendant HMA Monroe.

94.

Relator eventually discovered that Defendant HMA Monroe paid Defendant Clinica up to $15,000 and $20,000 each month as remuneration, at least in part, in exchange for referring pregnant Hispanic EMA/Medicaid beneficiaries to Defendant HMA Monroe for deliveries reimbursed by Georgia Medicaid.  *See* Exhibit G.  Defendant HMA Monroe tracked these deliveries.  For example, in April 2009, Erica Zygler reported 34 deliveries to-date in 2009, which involved Clinica patients.  *See* Exhibit L, Email from Sharon Queen to Gary Lang and Bill Williams, Apr. 23, 2009.   Defendant HMA Monroe also tracked the effect that such care would have on funds received under the Disproportionate Share Hospital program (DSH).

95.

The Clinica Agreement had not been input into the HMA contract monitoring system. The failure to place this contract in the system was unusual and outside of normal business practices.

96.

Defendant HMA Monroe CEO Gary Lang and CFO Jeff Grimsley created and submitted to HMA corporate a financial feasibility analysis in support of their request for approval of the Clinica contract.  The financial feasibility analysis lays out the explicit reason for the contract: the expectation that payments to Clinica will result in a significant increase in deliveries at Defendant HMA Monroe and in turn, an increase in Medicaid reimbursement. *See* Exhibit M, HMA, Inc. Financial Feasibility Analysis for "Clinica de la Mama Hispanic Maternity Program". Interpreter services, a cost center if actually purchased, and eligibility determination services are not mentioned in the Defendant HMA Monroe feasibility analysis, further underscoring the primary purpose of this agreement: to induce patient referrals to Defendant HMA Monroe.

97.

Defendant HMA Monroe specifically projected reaping a 56.2% rate of return on their $1,878,000 investment in Defendant Clinica's "Hispanic Maternity Program." *Id.* at 1.  This projection quantifying the gains expected to be paid with EMA/Medicaid dollars as a result of the referrals being purchased pursuant to the kickback scheme reveals a referral and profit motive behind the contractual relationship with Clinica, including both hospital and physician fees.

98.

Because the remuneration for the hospital depends on patient referrals, Clinica closely tracks the number of deliveries for each of the pregnant Government beneficiaries it refers to Defendant hospitals. *See, e.g.*, Exhibit N, Letter and Invoice from Tracey Cota to Gary Lang, Aug. 6, 2009 (patient information redacted).

99.

Defendants HMA, Inc., HMA Monroe and Clinica knowingly violated the AKS.

100.

Relator directly questioned Lang about the Defendant HMA Monroe-Clinica Agreement. Lang informed Relator that he came to Defendant HMA Monroe from his marketing job at a Tenet hospital in Hilton Head, South Carolina that had a similar contract with Clinica. Lang also indicated that Clinica referrals generated large volumes of Medicaid deliveries for Tenet. HMA cloned its kickback model from Tenet in order to achieve additional Medicaid patient referrals and revenues.

101.

Relator confirmed with Defendant Clinica that it entered into contractual arrangements with Tenet's Atlanta Medical Center and North Fulton Hospital. Mr. Lang indicated that Clinica referrals generated large volumes of Medicaid deliveries for Tenet. HMA expected and received increases in its deliveries as well due to Clinica referrals.

102.

Relator told CEO Lang that the Defendant HMA Monroe arrangement with Clinica violated the AKS because payments to Clinica were financial inducements to bring Medicaid beneficiaries to Defendant HMA Monroe for OB delivery services, which caused false claims that were ultimately submitted to and paid for by Medicaid.

103.

CEO Lang initially tried to defend the arrangement with Clinica but told Relator he would discuss it with HMA, Inc. legal staff.

104.

Soon thereafter, Relator received for processing a cover letter and "final invoice" to Defendant HMA Monroe from Clinica.  Exhibit N.

105.

The "Final Invoice" included a report entitled "Schedule of Deliveries by Hospital" for August 2009 and September 2009. *See id*. at p. 6-10 (patient identification redacted).  The report includes patient names, Medicaid approval status, and estimated delivery dates and specifies which of the five Clinica clinics would be managing the Clinica patient referred to Defendant HMA Monroe.  *Id*.  The report shows eleven deliveries by Clinica patients in Defendant HMA Monroe scheduled during August 2009, which were eligible for Emergency Medical Assistance, and three scheduled deliveries by Clinica patients during September 2009, which were eligible for Emergency Medical Assistance.  The "Final Invoice" also includes Clinica patient names and dates of OB deliveries at Defendant HMA Monroe in June and July 2009.  *Id*. at p. 11 and 19.

106.

The "Final Invoice" also included purported time records for Clinica personnel working at Defendant HMA Monroe.  Clinica billed 238.75 hours of time for the 18 day period of July 1, 2009 through July 18, 2009, which is an average of 13.26 hours of purported interpreter services by Clinica personnel at Defendant HMA Monroe for each day covered by the invoice.  *Id.* at 2.  Similarly, the partial invoice, dated July 8, 2009, includes purported time records for Clinica personnel at Defendant HMA Monroe for June 2009.  Clinica billed 412.50 hours of time for the 30-day month of June, which is an average of 13.75 hours a day of interpreter services purportedly provided by Clinica personnel.  *Id.* at 13.  Despite these time entries, Relator could

not confirm that any Clinica employees were even on the premises at Defendant HMA Monroe during the times in question.

107.

Not long after Relator voiced his concerns regarding the fraudulent nature of the HMA arrangement with Clinica to CEO Lang, Defendant HMA sent its Divisional CFO Bob Stiekes to Monroe, Georgia.  Mr. Stiekes terminated Relator's employment without providing any reason for the termination.  Relator's objections to that business practice threatened HMA's profits derived from the Clinica referrals and heightened the risk of exposure of HMA's illegal kickback scheme with Clinica.

108.

HMA, Inc. and Defendant HMA Monroe had been bringing in substantial revenue from Clinica referrals, and they projected even greater profits to continue into the future.

109.

During the course of the Defendant Hospitals' agreements with Clinica, Medicaid paid several thousand dollars for a well-baby normal delivery and an additional premium for a well-baby C-section delivery, for each delivery without medical complications.

**FALSE OR FRAUDULENT CLAIM SUBMITTED BY HMA MONROE ("HMA")**

110.

Since at least March 2008, Defendant HMA Monroe regularly and routinely presented claims to Medicaid for the OB services provided to the patients illegally referred by Clinica pursuant to the fraudulent kickback scheme.  The following serve as examples from the of the

false and fraudulent claims Defendant HMA Monroe submitted to the State Medicaid program

for Clinica patients and their newborns[1]:

FALSE OR FRAUDULENT CLAIMS SUBMITTED BY
MONROE HMA, INC.

MONROE HMA, INC.

| Claim Date | Payment Date | Admission Date | Discharge Date | Member Initials | Payee Provider Medicaid ID | Billed Amount | Paid Amount |
|---|---|---|---|---|---|---|---|
| 06/22/2009 | 07/13/2009 | ▮ | ▮ | ▮ | 566214907A | $4,207.80 | $2,505.69 |
| 08/27/2009 | 08/31/2009 | ▮ | ▮ | ▮ | 566214907A | $1,908.23 | $824.13 |
| 03/04/2009 | 03/16/2009 | ▮ | ▮ | ▮ | 566214907A | $4,591.96 | $2,505.69 |
| 02/12/2009 | 02/17/2009 | ▮ | ▮ | ▮ | 566214907A | $1,975.98 | $964.35 |
| 06/08/2009 | 06/29/2009 | ▮ | ▮ | ▮ | 566214907A | $4,745.54 | $2,505.69 |
| 04/07/2009 | 04/13/2009 | ▮ | ▮ | ▮ | 566214907A | $1,786.51 | $824.13 |
| 04/03/2009 | 04/20/2009 | ▮ | ▮ | ▮ | 566214907A | $8,606.92 | $3,948.63 |
| 03/24/2009 | 03/30/2009 | ▮ | ▮ | ▮ | 566214907A | $1,513.88 | $784.13 |
| 06/29/2009 | 07/06/2009 | ▮ | ▮ | ▮ | 566214907A | $818.45 | $824.13 |
| 06/29/2009 | 07/20/2009 | ▮ | ▮ | ▮ | 566214907A | $4,098.55 | $2,505.69 |

111.

Georgia did not know, and could not have known, of the false and fraudulent nature of

the claims until served with Relator's complaint in 2012.

**TENET'S FRAUDULENT SCHEME WITH CLINICA**

112.

Like the HMA-Clinica scheme described above, under cover of contracts purportedly for

Spanish interpreter, management, consulting, marketing, and other services, since March 15,

2000, Tenet has paid illegal remuneration to Defendant Clinica to recruit pregnant

---

[1] To protect confidential patient information, patient names have been replaced with initials and redacted. The admission and discharge dates have also been redacted. The actual patients' names, patient account numbers, and claim numbers are maintained by the Georgia Department of Community Health and can be made available to the Court under seal by that Department.

undocumented Hispanic women and refer them to Tenet hospitals for their deliveries and care for their newborns at Medicaid expense.

113.

For example, Defendant Atlanta Medical Center entered into contracts with Clinica from on or about March 15, 2000 until present. *See, e.g.*, Exhibit O, Affiliation Agreement between Tenet HealthSystem GB, Inc. dba Atlanta Medical Center and Hispanic Medical Management, Inc., Mar. 15, 2000; Marketing Consulting Agreement between Tenet HealthSystem GB, Inc. dba Atlanta Medical Center and Hispanic Medical Management, Inc., Mar. 15, 2000; Services Agreement between Tenet HealthSystem GB, Inc. dba Atlanta Medical Center and Hispanic Medical Management, Inc., Jan. 1, 2006; Services Agreement between Tenet HealthSystem GB, Inc. dba Atlanta Medical Center and Hispanic Medical Management, Inc., Sept. 1, 2008; Time Share Sublease Agreement between Tenet HealthSystem GB, Inc. dba Atlanta Medical Center and Hispanic Medical Management, Inc., Sept. 1, 2008; Services Agreement between Tenet HealthSystem GB, Inc. dba Atlanta Medical Center and Hispanic Medical Management, Inc., May 1, 2011.

114.

Defendant North Fulton Medical Center entered into contracts with Clinica from on or about November 1, 2001 until present. *See, e.g.*, Exhibit P, Services Agreement between North Fulton Regional Hospital and Hispanic Medical Management, Inc., Nov. 1, 2001; Services Agreement between North Fulton Medical Center, Inc. and Hispanic Medical Management, Inc., Nov. 1, 2003; Services Agreement between North Fulton Medical Center, Inc. and Hispanic Medical Management, Inc., Nov. 1, 2006; Services Agreement between North Fulton Medical Center, Inc. and Hispanic Medical Management, Inc., Dec. 1, 2009; and Services Agreement

between North Fulton Medical Center, Inc. and Cota Medical Management Group, May 11, 2011.

115.

Defendant Spalding Regional Medical Center entered into a contract with Clinica from on or about April 1, 2004 to June 29, 2004. *See, e.g.* Exhibit Q, Services Agreement between Tenet HealthSystem Spalding, Inc. dba Spalding Regional Medical Center and Hispanic Medical Management, Inc., Apr. 1, 2004; Letter from John Quinn to Tracey Cota, June 29, 2004.

116.

An essential purpose of the Tenet relationship with Clinica was to garner reimbursements/payments from Medicaid (plus DSH payments as described above and *infra*) for the services Tenet hospitals provided to Clinica-referred patients and their newborns.  In a 2006 document, Tenet described its "ongoing relationship with Clinica de la Mama (OB clinics for Hispanic patients)", stating that this relationship "results in an excellent referral source for deliveries."  Exhibit R, Q2 Summary of Key Volume Impacts Detailed by Region, 2006.

117.

Tenet  counted on and tracked  revenue from the Clinica Medicaid newborns, including those requiring treatment in the neonatal intensive care units, in addition to the Clinica deliveries. *See, e.g.*, Exhibit S, Email from Angie Busch to Illona Wozniak, Nov. 10, 2008.  Tenet also tracked the effect that such care would have on funds received under the Disproportionate Share Hospital program (DSH).

118.

Tenet's corporate office and the individual hospital facilities worked together to knowingly and intentionally pay for referrals of Medicaid beneficiaries from Clinica for obstetrical services and infant care provided at Tenet hospitals.

119.

According to the initial Affiliation Agreement, AMC was required to pay a management fee that depended on the volume of "Net Collections". Exhibit O. Tenet understood that other hospitals that worked with Clinica's obstetrical clinics did not pay any fees to Clinica.

120.

Tenet also suggested that the Clinica contract was meant to support its Ob-GYN Residency Program, which lost its accreditation in 2008.

121.

Tenet Hospitals remained concerned about the total volume of patients recruited through its hospitals' arrangements with Clinica, and company emails demonstrate the importance of the patient-referral process to the relationship. For example, in September 2008, Tenet corporate asked AMC and NF about their clinics' volumes over the past three months, specifically asking about "overall deliveries, not %." *See* Exhibit T, Email from Joe Austin to Bill Moore and John Holland, Sept. 26, 2008.

122.

Where deliveries were lower, Defendant Hospital executives expressed dissatisfaction with the Clinica relationship. AMC CEO Moore responded that his hospital had seen a "marked decrease" in deliveries, but noted that he had assumed that it was because Clinica patients were being directed to other Tenet hospitals. *Id.* He explained, "June also marked the time when Clinica fired the Overstreets so I assumed the volume from the clinics they used to staff was

being directed to North Fulton.  If NFMC has not seen an increase then we have a problem.  Our volume from January through May from Clinica exceeded our previous two year's volume.  The drop off had all come in the last three months.")  *Id.*

123.

When it became clear that patients were not being directed within the Tenet network of hospitals, Tenet executives expressed disappointment and pledged to raise the issue with Clinica. North Fulton President and CEO Joe Austin responded, "June-August Clinica volumes for 2007 and 2008 were 349 and 340, respectively.  Based on our flat volume and Bill's [AMC's] decline, this would lead us to believe Clinica is diverting to another program.  Our contract is up for re-negotiation within the next 60-90 days.  Wes [NF CFO] and I are going to handle this so we will ask some questions during our discussions with Ed and Tracey [Cota]."  *Id.*   Similarly, a report relating to North Fulton Regional Hospital notes, "Contacted Clinica leadership and physician to ensure that there is no redirect of business; by month end volumes were up to previous levels; an increased number of deliveries scheduled for February."  Exhibit U, North Fulton Regional Hospital Report.

124.

Tenet hospital executives also expressed concern directly to Clinica and its management over declines in deliveries and a lack of patient referrals in 2008.

125.

In other emails, Tenet executives discussed whether they could "get Clinica to send us the business" without also contracting for translation services because of the way Clinica "held [North Fulton] hostage."  Exhibit V, Email from Debbie Keel to Kristy Waters, Nov. 18, 2009.

126.

AMC and North Fulton were not the only Tenet hospitals to create patient referral arrangements with Tenet.    In October 2003, John Quinn, CEO of Spalding Regional and Sylvan Grove Hospital, included "implent[ing] the Clinica de la Mama program" as one of four personal goals required to be submitted to Greg Burfitt, Quinn's Tenet supervisor, to increase market share.  Exhibit W, Tenet Stub-Year Performance Review, Dec. 31, 2003.

127.

Spalding Regional did enter into the relationship with Clinica in 2004, but it failed to produce enough patient referrals and "the Clinica initiative was eliminated for non-performance" after a few months.  Exhibit Q.

128.

In 2004, Tenet's Spalding Regional looked to the Clinica referral relationship as a "Key Initiative" to grow the hospital's Obstetrics business volume.  Exhibit X, 2004 Key Initiatives.

129.

Tenet knowingly violated the Anti-Kickback Statute, the Georgia False Medicaid Claims Act, the Georgia Medical Assistance Act, and other Georgia laws when it made knowing and false representations to Georgia by paying Clinica for services including its referral of Emergency Medicaid-eligible patients and their infants and then submitting claims to Georgia Medicaid for those illegally referred services.

**SPECIFIC FALSE OR FRAUDULENT CLAIMS
SUBMITTED TO MEDICAID BY TENET**

130.

Pursuant to its unlawful arrangements with Clinica, Tenet hospitals have submitted tens of thousands of false or fraudulent claims to Georgia Medicaid from March 15, 2000 to present.

The following example claims serve as examples from the thousands of false and fraudulent

claims Tenet submitted to the State Medicaid program for Clinica patients and their newborns[2]:

### FALSE OR FRAUDULENT CLAIMS SUBMITTED BY
### ATLANTA MEDICAL CENTER ("AMC")

#### ATLANTA MEDICAL CENTER

| Claim Date | Payment Date | Admission Date | Discharge Date | Member Initials | Payee Provider Medicaid ID | Billed Amount | Paid Amount |
|---|---|---|---|---|---|---|---|
| 03/05/2008 | 04/14/2008 | ██████ | ██████ | ███ | 300033352A | $8,960.55 | $3,127.06 |
| 12/17/2007 | 12/24/2007 | ██████ | ██████ | ███ | 300033352A | $2,044.00 | $1,668.57 |
| 04/17/2008 | 05/27/2008 | ██████ | ██████ | ███ | 300033352A | $32,596.00 | $5,445.33 |
| 02/22/2008 | 02/25/2008 | ██████ | ██████ | ██ | 300033352A | $5,773.00 | $2,563.35 |
| 03/03/2009 | 04/06/2009 | ██████ | ██████ | ███ | 300033352A | $7,614.00 | $3,078.66 |
| 02/18/2009 | 02/23/2009 | ██████ | ██████ | ███ | 300033352A | $2,204.00 | $1,906.54 |
| 02/17/2011 | 02/21/2011 | ██████ | ██████ | ███ | 300033352A | $19,445.17 | $4,189.08 |
| 02/17/2011 | 02/21/2011 | ██████ | ██████ | ███ | 300033352A | $2,609.18 | $1,574.26 |
| 03/25/2011 | 03/28/2011 | ██████ | ██████ | ███ | 300033352A | $28,218.61 | $6,092.24 |
| 03/25/2011 | 03/28/2011 | ██████ | ██████ | ███ | 300033352A | $4,065.58 | $2,144.22 |

### FALSE OR FRAUDULENT CLAIMS SUBMITTED BY
### NORTH FULTON HOSPITAL (North Fulton)

#### NORTH FULTON REGIONAL HOSPITAL

| Claim Date | Payment Date | Admission Date | Discharge Date | Member Initials | Payee Provider Medicaid ID | Billed Amount | Paid Amount |
|---|---|---|---|---|---|---|---|
| 03/14/2007 | 03/19/2007 | ██████ | ██████ | ███ | 300043773D | $12,088.60 | $3,878.38 |
| 03/14/2007 | 03/19/2007 | ██████ | ██████ | ███ | 300043773D | $1,850.30 | $2,419.89 |
| 03/10/2008 | 05/05/2008 | ██████ | ██████ | ███ | 300043773D | $19,010.00 | $2,731.01 |
| 03/20/2008 | 03/24/2008 | ██████ | ██████ | ███ | 300043773D | $3,902.60 | $1,558.89 |
| 04/13/2009 | 05/18/2009 | ██████ | ██████ | ███ | 300043773D | $13,148.80 | $2,731.01 |
| 03/30/2009 | 04/06/2009 | ██████ | ██████ | ███ | 300043773D | $3,057.70 | $3,287.29 |
| 11/05/2010 | 01/24/2011 | ██████ | ██████ | ███ | 300043773D | $17,472.10 | $3,055.45 |
| 09/16/2010 | 09/27/2010 | ██████ | ██████ | ███ | 300043773D | $2,269.50 | $1,185.31 |
| 07/21/2011 | 07/25/2011 | ██████ | ██████ | ███ | 300043773D | $15,807.70 | $3,055.45 |
| 07/26/2011 | 08/01/2011 | ██████ | ██████ | ███ | 300043773D | $2,327.40 | $1,185.31 |

---

[2] To protect confidential patient information, patient names have been replaced with initials and redacted.  The admission and discharge dates have also been redacted.  The actual patients' names, patient account numbers, and claim numbers are maintained by the Georgia Department of Community Health and can be made available to the Court under seal by that Department.

FALSE OR FRAUDULENT CLAIM SUBMITTED BY
SPALDING REGIONAL HOSPITAL

### SPALDING REGIONAL MEDICAL CENTER

| Claim Date | Payment Date | Admission Date | Discharge Date | Member Initials | Payee Provider Medicaid ID | Billed Amount | Paid Amount |
|---|---|---|---|---|---|---|---|
| 02/23/2004 | 03/01/2004 | | | | 300043805A | $12,838.00 | $5,299.45 |
| 02/12/2004 | 02/17/2004 | | | | 300043805A | $3,270.50 | $3,678.74 |
| 02/26/2004 | 03/01/2004 | | | | 300019011A | $12,722.25 | $3,046.87 |
| 02/24/2004 | 03/01/2004 | | | | 300043805A | $3,066.00 | $2,028.02 |
| 02/20/2004 | 02/23/2004 | | | | 300018468A | $20,231.25 | $4,571.34 |
| 03/11/2004 | 03/15/2004 | | | | 300043805A | $9,552.50 | $3,290.75 |
| 03/11/2004 | 03/15/2004 | | | | 300043805A | $2,351.00 | $1,180.39 |
| 06/22/2004 | 06/28/2004 | | | | 300043805A | $16,170.60 | $3,920.95 |
| 06/22/2004 | 06/28/2004 | | | | 300043805A | $1,901.00 | $1,180.39 |
| 09/17/2004 | 09/20/2004 | | | | 300043805A | $11,055.90 | $2,638.88 |
| 09/28/2004 | 10/04/2004 | | | | 300043805A | $1,814.00 | $1,180.39 |
| 10/29/2004 | 11/01/2004 | | | | 300043805A | $7,281.50 | $2,638.88 |
| 10/21/2004 | 10/25/2004 | | | | 300043805A | $1,453.50 | $1,522.77 |

131.

Georgia did not know, and could not have known, of the false and fraudulent nature of

the claims until served with Relator's complaint in 2012.

## COUNT I

### VIOLATIONS OF THE GEORGIA FALSE MEDICAID CLAIMS ACT
### (Against the Hospital Defendants and Clinica)

132.

Georgia incorporates herein by reference the facts set forth above in paragraphs 1-

136.

133.

The Georgia False Medicaid Claims Act, O.C.G.A. §§ 49-4-168, *et seq.,* imposes

liability on any person who:

(1) Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

(3) Conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid;

O.C.G.A. § 49-4-168.1(a)(1)-(3).

134.

The Defendant Hospitals are liable under the Georgia FMCA, § 49-4-168.1(a) because they knowingly presented to the Georgia Medicaid program false or fraudulent claims for payment for services rendered to Clinica patients and their newborns.  The claims were false and fraudulent because they were the result of the kickbacks paid by the hospitals to Clinica in violation of the AKS, the Georgia Medicaid rules (the Part One Manual), and the Georgia physician licensure statute.

135.

The Defendant Hospitals are liable under the Georgia FMCA, § 49-4-168.1(b) because they knowingly made, used, and caused to be made or used a false record or statement material to a false or fraudulent claim when they repeatedly submitted false certifications of compliance with federal and state law—as detailed above in paragraphs—to be obtain Medicaid payments on their false Clinica kickback-related claims.

136.

Defendant Clinica violated the FMCA by knowingly causing to be used false records or statements material to a false or fraudulent claim for payment from the Defendant Hospitals for services rendered to Clinica patients and their newborns.  The claims were false and fraudulent

because they were the result of the kickbacks paid by the hospitals to Clinica in violation of the AKS, the Georgia Medicaid rules (the Part One Manual) and the Medical Assistance Act.

137.

Defendant Hospitals violated the AKS and the Medicaid rules prohibiting kickbacks by paying kickbacks camouflaged as interpreter service payments and management fees to Defendant Clinica, and Defendant Clinica violated the AKS and the Georgia FMCA by soliciting or receiving the kickback payments from the Defendant Hospitals.

138.

Defendants' false claims and false certifications and corresponding tainted claims for payment defrauded the State in that the State did not know that Defendants' claims for payment for Obstetric (OB) services rendered to Clinica patients and newborns did not comply with federal and state statutes and regulations due to Defendants' false certifications in their Cost Reports, their execution of the Statements of Participation, Attestations of Compliance, Powers of Attorney and EFT Agreement forms. The State was unaware that said certifications were false and would not have paid the Hospital Defendants' claims for services to Clinica patients or their newborns had it known about the kickback referral schemes that generated those claims.

139.

In seeking payment from Medicaid in violation of the AKS and Georgia laws, Defendants HMA and Tenet, respectively, violated the FMCA because the State paid money to Defendants HMA and Tenet that it otherwise would not have paid had it known of Defendants' noncompliance.

140.

Because compliance with the AKS is, and was, a condition for participation in Medicare and Medicaid, once Defendants violated the AKS they were no longer eligible for reimbursements from Georgia Mediciad.  Nonetheless, Defendants continued to submit false or fraudulent claims to Medicaid  and to retain ill-gotten payments derived from those false or fraudulent claims.

141.

Where, as here, a provider is disqualified from participating in the Medicare and Medicaid programs because it violated the AKS, the Georgia Medical Assistance Act, the Georgia Participation Agreement and the Medicaid rules and persists in presenting claims for payment it knows the State does not legally owe, the provider is liable under the FMCA for submission of those false claims because the provider knowingly asks the government to pay amounts it does not owe.

142.

Defendants are all in violation of the FMCA , § 49-4-168.1(c) because of their conspiracies to get the false claims allowed or paid.

143.

HMA conspired with Clinica in violation of § 49-4-168.1(c) to get Clearview Regional's claims for Clinica patients and their newborns paid.

144.

Tenet conspired with Clinica in violation of § 49-4-168.1(c) to get its hospitals' claims for Clinica patients and their newborns paid by Medicaid

145.

46

Defendant Hospitals repeatedly fraudulently certified compliance with the AKS and other applicable laws as detailed above.  These fraudulent representations were material because compliance with those laws was, and is, a condition of the State's payment of funds under the Medicaid program.

146.

As shown above, Defendants' presentment of said false or fraudulent claims to the State was not the result of Defendants' disregard of government regulations or Defendants having improper internal policies.  Even if that were the circumstances of Defendants' presentment of false or fraudulent claims to the State (which it was not), Defendants, nonetheless, knowingly asked the State  to pay amounts it did not owe and then intentionally retained the ill-gotten payments.

147.

As a direct and proximate result of Defendants' presentment of false or fraudulent claims for payment and submission of false or fraudulent records to get false or fraudulent claims paid, the State of Georgia has suffered actual monetary damages to be proved at trial and is entitled to recover actual and treble damages plus a civil monetary penalty for each false or fraudulent claim paid.

**COUNT II**
**THE PRESENTMENT OF FALSE OR FRAUDULENT CLAIMS**
**IN VIOLATION OF THE GEORGIA FALSE MEDICAID CLAIMS ACT**
**(As to the Defendant Hospitals and Defendant Clinica)**

148.

Georgia incorporates herein by reference the facts set forth above in paragraphs 1-136.

149.

Under the Medicaid statute, the federal government provides money directly to state Medicaid programs in order to assist in paying for the cost of medical care for program beneficiaries such as the poor and the disabled. *See* 42 U.S.C. § 1396b. The federal government does not pay Medicaid providers directly, but provides each state with a monetary advance on a quarterly basis to pay a portion of the program's quarterly costs. Individual states then use these federal funds, along with their own funds, to reimburse providers directly for providing such care. *See generally* 42 U.S.C. § 1395b.

150.

The AKS applies to any item or service for which payment may be made in whole or in part under a "Federal health care program." 42 U.S.C. § 1320a-7b(b)(1) and (2).  The AKS defines the term "Federal health care program" to specifically include any State health care program, including (1) a State plan approved under Title XIX of the Social Security Act (Grants to States for Medical Assistance Programs), (2) any program receiving funds under Title V of the Social Security Act (Maternal and Child Health Services Block Grant), (3) any program receiving funds under Subtitle A of Title XX of the Social Security Act (Block Grants to States for Social Services) or from an allotment to a State under such Subtitle, or (4) a State child health plan approved under Title XXI of the Social Security Act.  42 U.S.C. § 1320a-7b(f); 42 U.S.C. § 1320a-7(h). Thus, federal program funds may not be used to pay a provider for kickback-tainted claims in violation of the AKS.

151.

Under the Georgia False Medicaid Claims Act, a defendant may be

liable not only for submitting a false claim, but also for causing another to submit a false claim. *See* O.C.G.A. § 49-4-168(a). Defendants, by causing the State of Georgia to reimburse claims made in violation of the AKS, caused the United States to pay funds to the State of Georgia for services rendered in violation of that statute.

152.

Thus, even if the State of Georgia did not statutorily prohibit payment on kickback-tainted claims made by Medicaid providers, such claims nevertheless may serve as the basis for a violation of the Georgia FMCA.

**COUNT III**
**VIOLATIONS OF THE GEORGIA MEDICAL ASSISTANCE ACT**
**(As to the Defendant Hospitals and their parents and affiliates,**
**and Defendant Clinica)**

153.

Georgia incorporates herein by reference the facts set forth above in paragraphs 1-136.

154.

The Georgia Medical Assistance Act (the "MAA"), O.C.G.A. § 49-4-146.1(b), makes it unlawful to:

> (1) obtain, attempt to obtain, or retain for himself, herself, or any other person any medical assistance or other benefits or payments under this article, or under a managed care program operated, funded, or reimbursed by the Georgia Medicaid program, to which the person or provider is not entitled, or in an amount greater than that to which the person or provider is entitled, when the assistance, benefit, or payment is obtained attempted to be obtained, or retained, by:

> (A) Knowingly and willfully making a false statement or false representation;

(B)  Deliberate concealment of any material fact; or

(C)  Any fraudulent scheme or device; or

O.C.G.A. § 49-4-146.1(b).

155.

The Hospital Defendants are liable to the State of Georgia for all Medicaid funds paid for services to Clinica patients and their newborns because Defendants obtained and retained those Medicaid reimbursements to which they were not entitled by knowingly and willfully making false statements or false representations of compliance with the AKS, the Medicaid rules, the Georgia Physician Licensure statute, and the Georgia Medicaid Participation Agreement.

156.

The Hospital Defendants are liable to the State of Georgia for all Medicaid funds paid for services to Clinica patients and their newborns because Defendants obtained and retained those Medicaid reimbursements to which they were not entitled by deliberate concealment of material fact.

157.

The Hospital Defendants are liable to the State of Georgia for all Medicaid funds paid for services to Clinica patients and their newborns because Defendants obtained and retained those Medicaid reimbursements to which they were not entitled by their fraudulent kickback schemes.

158.

As shown above, Defendants violated the Georgia Medical Assistance Act by:

    (a)     knowingly and willfully making false statements or false representations to the state to obtain Medicaid payments;

    (b)     deliberately concealing the material facts of their kickback/ referral arrangement to obtain Medicaid payments; and/or

    (c)     using a fraudulent scheme or device – referral payments that violated the AKS and the requirements of the state Medicaid Manual, Part I – to obtain Medicaid payments.

159.

As a direct and proximate result of Defendants' presentment of false or fraudulent claims for payment and submission of false or fraudulent records to get false or fraudulent claims paid, the State of Georgia has suffered actual monetary damages to be proved at trial and is entitled to recover actual and treble damages plus a civil monetary penalty for each false claim.

**COUNT IV**

**GA FMCA CIVIL CONSPIRACY**
**(As To All Defendants)**

160.

Georgia incorporates herein by reference the facts set forth above in paragraphs 1-136.

161.

The Georgia FMCA subjects to civil liability any person who knowingly presents, or causes to be presented, to the government a false or fraudulent claim for payment or approval, as well as any person who <u>conspires</u> to defraud the government by presenting a false or fraudulent claim for payment or getting a false or fraudulent claim paid.

162.

Defendants HMA, Tenet and Clinica each had a duty to comply with federal and state statutes and regulations in connection with the presentment of claims for payment to the government, and otherwise to not present or cause to be presented claims for payment that are violative of the AKS or Georgia's Medicaid Provider Agreement.

163.

As shown above, Defendants HMA and Clinica and Defendants Tenet and Clinica, respectively, conspired together to actively disregard and/or violate federal and state statutes and regulations in the presentment of claims to the government for payment.

164.

Defendants HMA and Tenet were financially motivated to enter into the contracts with Clinica to induce Clinica to refer pregnant patients to the Defendant Hospitals. The consideration paid by Defendant Hospitals to Clinica under the "services agreements" was for unlawful patient referrals. The referral payments violated the AKS and the Georgia FMCA.

165.

The referral relationships between HMA/Clinica and Tenet/Clinica were formed for the purpose of defrauding Georgia by getting false or fraudulent Medicaid claims allowed and paid.

166.

Defendants HMA and Clinica, and Tenet and Clinica acted in concert with the specific intent of conspiring for their mutual profit and gain to the detriment of the taxpayers of the State of Georgia in violation of O.C.G.A. § 49-4-168.1(a)(3).

167.

The foregoing conspiracy directly and proximately caused the government to pay claims submitted by the Hospital Defendants that it otherwise would not have paid to Hospital Defendants, had it known of Defendants' unlawful kickback arrangement. These conspiracies caused the Government Payors to suffer damages in amounts to be proven at trial.

**COUNT V**

**FRAUD AND DECEIT**

**(as Against the Hospital Defendants)**

168.

Georgia incorporates herein by reference the facts set forth above in paragraphs 1-136.

169.

Per Georgia statute, "[f]raud, accompanied by damage to the party defrauded, always gives a right of action to the injured party." O.C.G.A. § 51-6-1.

170.

As described above, the Hospital Defendants have made multiple and repeated false statements with each  submission of an EMA claim for a Clinica patient delivery and of Medicaid claims for medical care for these patients' newborn babies.  These false statements have included:

(a)    representing that the claims submitted for services provided to Clinica patients and their newborns were not the result of illegal kickbacks when, in fact, the Defendants utilized their patient referral kickback scheme which resulted in the steering of pregnant Medicaid patients to Defendant Hospitals and the submission of false or fraudulent claims to the

government, in violation of the Georgia Medicaid Provider Handbook, Part I Part I, ¶ 106(B) and (E);

(b)      representing that the claims submitted for services provided to Clinica patients and their newborns were not the result of canvassing of neighborhoods for direct patient contact when, in fact, the Hospital Defendants conspired with Defendant Clinica to facilitate canvassing of neighborhoods for direct contact with pregnant putative Medicaid (EMA) members, in violation of  Part I, ¶ 106(E);

(c)      representing that they had allowed Medicaid or PeachCare for Kids members the opportunity to choose freely among available enrolled providers when, in fact, the Hospital Defendants conspired with Defendant Clinica to deny patients freedom to choose among available providers through Clinica's unilateral referral and direction of patients to specific Defendant Hospitals, in violation of Part I, ¶ 106(F);

(d)      certifying that they had complied with all State and Federal laws and regulations related to furnishing Medicaid/PeachCare for Kids service when, in fact, the claims submitted violated the AKS, the FCA, and the GA FMCA;

(e)      submitting false claims for services provided to Clinica patients and their newborns in violation of Part I, ¶ 106(L) and (MM).

171.

As described in detail above, and incorporated into this Count, the Hospital Defendants knew or should have known that their certifications in regard to claims submitted for Clinica patient deliveries and for care of their newborns were false.

172.

The Hospital Defendants intended to induce the State to pay EMA claims and Medicaid for newborn claims in relation to Clinica patients.  In fact, each  Hospital Defendant expressly certified, in its Power of Attorney form for electronic claims submissions that it "understand(s) and acknowledge(s) that the Department will rely on this certification in the payment of medical assistance . . . ."  (*See* Exh. L.)

173.

Georgia justifiably relied on the Hospital Defendants' false statements and omissions in paying the Hospital Defendants' false claims.

174.

Georgia was damaged by paying claims submitted by the Hospital Defendants that it otherwise would not have paid to Defendant Hospitals, had it known of Defendants' fraudulent certifications that concealed the unlawful kickback arrangement.

## COUNT VI

## BREACH OF CONTRACT

175.

Georgia incorporates herein by reference the facts set forth above in paragraphs 1-136.

176.

In the alternative to the above Georgia FMCA, MAA, and Fraud and Deceit claims, Georgia alleges that it entered into provider agreements with the Defendant Hospitals for the provision of medical services to Medicaid and EMA recipients, and that these provider

agreements included, as material terms, the Defendant Hospitals' agreement not to pay kickbacks for Medicaid patient referrals.

### 177.

In breach of their provider agreements, the Defendant Hospitals paid kickbacks to Defendant Clinica for the referral of Medicaid and EMA patients.

### 178.

The Hospital Defendants materially breached their provider agreements with the State of Georgia.

### 179.

Georgia was damaged by paying the Hospital Defendants' claims that were submitted in breach of their provider agreements with the Hospital Defendants.

## COUNT VII

## PAYMENT BY MISTAKE

### 180.

Georgia incorporates herein by reference the facts set forth above in paragraphs 1-136.

### 181.

This is a claim for the recovery of monies paid by the State of Georgia to the hospital defendants (directly or indirectly) as a result of mistaken understandings of fact.

### 182.

The State of Georgia paid the hospital defendants for claims for health services rendered to patients who had been referred as a result of illegal kickbacks without knowledge of material facts, and under the mistaken belief that the hospital defendants were entitled to receive payment for such claims, which were not eligible for payment. The State of Georgia's mistaken belief was material to its decision to pay the hospital defendants for such claims. Accordingly, the hospital defendants are liable to account and pay to the State of Georgia the amounts of the payments made in error to the hospital defendants by the State of Georgia.

## COUNT VIII

### FRAUDULENT CONCEALMENT
### (as Against the Hospital Defendants)

183.

Georgia incorporates herein by reference the facts set forth above in paragraphs 1-136.

Per Georgia statute, concealment of a material fact, done in such a manner as to deceive and mislead, supports an action for fraud. *See* O.C.G.A. § 51-6-1.

184.

As described above, the Hospital Defendants have, in a manner intended to deceive and mislead, repeatedly concealed that they paid kickbacks to Clinica for each Clinica patient who delivered a baby at each Defendant Hospital.

185.

The Hospital Defendants intentionally concealed the kickback scheme with each submission of an EMA claim for a Clinica patient delivery and of Medicaid claims for

medical care for these patients' newborn babies.  These concealments have included, among

others noted above:

(a)      concealing that the claims submitted for services provided to Clinica patients and

their newborns were the result of illegal kickbacks, in violation of the Georgia Medicaid

Provider Handbook, Part I, ¶ 106(B) and (E);

(b)      concealing that the claims submitted for services provided to Clinica patients and

their newborns were the result of canvassing of neighborhoods for direct patient contact when, in

fact, the Hospital Defendants conspired with Defendant Clinica to facilitate canvassing of

neighborhoods for direct contact with pregnant putative Medicaid (EMA) members, in violation

of  Part I, ¶ 106(E);

(c)      concealing that they had denied Medicaid or PeachCare for Kids members the

opportunity to choose freely among available enrolled providers through Clinica's unilateral

referral and direction of patients to specific Defendant Hospitals, in violation of Part I, ¶ 106(F);

(d)      certifying that they had complied with all State and Federal laws and regulations

related to furnishing Medicaid/PeachCare for Kids service when, in fact, the claims submitted

violated the AKS, the FCA, and the GA FMCA;

(e)      submitting false claims for services provided to Clinica patients and their

newborns in violation of Part I, ¶ 106(L) and (MM).

186.

As described in detail above, and incorporated into this Count, the Hospital

Defendants knew or should have known that their certifications in regard to claims

submitted for Clinica patient deliveries and for care of their newborns were false.

187.

The Hospital Defendants intended to induce the State to pay EMA claims and Medicaid for newborn claims in relation to Clinica patients.  In fact, each Hospital Defendant expressly certified, in its Power of Attorney form for electronic claims submissions that it "understand(s) and acknowledge(s) that the Department will rely on this certification in the payment of medical assistance . . . ."  (*See* Exh. L.)

188.

Georgia justifiably relied on the Hospital Defendants' fraudulent omissions in paying the Hospital Defendants' false claims.

189.

Georgia was damaged by paying claims submitted by the Hospital Defendants that it otherwise would not have paid, had it known of Defendants' fraudulent certifications that concealed the unlawful kickback arrangement.


**PRAYER FOR RELIEF**

WHEREFORE, Georgia prays for judgment and relief against Defendants Health Management Associates, Inc., Monroe HMA, LLC d/b/a Clearwater Regional Medical Center, and Tenet Healthcare Corporation and its subsidiaries:  Tenet HealthSystem GB, Inc. d/b/a Atlanta Medical Center and South Fulton Medical Center, n/k/a Atlanta Medical Center –South Campus; North Fulton Medical Center, Inc. d/b/a North Fulton Regional Hospital; Tenet Health System Spalding, Inc. d/b/a Spalding Regional Medical Center; Tenet Health System SGH, Inc. d/b/a Sylvan Grove Hospital; and Hispanic Medical Management, Inc. d/b/a Clinica de la Mama, Clinica de la Mama, Inc. d/b/a Clinica de la

Mama, and Clinica de la Mama and Clinica del Bebe, including their Affiliated Parent or Successor Corporations, as follows:

(a)     Defendants be ordered to cease and desist from presenting and/or causing the submission of any more false or fraudulent claims to the government or in any way from otherwise violating O.C.G.A. §§ 49-4-168, *et seq.*

(b)     that judgment be entered in favor of the State of Georgia and against Defendants on Counts I –VIII and in the actual amount of each and every false or fraudulent claim and so multiplied (trebled) as provided by O.C.G.A. 49-4-168.1(a), plus a civil penalty of not less than Five Thousand, Five Hundred ($5,500.00) dollars nor more than Eleven Thousand ($11,000.00) Dollars per claim, as provided by O.C.G.A. 49-4-168.1(a), to the extent such multiplied civil penalties shall fairly compensate the State of Georgia for losses resulting from Defendants' violations of federal and state statutes and regulations, together with penalties for specific claims to be identified at trial after full discovery;

(c)     that the State of Georgia be awarded the maximum amount allowed pursuant to the Georgia False Medicaid Claims Act, the Georgia Medical Assistance Act, and other Georgia laws cited and referenced herein;

(d)     that the State of Georgia be awarded punitive damages for Defendants' fraudulent conduct;

(e)     that judgment be granted for State of Georgia and against Defendants for any and all allowable costs, including, but not limited to, court costs, expert fees and all attorneys' expenses and fees incurred in the prosecution of this *qui tam* action;

(f)     that the State of Georgia be granted any and all other relief to which they are entitled, whether by law or equity.

## DEMAND FOR JURY TRIAL

Plaintiff the State of Georgia hereby requests a trial by jury of all issues triable by jury.

Respectfully submitted, this 30 day of July, 2013.

SAMUEL S. OLENS
Attorney General for the State of Georgia

*Britt C. Grant by permission*

BRITT C. GRANT
Counsel for Legal Policy
Georgia Bar No. 113403
bgrant@law.ga.gov

NANCY B. ALLSTROM
Senior Assistant Attorney General
Georgia Bar No. 009830
nallstrom@law.ga.gov