IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

UNITED STATES OF AMERICA *ex*
*rel.* RALPH D. WILLIAMS, UNITED
STATES OF AMERICA, and STATE OF    *
GEORGIA,

                                                *

     Plaintiffs,

                                                *     CASE NO. 3:09-cv-130 (CDL)

vs.

                                                *

HEALTH MANAGEMENT ASSOCIATES,
INC., *et al.*,

                                                *

     Defendants.          *

_____

O R D E R

It is estimated that more than 340,000 babies are born each year to undocumented alien mothers in United States hospitals.[1] The American taxpayers, through the Medicaid program, pay these hospitals at least $1 billion per year for these deliveries.[2] While the wisdom of the public policy related to these issues is for the Legislative and Executive Branches (and not for this

---

[1] Jeffrey S. Passel & Paul Taylor, *Unauthorized Immigrants and Their U.S.-Born Children*, Pew Hispanic Center (August 11, 2010), *available at* http://www.pewhispanic.org/2010/08/11/unauthorized-immigrants-and-their-us-born-children/ (last visited June 23, 2014).

[2] Medicaid Financial Management Report 2012, MAP - National Totals tab, line 61 (Sept. 20, 2013), *available at* http://medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Data-and-systems/MBES/Downloads/FMR-for-FY2012.zip (last visited June 23, 2014) (reporting that Medicaid's Medical Assistance Program paid roughly $2.4 billion for emergency services for undocumented aliens in 2012); U.S. General Accounting Office, UNDOCUMENTED ALIENS: Questions Persist about Their Impact on Hospitals' Uncompensated Care Costs (May 2004), *available at* http://www.gao.gov/assets/250/242452.pdf (last visited June 23, 2014) (noting that "at least half of emergency Medicaid expenditures . . . were for labor and delivery services for pregnant women").

Court) to consider, the financial opportunities presented by these numbers reveal why the healthcare industry may be motivated to pursue this slice of the Medicaid pie aggressively. In this case, Plaintiffs maintain that Defendants' aggressive pursuit violated the law.

Plaintiffs allege that five hospitals in Georgia and South Carolina paid clinics that provided prenatal care to undocumented Hispanic mothers to refer those mothers to their hospitals for the delivery of their babies in violation of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b. When the hospitals submitted Medicaid claims for these deliveries, Plaintiffs contend that they violated the federal False Claims Act, 31 U.S.C. § 3729, and its Georgia counterpart, the Georgia Medicaid False Claims Act, O.C.G.A. § 49-4-168.1 to 168.6.[3]  As explained in the remainder of this Order, the Court finds that the Plaintiffs have alleged sufficient facts to support these claims, and if they are able to prove those facts, they will be entitled to relief.  Accordingly, Defendants' motions to dismiss (ECF Nos. 111, 113, 155, 156 & 157) are denied.[4]

---

[3] Plaintiffs also assert claims under several other state law theories, which all depend on the alleged pay-for-referrals scheme.

[4] This lawsuit was initially filed as a *qui tam* action by Relator Ralph Williams (ECF No. 47).  Pursuant to the applicable law, Williams notified the United States and the State of Georgia to give them an opportunity to intervene and pursue this action directly.  The State of Georgia intervened and filed its own Complaint asserting all of the Georgia Medicaid claims asserted by Williams in his Complaint.  The United States also intervened and filed its own Complaint.  The United

MOTION TO DISMISS STANDARD

Defendants' motions to dismiss are based predominately on Federal Rule of Civil Procedure 12(b)(6), which authorizes dismissal for failure to state a claim upon which relief can be granted. When considering a 12(b)(6) motion to dismiss, the Court must accept as true all facts set forth in the plaintiff's complaint and limit its consideration to the pleadings and exhibits attached thereto. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). The complaint must include sufficient factual allegations "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "[A] formulaic recitation of the elements of a cause of action will

---

States asserts all of the claims asserted by Williams based on federal Medicaid payments, but it did not name Health Management Associates, Inc., the parent company of Defendant HMA Monroe, in its Complaint. Defendants seek to dismiss Williams's complaint now that the United States and Georgia have intervened. Although the United States and Georgia have the "primary responsibility for prosecuting the action," Williams "ha[s] the right to continue as a party to the action." 31 U.S.C. § 3730(c); *accord* O.C.G.A. § 49-4-168.2(d)(1). Moreover, since the United States is not presently pursuing Williams's claims against Health Management Associates, Inc., Williams may pursue those claims on behalf of the United States. Accordingly, Defendants' motion to dismiss Williams's complaint solely because the United States and the State of Georgia have intervened in this action is denied.

not do[.]" *Id.* Although the complaint must contain factual allegations that "raise a reasonable expectation that discovery will reveal evidence of" the plaintiff's claims, *id.* at 556, "Rule 12(b)(6) does not permit dismissal of a well-pleaded complaint simply because 'it strikes a savvy judge that actual proof of those facts is improbable,'" *Watts v. Fla. Int'l Univ.,* 495 F.3d 1289, 1295 (11th Cir. 2007) (quoting *Twombly,* 550 U.S. at 556).

Plaintiffs' claims allege fraudulent conduct, which must be pled with sufficient specificity. *See United States* ex rel. *Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1308-09 (11th Cir. 2002) (holding that Federal Rule of Civil Procedure 9(b) applies to False Claims Act claims). Generally, fraud claims must include allegations of "facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Id.* at 1310 (internal quotation marks omitted). There must also be "some indicia of reliability . . . to support the allegation of *an actual false claim* for payment being made to the Government." *Id.* at 1311.[5]

---

[5] Defendants' motions to dismiss do not present the "plausibility" dilemma that this Court has previously found confounding in other cases. *See Barker* ex rel. *United States v. Columbus Reg'l Healthcare Sys., Inc.*, 977 F. Supp. 2d 1341, 1345-46 (M.D. Ga. 2013). And remarkably, Defendants' counsel acknowledged at the hearing on these motions that Plaintiffs' counsel likely could allege a sufficient claim but did not do so due to sloppy lawyering. Counsel for the

FACTUAL ALLEGATIONS

Defendants Hispanic Medical Management, Inc., Clinica de la Mama, and Clinica del Bebe ("Clinics") provide prenatal services to pregnant Hispanic women who are undocumented aliens.  These women are not eligible for regular Medicaid coverage, but they are generally eligible for Medicaid emergency medical assistance when they deliver their babies.  Plaintiffs allege that the Defendant hospitals paid illegal kickbacks to the Clinics in return for Medicaid patient referrals.  There are two groups of hospital Defendants.  The first group consists of Health Management Associates, Inc. ("HMA") and one of its Georgia subsidiary hospitals, HMA Monroe, LLC ("HMA Monroe").  The second group consists of Tenet Healthcare Corporation ("Tenet") and four of its subsidiary hospitals, three of which are located in Georgia and one in South Carolina.  These Tenet subsidiary hospitals (collectively, "Tenet Hospitals") are Tenet Health System GB, Inc. d/b/a Atlanta Medical Center and Atlanta Medical Center-South Campus ("Atlanta Medical Center"), North Fulton Medical Center, Inc. d/b/a North Fulton Hospital ("North Fulton"), Tenet Health System Spalding, Inc. d/b/a Spalding Regional Medical Center ("Spalding Regional"), and Hilton Head Health System, L.P. d/b/a Hilton Head Hospital ("Hilton Head").

---

United States, Georgia, and Williams strongly contest this accusation and do not seek leave to perfect their Complaints.

I.   **Health Management Associates and HMA Monroe Allegations**

A.   <u>HMA Monroe's Services Agreement with the Clinics</u>

Relator Ralph Williams is a former chief financial officer of HMA Monroe.  When Williams began his employment at HMA Monroe in April 2009, he discovered a copy of an agreement between HMA Monroe and the Clinics, which was allegedly approved by HMA. Under the agreement, the Clinics purportedly provided Spanish translation and eligibility services to HMA Monroe for its Hispanic patients.  U.S. Compl. in Intervention ¶¶ 134, 171, ECF No. 153 [hereinafter U.S. Compl.]; Ga. Compl. in Intervention ¶ 78, ECF No. 55 [hereinafter Ga. Compl.].  On its face, the services agreement between HMA Monroe and the Clinics states that the Clinics would provide HMA Monroe with 24/7 translation services, Medicaid eligibility determination services, and other support services.  U.S. Compl. Ex. 23, Services Agreement A-1, ECF No. 153-26 at 12.  Plaintiffs allege that HMA Monroe paid the Clinics between $15,000 and $20,000 per month under the services agreement.  Ga. Compl. ¶ 94; *accord* U.S. Compl. ¶ 176. Plaintiffs allege that the interpreter services were not the primary reason for the agreement, but the agreement was a sham "designed to conceal the underlying financial motive, which was the purchasing of Clinic[] referrals by . . . HMA Monroe." Ga. Compl. ¶ 83; *accord* U.S. Compl. ¶¶ 171, 175.

Plaintiffs allege that HMA Monroe and HMA knew when they entered the services agreement with the Clinics that its real purpose was to generate Medicaid referrals.  Ga. Compl. ¶¶ 100-01; U.S. Compl. ¶¶ 171, 175.  Plaintiffs assert that HMA Monroe CEO Gary Lang, who came to HMA Monroe from a Tenet Hospital, told Williams that the services agreement had been cloned from an agreement Tenet had with the Clinics and that the Clinics' "referrals generated large volumes of Medicaid deliveries for Tenet."  Ga. Compl. ¶ 100; U.S. Compl. ¶ 186.  Plaintiffs point to a financial feasibility analysis created by HMA Monroe CEO Gary Lang and then-CFO Jeff Grimsley in support of their request for their parent HMA's approval of the contract.  U.S. Compl. ¶ 175; Ga. Compl. ¶¶ 96-97; U.S. Compl. Ex. 24, Fin. Feasibility Analysis, ECF No. 153-25.  The financial feasibility analysis projects a 56.2% return on investment and focuses on the expected revenue from the services agreement between HMA Monroe and the Clinics, particularly the number of expected deliveries and the reimbursement rate per delivery.  Fin. Feasibility Analysis at 1-2.  The financial feasibility analysis contains an expense item for "Outside Services," which includes "Clinica de la Mama" and "Neo-natology."  *Id.* at 2.  The financial feasibility analysis does not provide any detail on the "Outside Services" expense item.  *Id.* at 1-2.  Plaintiffs also point to a memorandum from HMA Monroe personnel to HMA personnel seeking

approval for the services agreement. U.S. Compl. Ex. 21, Mem. from G. Lang & J. Grimsley to B. Jones & B. Stiekes (Apr. 2, 2008), ECF No. 153-24. The memorandum states that the Clinics would provide "translation, eligibility services, pre-registration and management of OB patients seen at" HMA Monroe. *Id.* The memorandum recommends that HMA approve the services agreement "to add new service and grow OB service line volume." *Id.*

In support of their assertion that the Clinic agreement was a sham, Plaintiffs allege that HMA Monroe tried to hide the agreement by keeping it out of HMA Monroe's contract monitoring system. U.S. Compl. ¶ 183. Plaintiffs also allege that the Clinic did not actually provide all of the services for which it billed. *Id.* ¶ 184; Ga. Compl. ¶ 90. Williams investigated the agreement to determine whether the clinics were actually providing interpreter services to HMA Monroe. U.S. Compl. ¶¶ 184-85; Ga. Compl. ¶ 90. HMA Monroe's director of nursing services told Williams that HMA Monroe used AT&T Interpreter Services, not interpreters from the Clinics. U.S. Compl. ¶ 185; Ga. Compl. ¶ 91; Ga. Compl. Ex. J, Email from S. Queen to B. Williams (Aug. 20, 2009), ECF No. 55-10 (stating that HMA Monroe uses AT&T Interpreter Services). HMA Monroe human resources personnel also told Williams that they "had no knowledge of

Clinic[] personnel rendering interpreter services to patients at Defendant HMA Monroe." Ga. Compl. ¶ 93.

HMA Monroe and HMA point out that the services agreement between HMA Monroe and the Clinics was terminated in July 2009. U.S. Compl. Ex. 25, Letter from T. Cota to G. Lang (Aug. 6, 2009), ECF No. 153-28. HMA Monroe and HMA also point out that the emails cited by Plaintiffs regarding interpreter services are dated *after* the services agreement termination date. Email from S. Queen to B. Williams (Aug. 20, 2009). HMA Monroe and HMA argue that these emails establish as a matter of law that the Clinics actually did provide interpreter services to HMA Monroe before the services agreement was terminated. Though one of the emails does suggest that the Clinics provided some interpreter services prior to July 16, 2009, the emails do not establish the extent or value of the interpreter services. *Id.* (stating that HMA Monroe had not had any interpreters since July 16 and that the Clinics did not provide HMA Monroe with schedules). These emails do not directly contradict the allegations in the Complaints that key HMA Monroe personnel did not use or were not aware of interpreters provided by the Clinics, so the Court may not discount those allegations at this stage of the proceedings.

B.   Medicaid Claims Submitted by HMA Monroe

Plaintiffs allege that after HMA Monroe executives, including CEO Gary Lang, developed the alleged pay-for-referrals scheme with the Clinics, HMA Monroe submitted claims to Georgia Medicaid for Clinic patients who delivered their babies at HMA Monroe.  Ga. Compl. ¶ 110; U.S. Compl. ¶ 193.  Plaintiffs provided specific examples of these claims, including patient service dates, Medicaid claim dates, claim amounts, and amounts paid by Medicaid.  Ga. Compl. ¶ 110.  Plaintiffs also contend that HMA Monroe submitted false cost reports to Medicare and Georgia Medicaid and sought additional reimbursement from the Medicare Disproportionate Share program based on figures that included Clinic patients who had been referred to HMA Monroe under the allegedly illegal kickback scheme.  U.S. Compl. ¶¶ 194-95; Ga. Compl. ¶¶ 39-46.

C.   Claims Against HMA Monroe and HMA

The United States asserts claims against HMA Monroe under the following theories: (1) False Claims Act; (2) False Claims Act civil conspiracy; (3) unjust enrichment; and (4) payment under mistake of fact.  In addition to these claims, Williams asserts a False Claims Act civil conspiracy claim against HMA on behalf of the United States.  Georgia asserts claims against HMA Monroe and HMA under the following theories: (1) Georgia False Medicaid Claims Act (HMA Monroe); (2) Georgia Medical Assistance

Act (HMA Monroe); (3) Georgia False Medicaid Act civil conspiracy (both); (4) fraud (HMA Monroe); (5) breach of contract (HMA Monroe); (6) payment by mistake (HMA Monroe); and (7) fraudulent concealment (HMA Monroe). All of these claims are rooted in the allegation that HMA Monroe had an illegal pay-for-referrals deal with the Clinics and submitted claims to Georgia Medicaid for services rendered to Clinic patients who were referred to HMA Monroe because of that deal. Plaintiffs also allege that HMA Monroe falsely certified compliance with the Anti-Kickback Statute when it submitted cost reports under the Medicare Disproportionate Share Program.

## II. Tenet Defendant Allegations

### A. Tenet's Services Agreements with the Clinics

Plaintiffs allege that each of the Tenet Hospitals also entered sham agreements with the Clinics that were designed to conceal the true motive, which was payment for Medicaid referrals. U.S. Compl. ¶ 61; Ga. Compl. ¶¶ 10, 118. Plaintiffs allege that the Tenet Hospitals paid illegal kickbacks to the Clinics for patient referrals and then submitted false claims to Medicaid for medical services provided to Clinic patients. U.S. Compl. ¶¶94-95, 127-28, 140-41, 156-57; Ga. Compl. ¶¶ 9-10, 118. Plaintiffs also contend that the Tenet Hospitals sought additional reimbursement from the Medicare Disproportionate Share Program based on figures that included Clinic patients who

had been referred to the Tenet Hospitals under the illegal kickback scheme. U.S. Compl. ¶¶ 96, 129, 142, 158; Ga. Compl. ¶¶ 10, 118.

      1. *Atlanta Medical Center's Clinic Agreements*

Beginning in 1999, Atlanta Medical Center began negotiating with Clinic representatives for a deal that would increase Atlanta Medical Center's obstetric patient volume. U.S. Compl. ¶¶ 50-51. Atlanta Medical Center initially proposed having the Clinics establish and operate a residency clinic. *Id.* ¶ 53. Atlanta Medical Center would provide physician services to Clinic patients, and the Clinics would collect cash payments from the patients for those services and would retain the payments with no obligation to pay Atlanta Medical Center for the services its physicians provided. *Id.* When Tenet's legal counsel warned that such a deal would violate the Anti-Kickback Statute, Atlanta Medical Center and the Clinics restructured the deal, and instead of the Clinics retaining the fees from the Clinic patients, Atlanta Medical Center would pay the Clinics roughly the same amount and call it a "management fee." *Id.* ¶¶ 55-56. During negotiations, Clinic personnel told Atlanta Medical Center personnel that if they reached an agreement, the Clinics would refer patients from their other locations (not just the residency clinic) to Atlanta Medical Center "for delivery of their babies." *Id.* ¶ 61.

In 2000, Atlanta Medical Center CEO Bruce Buchanan told a Tenet corporate executive that if Atlanta Medical Center did not reach an agreement with the Clinics, the Clinics "would pursue a relationship with another hospital." *Id.* ¶ 65. Shortly after that, the parties reached a deal for Atlanta Medical Center to pay the Clinics a minimum monthly management fee of $42,350 "for the operation and management" of the residency clinic. U.S. Compl. Ex. 5, Affiliation Agreement ¶ 6, ECF No. 153-5; U.S. Compl. ¶ 66. Atlanta Medical Center and the Clinics opened the new residency clinic, which was staffed by faculty and residents of Atlanta Medical Center's obstetrical residency program and Atlanta Medical Center physicians. Affiliation Agreement ¶ 3(f).

When the new residency clinic opened, the Clinics began referring patients from their other locations to Atlanta Medical Center for delivery of their babies. U.S. Compl. ¶ 69. Although Clinic personnel were not doctors, they were "able to direct referrals to particular hospitals," such as Atlanta Medical Center based on the Clinics' "control of the patients who sought services and [their] leverage over the physicians who saw those patients." *Id.* ¶ 70. Specifically, the Clinics told patients that they would not receive Medicaid benefits unless they went to their assigned hospital. *Id.* ¶¶ 72-73. And the Clinics, which controlled which physicians were given time slots

at their facilities, only gave time slots to physicians who agreed to send patients to Atlanta Medical Center for delivery. *Id.* ¶¶ 71, 74.

The majority of Clinic referrals to Atlanta Medical Center were not from the residency clinic; they were from other Clinic locations. *Id.* ¶ 77. The residency clinic had a "low volume" of patients, and the physician faculty members expressed concern about the low numbers. *Id.* ¶ 81. Plaintiffs allege that the monthly management fee paid by Atlanta Medical Center to the Clinics "was excessive in light of the low volume of patients seen at the residency clinic." *Id.* ¶ 79. Tenet's own legal counsel found in June 2000 that "there was no fair market value justification for the compensation rate set by the contract" and that Atlanta Medical Center did not provide any documentation of its expenses to justify the management fee. *Id.* ¶ 80.

In 2001, Bill Moore replaced Buchanan as CEO of Atlanta Medical Center. Moore received reports from Clinic representatives "regarding patient volume and admissions from all of [the Clinics'] facilities, not just the residency clinic." *Id.* ¶ 83. The residency program "continued to see few patients," but Atlanta Medical Center kept paying the management fee to the Clinics, and the Clinics kept referring patients from their other facilities to Atlanta Medical Center for delivery of their babies. *Id.* ¶ 84. When the initial affiliation agreement

expired, Atlanta Medical Center continued to make payments to the Clinics without a written contract in place. *Id.* ¶ 85.

By 2004, the residency clinic only generated $20,000 per month in revenue, though Atlanta Medical Center continued to pay the Clinics more than $40,000 per month. *Id.* ¶ 86. In 2005, Atlanta Medical Center entered a new agreement with the Clinics under which the Clinics would make "the same amount as under the previous contract, even if the management fee was changed." *Id.* ¶¶ 88-89. Under that agreement, Atlanta Medical Center agreed to pay $23.50 per hour for translation services ($7 more per hour than North Fulton paid for translation services) and increased the hourly fee paid for Medicaid eligibility services "to ensure that [the Clinics] would continue to make roughly the same amount of money." *Id.* ¶ 89. And the Clinics "began retaining the patient fees at the residency clinic" for services provided by Atlanta Medical Center physicians, residents, and nurses. *Id.* ¶ 90.

The residency program was terminated in 2008, but the relationship between Atlanta Medical Center and the Clinics continued, with Atlanta Medical Center ostensibly paying for translation and eligibility services. *Id.* ¶¶ 92-93. Plaintiffs allege that the Clinics were "not even required to submit an invoice to receive [the] monthly payment." *Id.* ¶ 93. Rather, Atlanta Medical Center "paid automatically based on the

contract." *Id.* And the Clinics continued to refer patients to Atlanta Medical Center. *Id.* ¶ 94.

Tenet corporate executives monitored the number of deliveries at Tenet hospitals and asked hospital management to report on Clinic volumes. U.S. Compl. Ex. 11, Email Chain between J. Austin, B. Moore & J. Holland (Sept. 25-26, 2008), ECF No. 153-13. When the number of deliveries fell in 2008, Moore investigated whether Clinic patients were being directed to other Tenet hospitals. U.S. Compl. ¶ 116. He noted that if North Fulton had "not seen an increase," presumably making up for the Atlanta Medical Center decline, then there was "a problem." Email Chain between J. Austin, B. Moore & J. Holland (Sept. 25-26, 2008).

### 2. North Fulton's Clinic Agreements

In 2000, Atlanta Medical Center's CEO introduced North Fulton CEO John Holland to Clinic representatives. U.S. Compl. ¶ 98. Holland expressed an interest in having the Clinics establish a new location in Roswell, Georgia that would send patients to North Fulton. *Id.* ¶ 99. At the time, North Fulton did not have a large Hispanic patient population and would not need translators unless the Clinic referred Hispanic patients to North Fulton; Holland offered to pay the Clinics for translators and "community outreach." *Id.* ¶¶ 99-100.

When North Fulton began its negotiations with the Clinics, many of the Clinics' patients delivered their babies at Northside Hospital in North Atlanta, and the Clinics helped those patients "with Medicaid eligibility paperwork at no charge to Northside." *Id.* ¶¶ 102-05. Holland and Clinic representatives discussed how to ensure that physicians who provided services to Clinic patients would "shift their admissions from Northside to North Fulton." *Id.* ¶ 103. Northside learned of this plan, and the Clinics made a presentation to Northside proposing that Northside pay the Clinics for services, including Medicaid eligibility services that it was already providing for free to Clinic patients who delivered their babies at Northside. *Id.* ¶ 105. Northside declined to pay. *Id.*

As negotiations continued and Holland met regularly with Clinic representatives, Holland told Clinic representatives "that he wanted at least 50 deliveries per month from Clinic[] facilities." *Id.* ¶ 109. And a business plan prepared by North Fulton employees states that "upon completion of the contract," the Clinics "will begin directing admissions" to North Fulton and "will shift 100% of their volume from Northside" to North Fulton, and "[a]ll deliveries will be Medicaid." *Id.* ¶ 110; U.S. Compl. Ex. 9, Business Plan Proforma Worksheet, ECF No. 153-11. North Fulton expected that the revenue from the

Medicaid referrals would far exceed the fees paid to the Clinics.  U.S. Compl. ¶ 111.

The Clinics and North Fulton entered a services agreement in October 2001; under that agreement, North Fulton ostensibly paid the Clinics to provide translation and other services for a monthly fee of between $42,680 and $53,480.  *Id.* ¶ 112.  After the contract was executed, the Clinics began sending their patients to North Fulton.  *Id.* ¶ 113.  When two doctors refused because North Fulton was farther from some patients' homes than Northside, the Clinics barred those doctors from seeing Clinic patients at Clinic facilities.  *Id.* ¶¶ 106, 113.  Other doctors understood that to keep their positions with the Clinics, they must deliver the patients' babies at North Fulton or another Tenet hospital.  *Id.* ¶ 115.

North Fulton renewed the contract with the Clinics several times.  During the course of the relationship between North Fulton and the Clinics, North Fulton's executives emphasized "that North Fulton had a quota for admissions that [the Clinics were] expected to meet." *Id.* ¶ 121.  In 2005, North Fulton's chief nursing officer questioned the value of the contract and stated that she had "many questions and concerns about what" North Fulton was getting in return for the fees it paid to the Clinics.  U.S. Compl. Ex. 14, Email from J. Reeves to P. Allen & L. Sneed (Aug. 22, 2005), ECF No. 153-17.  North Fulton renewed

the contract even after it learned "that it was being billed for marketing work that was never performed by Clinic[] personnel." U.S. Compl. ¶ 126.

In 2006, Holland was promoted to a senior vice president position at Tenet, and David Anderson was appointed as interim CEO of North Fulton. *Id.* ¶ 122. Anderson questioned the Clinic contract, but Clinic representatives "met with Anderson and made clear how many patients [the Clinics were] sending to North Fulton, and threatened to cease patient referrals if North Fulton did not renew the contract." *Id.* ¶ 123. North Fulton renewed the contract, and the Clinics continued to send Medicaid patients to North Fulton. *Id.* ¶ 124.

At some point, Joe Austin became CEO of North Fulton. Email Chain between J. Austin, B. Moore & J. Holland (Sept. 25-26, 2008). As senior vice president of Tenet's Southern States Region, Holland monitored the number of deliveries at Tenet hospitals and asked hospital management to report on Clinic volumes. *Id.* When the number of deliveries fell at Atlanta Medical Center in 2008 and Tenet executives determined that the Clinics were not directing the patients to North Fulton or other Tenet hospitals, Austin told the other executives that he believed the Clinics were "diverting [patients] to another program." *Id.* Austin noted that the contract between North Fulton and the Clinics was up for renegotiation, and he pledged

to contact Clinic representatives about the issue. *Id.* Soon, "volumes were up to previous levels." U.S. Compl. Ex. 12, North Fulton EBITDA 1, ECF No. 153-14.

> 3. *Spalding Regional's Clinic Agreements*

In 2003, Spalding Regional CEO John Quinn contacted Clinic personnel to discuss a deal between the Clinics and Spalding Regional. U.S. Compl. ¶ 131. Quinn was aware of the Clinics' relationship with Atlanta Medical Center, and he wanted the Clinics to open a clinic near Spalding Regional and refer Hispanic Medicaid patients to Spalding Regional. *Id.* At the time, Spalding Regional did not have a large volume of Hispanic labor and delivery patients and did not have an existing need for translation services. *Id.* ¶¶ 132, 134. Clinic personnel explained their "model" to Quinn and gave him a copy of the North Fulton agreement, "which provided for payments ostensibly for translation and marketing services." *Id.* Clinic representatives told Quinn that the Clinics "could send 30-40 deliveries a month to Spalding" Regional if Spalding Regional implemented the Clinic model. *Id.* ¶ 133.

One of Quinn's personal performance goals was to increase Spalding Regional's market share and grow the market area. U.S. Compl. Ex. 15, Tenet Performance Review 1, ECF No. 153-18. To reach this goal, Quinn proposed implementing the Clinic model. *Id.* Spalding Regional entered an agreement with the Clinics

under which the Clinics opened a new location near Spalding Regional. U.S. Compl. ¶¶ 136-37. Quinn "was very clear that he expected the contract with [the Clinics] to generate patient referrals to Spalding" Regional. *Id.* ¶ 138. But the deal "did not generate the expected amount of referrals," and after a few months Quinn canceled "the contract due to insufficient delivery volume from" the Clinics. *Id.* ¶ 139.

### 4. Hilton Head's Clinic Agreements

In 2005, Hilton Head CEO Elizabeth Lamkin contacted Clinic representatives and told them that her area had a large Hispanic population but "was losing patients to a competing hospital." *Id.* ¶¶ 144, 146. Lamkin was familiar with the Clinics because she had served as COO of North Fulton. At North Fulton, Lamkin emphasized to the Clinics "that North Fulton had a quota for admissions that [the Clinics were] expected to meet." *Id.* ¶¶ 121, 144. Lamkin asked the Clinics for "the same contractual arrangement as at North Fulton, which involved payments ostensibly for translation, marketing and other services." *Id.* ¶ 147. "Lamkin made clear that she wanted 30 deliveries per month from" the Clinics. *Id.* ¶ 148. Hilton Head entered an agreement with the Clinics under which the Clinics established a new location in Hilton Head, South Carolina and began referring patients to Hilton Head. *Id.* ¶ 150. Hilton Head personnel expected significant referrals from the Clinic agreement and

"attributed a dramatic increase in OB cases" to the Clinic agreement. *Id.* ¶¶ 152-53. Hilton Head renewed the contract several times, even though it was unable to track the hours worked by Clinic employees on certain tasks. *Id.* ¶¶ 154-55.

5. *Involvement of Tenet Corporate Personnel*

As early as 2003, Tenet executives, including Bill Henning, met with Clinic representatives to discuss opening more Clinic facilities in connection with Tenet hospitals so they could "replicate the profitable program in place at North Fulton." U.S. Compl. ¶ 159-60. When Henning met with the hospital CEOs in 2004, he asked them how the Clinic program "was impacting admissions at" Atlanta Medical Center "and North Fulton, and how [the Clinics] could increase future business there and at other Tenet Hospitals." *Id.* ¶ 161. In response to Henning's requests, "Moore and Holland explained that they were pleased with the Clinic[] relationship" and provided Henning with their hospitals' delivery numbers. *Id.* ¶ 162.

Tenet employees emphasized that a "large part of Georgia [Medicaid] inventory" came from the services agreements with the Clinics. *Id.* ¶ 164; Ga. Compl. Ex. A, Email from H. Lanzner to K. Waters (Feb. 23, 2007), ECF No. 55-1; *accord* Ga. Compl. ¶ 10;. At least one Tenet Hospital noted that the Clinic program resulted "in an excellent referral source for deliveries." Ga. Compl. Ex. R, Q2 Summary, ECF No. 55-18 at 2.

Again, Tenet corporate executives tracked the revenue from Clinic referrals.  Email Chain between J. Austin, B. Moore & J. Holland (Sept. 25-26, 2008).  And Tenet corporate executives, including Holland, were aware that when the number of Clinic referrals dipped, Tenet representatives met with Clinic representatives to make sure that the Clinics were not "diverting to another program."  *Id.*; Ga. Compl. ¶¶ 122-23; U.S. Compl. ¶ 117.  Finally, Tenet corporate executives discussed ways to keep the Clinic referrals without continuing the translation services agreements.  U.S. Compl. ¶ 166; U.S. Compl. Ex. 20, Email from D. Keel to K. Waters (Nov. 18, 2009), ECF No. 153-23.

> B.  <u>Medicaid Claims Submitted by Tenet Hospitals</u>

Plaintiffs claim that after Tenet Hospital executives, including Bruce Buchanan (Atlanta Medical Center), Bill Moore (Atlanta Medical Center), John Holland (North Fulton), Joe Austin (North Fulton), John Quinn (Spalding Regional), and Elizabeth Lamkin (Hilton Head) developed the alleged pay-for-referrals schemes with the Clinics, Tenet Hospitals submitted claims to Georgia Medicaid and South Carolina Medicaid for Clinic patients who delivered their babies at the Tenet Hospitals.  U.S. Compl. ¶¶ 83, 94, 98, 127, 131, 140, 144, 156; Ga. Compl. ¶ 123, 130.  Plaintiffs provided specific examples of claims submitted by Atlanta Medical Center, North Fulton, and

Spalding Regional.   The examples include patient service dates, Medicaid claim dates, claim amounts, and amounts paid by Medicaid.  Ga. Compl. ¶ 130.  Plaintiffs also contend that Tenet Hospitals submitted false cost reports to Medicare, Georgia Medicaid, and South Carolina Medicaid and sought additional reimbursement from the Medicare Disproportionate Share program based on figures that included Clinic patients who had been referred to the Tenet Hospitals under the illegal kickback scheme.   U.S. Compl. ¶¶ 95-96, 128-29, 141-42, 157-58; Ga. Compl. ¶¶ 39-46.

C.   Claims Against Tenet and Tenet Hospitals

The United States asserts claims against Tenet and the Tenet Hospitals under the following theories: (1) False Claims Act; (2) False Claims Act civil conspiracy; (3) unjust enrichment; and (4) payment under mistake of fact.  Georgia asserts claims against Tenet and the Tenet Hospitals under the following theories: (1) Georgia False Medicaid Claims Act (Tenet Hospitals); (2) Georgia Medical Assistance Act (Tenet Hospitals); (3) Georgia False Medicaid Act civil conspiracy (both); (4) fraud (Tenet Hospitals); (5) breach of contract (Tenet Hospitals); (6) payment by mistake (Tenet Hospitals); and (7) fraudulent concealment (Tenet Hospitals).  These claims are all rooted in the allegation that Tenet Hospitals had an illegal pay-for-referrals deal with the Clinics and submitted claims to

Georgia Medicaid and South Carolina Medicaid for services rendered to Clinic patients who were referred to Tenet Hospitals because of that deal, as well as cost reports that falsely certified compliance with the Anti-Kickback Statute.

DISCUSSION

The Hospitals contend that Plaintiffs' Complaints fail to state a claim upon which relief can be granted for two main reasons. First, the Hospitals assert that the Complaints fail to plead a violation of the Anti-Kickback Statute. Second, the Hospitals argue that the Complaints fail to plead a violation of the False Claims Act. The Court addresses each issue in turn, as well as Defendants' other arguments for dismissal.

## I. Do the Complaints Allege that the Hospitals Violated the Anti-Kickback Statute?

Plaintiffs' False Claims Act claims are based on an alleged violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b). Plaintiffs contend that when Defendants submitted their claims for Medicaid payment, they falsely certified that they had complied with the Anti-Kickback Statute. The Anti-Kickback Statute makes it a felony to offer or pay "remuneration" to "any person to induce such person" to refer patients for services that will be paid "in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2)(A). To establish a violation of the Anti-Kickback Statute, Plaintiffs must show

25

that the Hospitals "(1) knowingly and willfully, (2) paid money, directly or indirectly, to [the Clinics], (3) to induce [the Clinics] to refer individuals to [the Hospitals] for the furnishing of [medical services], (4) paid for by Medicaid." *See United States v. Vernon*, 723 F.3d 1234, 1252 (11th Cir. 2013) (setting forth elements of Anti-Kickback Statute violation).

The Hospitals do not dispute that they paid money to the Clinics or that the services the Hospitals rendered to Clinic patients were paid for by Medicaid, which is a federal health program. The Hospitals also do not seriously dispute that the Clinics "referred" patients to the Hospitals within the meaning of the Anti-Kickback Statute.[6] But they contend that the Complaints do not allege a violation of the Anti-Kickback Statute for two main reasons. First, the Hospitals contend that

---

[6] In their briefs, the Tenet Hospitals argued that the Clinics did not "refer" patients to the Hospitals because the Clinic owners are not physicians. At the hearing on the motions to dismiss, Defendants abandoned that argument, perhaps because the Eleventh Circuit has rejected it. The plain language of the Anti-Kickback Statute "speaks broadly to whoever knowingly and willfully . . . pays any remuneration to any person to induce such person . . . to refer an individual . . . for an item or service paid by Medicaid." *Vernon*, 723 F.3d at 1254 (first two alterations in original) (internal quotation marks omitted). In *Vernon*, the Eleventh Circuit concluded that a non-physician patient advocate "had the capacity to, and did, refer" her clients to a specialty pharmacy to fill their prescriptions; the fact that the patient advocate "could not actually prescribe the . . . medication [was] irrelevant." *Id.* Here, Plaintiffs allege that the Clinics had existing relationships with pregnant, undocumented Hispanic immigrant women and directed them to deliver their babies at the Hospitals. Those allegations sufficiently allege that the Clinics "referred" patients to the Hospitals.

the Complaints do not adequately allege that the Hospitals paid "remuneration" to the Clinics to induce them to refer Medicaid patients to the Hospitals.  Rather, the Hospitals assert that the Complaints and their exhibits simply allege that the Hospitals contracted with the Clinics to provide interpreters and other services for Hispanic patients and that the Hospitals merely hoped that the Clinics might refer patients to the Hospitals.  Second, the Hospitals argue that the Complaints do not adequately allege that the Hospitals acted knowingly and willfully.

A.  Do the Complaints Allege that the Hospitals Paid the Clinics Remuneration to Induce Medicaid Referrals?

The Anti-Kickback Statute forbids the offer or payment of "any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person" to refer Medicaid patients for services.  42 U.S.C. § 1320a-7b(b)(2).  Simply put, a hospital may not offer or pay any compensation for Medicaid referrals.

The Hospitals argue that they entered into legitimate business relationships with the Clinics and only *hoped* that those legitimate relationships would generate more referrals. Although the mere hope or expectation of future referrals may not make an otherwise legitimate business relationship illegal

under the Anti-Kickback Statute, *United States v. McClatchey*, 217 F.3d 823, 834 (10th Cir. 2000), that is not what the Plaintiffs allege here.   Plaintiffs clearly allege facts supporting their conclusion that the Hospitals entered sham agreements with the Clinics for the purpose of generating Medicaid referrals.   *See, e.g.*, U.S. Compl. ¶¶ 50-51, 61-66 (alleging that Atlanta Medical Center entered the Clinic deal to increase obstetric patient volume); *id.* ¶¶ 109-11 (alleging that North Fulton executives sought at least 50 deliveries per month in return for the Clinic management fee); *id.* ¶ 138 (alleging that Spalding Regional's CEO made it clear that he expected Medicaid referrals in exchange for the services agreement); *id.* ¶ 148 (alleging that Hilton Head's CEO demanded 30 deliveries per month from the Clinics); *id.* ¶ 171 (alleging that HMA Monroe's Lang "offered to pay thousands of dollars per month in return for 30 deliveries per month").

The Hospitals do not dispute that a straightforward quid pro quo kickback is unlawful: it is illegal for a hospital to pay a doctor for referrals and conceal the payments by giving the doctor a fake title and having him submit fake timesheets. *E.g.*, *United States v. Borrasi*, 639 F.3d 774, 777, 781-82 (7th Cir. 2011); *McClatchey*, 217 F.3d at 827, 834-35.   The Hospitals also do not dispute that an overpayment-for-services arrangement may be an illegal kickback: if a hospital pays a doctor for

legitimate services but pays more than fair market value to induce referrals, the difference between the amount paid and the actual value of the legitimate service is the illegal kickback. *Cf., e.g., United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.*, 874 F.2d 20, 30 (1st Cir. 1989) (noting that Medicare fraud statute's "any remuneration" provision "includes not only sums for which no actual service was performed but also those amounts for which some professional time was expended"); *United States v. Lipkis*, 770 F.2d 1447, 1449 (9th Cir. 1985) (describing a kickback arrangement where a laboratory paid more than fair market value for services provided by a medical group, so the court inferred that the laboratory was also paying for lab work referrals). The Hospitals argue that Plaintiffs did not adequately allege either type of illegal kickback. Instead, they insist that they paid fair market value, nothing more, for the services provided by the Clinics. This hyper-technical reading of Plaintiffs' Complaints is disingenuous.

Plaintiffs allege that under the Clinic model, the Hospitals paid remuneration to the Clinics for Medicaid referrals under one or both theories: payment for services that the Clinics did not provide and overpayment for services. The factual allegations and exhibits viewed in the light most favorable to Plaintiffs support the conclusion that North Fulton and HMA Monroe paid for services that the Clinics did not

actually provide.  U.S. Compl. ¶ 126 (alleging that the Clinics billed North Fulton for marketing services that were not provided); *id.* ¶¶ 184-85, Ga. Compl. ¶¶ 90-93 (alleging that key personnel at HMA Monroe did not actually use Clinic interpreters, which supports Plaintiffs' claim that the services agreement was a sham to conceal payments made to the Clinics for Medicaid referrals).  Plaintiffs further allege that Atlanta Medical Center allowed the Clinics to retain fees paid by patients for services that were actually provided by Atlanta Medical Center personnel.  U.S. Compl. ¶ 90.

Plaintiffs also allege that each Hospital overpaid the Clinics for services.  Plaintiffs allege that Atlanta Medical Center paid the Clinics an excessive management fee for running the residency clinic and that Atlanta Medical Center automatically paid the monthly management fee without even receiving an invoice detailing the services allegedly provided.  U.S. Compl. ¶¶ 79-81, 93.  Plaintiffs allege that North Fulton did not need interpreter services or Medicaid eligibility services absent Clinic referrals and that North Fulton paid an excessive fee for Clinic services.  *Id.* ¶¶ 100, 125.  Plaintiffs allege that although Spalding Regional did not need interpreter services or Medicaid eligibility services, it entered the same Clinic model that had been implemented at North Fulton and Atlanta Medical Center; under that model, the Hospitals paid

excessive fees to the Clinics in return for Medicaid referrals. *Id.* ¶¶ 132, 134.  And Plaintiffs allege that Hilton Head's CEO entered the same Clinic model she had used at North Fulton, where the Hospital paid for some services it did not receive and overpaid for other services.  *Id.* ¶¶ 144, 155.  The Complaints clearly allege that the Hospitals paid remuneration to the Clinics for Medicaid referrals, in violation of the Anti-Kickback Statute.[7]

> B.   Do the Complaints Allege that the Hospitals Acted Knowingly and Willfully?

The Hospitals contend that even if Plaintiffs alleged that Medicaid referrals were the purpose behind the Hospitals' decisions to enter the Clinic agreements, Plaintiffs did not sufficiently allege that the Hospitals acted knowingly and willfully.  To be a violation of the Anti-Kickback Statute, the offer or payment of remuneration for referrals must be done "knowingly and willfully."  42 U.S.C. § 1320a-7b(b)(2).  The Hospitals acknowledge that Plaintiffs allege that the Hospitals acted knowingly—that is, voluntarily and intentionally and not because of a mistake or by accident.  The Hospitals contend,

---

[7] Plaintiffs also allege that the Clinics were compensated for their referrals by being given the opportunity to obtain and retain the Tenet Hospitals' interpreter business.  No Court of Appeals has addressed this type of alleged "business opportunity" remuneration. Because the Complaints adequately allege remuneration under two widely accepted theories, the Court need not decide today whether providing a business opportunity in exchange for referrals is remuneration within the meaning of the Anti-Kickback Statute.

however, that Plaintiffs failed to allege that the Hospitals acted willfully, at least in part because they failed to use the word "willfully" in their Complaints.

Generally, the term "willfully" means that an "act was committed voluntarily and purposely, with the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law." *United States v. Starks*, 157 F.3d 833, 838 (11th Cir. 1998) (internal quotation marks omitted).  It is not necessary to prove that a defendant acted with specific intent to violate the Anti-Kickback Statute. *Id.* at 838-39 & n.8.  Rather, it is simply necessary to prove that the defendant acted with the intent to do something the law forbids—even if he is not aware of the specific law his conduct may violate. *Id.*

The Complaints and exhibits sufficiently allege that the Hospitals acted knowingly and willfully.  The Hospitals do not dispute that concealed payments may indicate an awareness of illegality.  The allegations and exhibits viewed in the light most favorable to Plaintiffs support the conclusion that Hospital executives entered the services agreements that paid the Clinics for Medicaid referrals under the guise of paying for services that were not actually provided or were not worth the amount paid.  Based on these allegations, the Court finds that Plaintiffs sufficiently alleged that executives at each Hospital

knew they were offering illegal kickbacks in exchange for Medicaid referrals and meant to do so.  The Complaints and exhibits also sufficiently allege that Tenet and HMA corporate executives knew about the kickback scheme, approved it, and fostered an environment where kickbacks to achieve quotas was the norm.  Plaintiffs have adequately alleged facts to support the conclusion that Defendants acted knowingly and willfully.[8]

## II.  Do the Complaints Allege that the Hospitals Violated the False Claims Act?

Having determined that the Complaints allege a violation of the Anti-Kickback Statute, the Court turns to the question whether the Complaints allege a violation of the False Claims Act, 31 U.S.C. § 3729(a).  The False Claims Act "creates civil liability for making a false claim for payment by the government."  *McNutt* ex rel. *United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005).  To prevail on a False Claims Act claim, the government or a relator must establish that the defendant presented a false claim to the United States for approval knowing that the claim was false. *United States* ex rel. *Walker v. R&F Props. of Lake Cnty., Inc.*,

---

[8] HMA Monroe argues that it cannot be held liable for Lang's actions because Lang did not have authority to enter the Clinic agreement.  To describe this argument as unpersuasive is charitable.  It would not be hyperbole to describe it as frivolous.  The focus here is on Plaintiffs' allegations in their Complaints, not on what Defendants believe Plaintiffs may be unable to ultimately prove.  Plaintiffs allege that Lang was HMA Monroe's CEO who negotiated the deal for HMA Monroe and worked with HMA executives to get it approved.

433 F.3d 1349, 1355 (11th Cir. 2005); *accord* 31 U.S.C.
§ 3729(a).  A violation of the Anti-Kickback Statute can form
the basis of a False Claims Act action if compliance with the
Anti-Kickback Statute is "necessary for reimbursement" of a
claim and the claimant submits the claim for reimbursement
knowing that the claimant was ineligible for the payment due to
a violation of the Anti-Kickback Statute. *McNutt*, 423 F.3d at
1259-60; *accord* 42 U.S.C. § 1320a-7b(g).

> A.   Is Compliance with the Anti-Kickback Statute a
>      Condition of Payment for Georgia and South Carolina
>      Medicaid Claims?

The Hospitals do not appear to dispute that compliance with
the Anti-Kickback Statute is a requirement for payment of a
Georgia or South Carolina Medicaid claim submitted after passage
of the Patient Protection and Affordable Care Act on March 23,
2010. *See* Patient Protection and Affordable Care Act, Pub. L.
No. 111-148, § 6402(f)(1), 124 Stat. 119, 759 (2010) (adding 42
U.S.C. § 1320a-7b(g): "In addition to the penalties provided for
in this section . . . a claim that includes items or services
resulting from a violation of this section constitutes a false
or fraudulent claim for purposes of [the False Claims Act]").
But the Hospitals argue that for claims submitted before March
23, 2010, compliance with the Anti-Kickback Statute was simply a
condition of *participation* in the Georgia and South Carolina
Medicaid programs, not a condition of *payment*, so any false

certification of compliance with the Anti-Kickback Statute in connection with those claims does not violate the False Claims Act. The Court disagrees.

### 1. Conditions of Georgia Medicaid Claims

Plaintiffs allege that the provider agreements between Georgia and the Hospitals prohibit the Hospitals from paying remuneration for referrals of Medicaid patients and further prohibit the Hospitals from billing Georgia Medicaid for services rendered to those patients. Ga. Compl. ¶¶ 47-55. By entering the provider agreements, the Hospitals agree to "comply with all of [Georgia Medicaid's] requirements" including Georgia's Policies & Procedures for Medicaid/PeachCare for Kids Manual. Ga. Compl. Ex. B, Statement of Participation, ECF No. 55-2 at 2. The Manual states: "Any offer or payment of remuneration, whether direct, indirect, overt, covert, in cash or in kind, in return for the referral of a Medicaid or PeachCare for Kids member is . . . prohibited." Ga. Compl. Ex. C, Ga. Dep't of Cmty. Health Div. of Medicaid, Policies & Procedures for Medicaid/PeachCare for Kids § 106(E), ECF No. 55-3. Also, enrolled providers must not "bill the Division [of Medicaid] for any services not performed or delivered in accordance with all applicable policies." *Id.* § 106(J).

The Hospitals emphasize that § 106 is titled "General Conditions of Participation," and they argue that this heading

means that compliance with the anti-kickback policy is merely a condition of *participation* in Georgia Medicaid, not a condition of *payment* for Georgia Medicaid claims.  Therefore, according to the Hospitals, even if they made illegal kickbacks for Medicaid referrals, they cannot be held liable under the False Claims Act.  The proper sanction for those violations, according to Defendants, is restricted to penalties affecting their participation in the Georgia Medicaid program, which presumably could include denial of continued participation.  The Court does not interpret § 106(E) this narrowly.  That section clearly prohibits the kickbacks alleged in Plaintiffs' Complaints.  And § 106(J) prohibits the Hospitals from billing for services that violates the Georgia Medicaid policies, including the kickback prohibition.  If a bill, which is prohibited because it is for services tainted by illegal kickbacks, is nevertheless submitted and paid, then the payment is obviously conditioned on the false representation that the bill complied with the Georgia Medicaid policies.

The Hospitals also rely on *New York v. Amgen, Inc.*, 652 F.3d 103 (1st Cir. 2011).  In *Amgen*, the First Circuit interpreted § 106(E) of the Georgia Medicaid agreement and found that it was not relevant to the alleged kickbacks in that case, where the defendants were accused of a kickback scheme to induce doctors to prescribe an anemia drug.  *Id.* at 116.  The Court is

not persuaded that *Amgen*, which is not binding precedent on this Court, counsels in favor of concluding that § 106(E) is merely a condition of participation (not a condition of payment) for the type of kickback alleged in this case. Section 106(E) directly addresses the type of kickback alleged here: payment of remuneration in return for the referral of a Medicaid patient. And as previously explained, § 106(J) prohibits providers from billing Georgia Medicaid for any services that are not delivered in accordance with all applicable policies. Since it is a violation of the applicable policies to pay a kickback for the referral of a patient, an enrolled provider may not bill Georgia Medicaid for services rendered to patients who were obtained via illegal kickbacks. The *Amgen* court even noted that § 106(E) "may identify some preconditions of payment under Georgia's Medicaid program" and suggested that its conclusion would have been different if the alleged kickbacks in that case involved "payments in exchange for referrals of patients." *Id.* For all of these reasons, the Court finds the rationale expressed in *Amgen* to be reconcilable with this Court's conclusion today and finds the *Amgen* holding distinguishable based on the difference in the facts presented.

The Court also notes that the Eleventh Circuit in *McNutt* emphasized that "[w]hen a violator of government regulations is ineligible to participate in a government program and that

violator persists in presenting claims for payment that the violator knows the government does not owe, that violator is liable, under the [False Claims] Act, for its submission of those false claims." *McNutt*, 423 F.3d at 1259.  The Eleventh Circuit further noted that "[t]he violation of the regulations and the corresponding submission of claims for which payment is known by the claimant not to be owed make the claims false" under the False Claims Act. *Id.*

For all of these reasons, the Court concludes that Plaintiffs have sufficiently alleged that compliance with anti-kickback rules was a condition of payment for Georgia Medicaid claims, even for claims that predated the Affordable Care Act.

2.  *Conditions of South Carolina Medicaid Claims*

The United States alleges that the provider agreement between South Carolina and Hilton Head prohibits Hilton Head from paying remuneration for referrals of Medicaid patients and further prohibits Hilton Head from billing South Carolina Medicaid for services rendered to those patients.  U.S. Compl. ¶¶ 34-36.  The Hilton Head provider agreement states that Hilton Head "agrees to comply with all applicable federal and state laws and regulations in effect and as may be promulgated during the term of this Contract in the provision of services and performance of it[s] obligations under this Contract."  U.S. Compl. Ex. 3, Hilton Head Provider Agreement art. IX ¶ N, ECF

No. 153-3.  The provider agreement further states that Hilton Head "shall not submit for payment any claims, statements, or reports which he knows, or has reason to know, are not properly prepared or payable pursuant to federal and state law, applicable regulations, this Contract, and SCDHHS policy."  *Id.* art. VI ¶ A.  It is a violation of federal law to pay a kickback for the referral of a Medicaid patient, so, under its provider agreement, Hilton Head may not bill South Carolina Medicaid for services rendered to patients who were obtained via illegal kickbacks.  The Court thus concludes that the United States sufficiently alleged that compliance with anti-kickback rules was a condition of payment for South Carolina Medicaid claims.

B.   Do the Complaints Allege a False Claims Act Violation?

Plaintiffs allege that the Hospitals submitted claims to Georgia and South Carolina Medicaid in connection with Clinic patients and that Georgia and South Carolina Medicaid paid those claims and sought partial reimbursement from the federal government.  Plaintiffs listed examples of those claims in the Complaints, including the patient's initials, service date, amount claimed, and amount paid.  As discussed above, Plaintiffs allege that Hospital executives, including Gary Lang (HMA Monroe), Bruce Buchanan (Atlanta Medical Center), Bill Moore (Atlanta Medical Center), John Holland (North Fulton and Tenet Corporate), Joe Austin (North Fulton), John Quinn

(Spalding Regional), and Elizabeth Lamkin (Hilton Head), entered the services agreements knowing that the primary purpose of the agreement was to generate illegal Medicaid referrals. Plaintiffs further allege that compliance with anti-kickback rules is necessary for payment of a Georgia or South Carolina Medicaid claim.  And Plaintiffs allege that the Hospitals paid the Clinics to refer Medicaid patients to the Hospitals and that the Hospitals submitted claims for reimbursement to Georgia and South Carolina Medicaid in connection with those patients.

These factual allegations support Plaintiffs' conclusion that when the Hospitals submitted Medicaid claims for Clinic patients who were referred while the services agreements were in effect, the Hospitals falsely certified compliance with the Anti-Kickback Statute.  *See Walker, Inc.*, 433 F.3d at 1360 (affirming denial of 12(b)(6) motion as to False Claims Act claim by former employee who observed improper billing practices that led to alleged false claims).  Plaintiffs' allegations address who submitted the false claims: the Hospitals submitted the claims pursuant to a kickback scheme engineered by Hospital executives, including Gary Lang, Bruce Buchanan, Bill Moore, John Holland, Joe Austin, John Quinn, and Elizabeth Lamkin.  The allegations address when the Hospitals submitted the claims to Georgia or South Carolina Medicaid.  The allegations address how the claims were false: the claims for reimbursement were made

even though the Hospitals paid the Clinics to refer the Medicaid patients.  And Plaintiffs' Complaints allege that the primary purpose of the alleged kickback scheme was to generate Medicaid referrals, so Hospital executives who engineered the scheme knew that false claims would be submitted to Georgia or South Carolina Medicaid for services that arose from Clinic referrals bought with illegal kickbacks.

Plaintiffs also allege that the Hospitals violated the False Claims Act when they submitted their hospital cost reports to the Centers for Medicare and Medicaid Services.  U.S. Compl. ¶¶ 21-22, 95-96, 128-29, 141-42, 157-58, 194-95.  Specifically, Plaintiffs allege that in their cost reports, the Hospitals sought additional reimbursement from the Medicare Disproportionate Share Program "based on figures that included Clinic[] patients referred pursuant to the kickback scheme." *Id.* ¶¶ 96, 129, 142, 158, 195.

Hospitals that serve a "significantly disproportionate number of low-income patients" may receive supplemental payments from Medicare.  42 U.S.C. § 1395ww(d)(5)(F)(i)(I).  The supplemental payments are based on the hospital's "disproportionate patient percentage." *Id.* § 1395ww(d)(5)(F)(v). And the "disproportionate patient percentage" is the sum of two fractions: the Medicare fraction and the Medicaid fraction. 42 U.S.C. § 1395ww(d)(5)(F)(vi); 42 C.F.R. § 412.106(b).  The

Medicaid fraction is calculated by dividing the number "patient days" for Medicaid patients by the total number of the hospital's patient days.   42 U.S.C. § 1395ww(d)(5)(F)(vi)(II); 42 C.F.R. § 412.106(b)(4).   The disproportionate share adjustment is reported on a hospital's annual cost report. U.S. Compl. ¶ 22.   In general, more Medicaid patients means a higher disproportionate share adjustment. *Id.* And Plaintiffs allege that the Hospitals inflated their Medicaid fraction by including Clinic patients whose referrals were bought with illegal kickbacks. *Id.* ¶¶ 96, 129, 142, 158, 195.

To be reimbursed by Medicare, a hospital's representative "must execute an express certification in the cost report." *Id.* ¶ 22.   That cost report contains a certification statement followed by a certification:

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.
>
> I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by [name of facility, ID number of facility] for the cost reporting period beginning [date] and ending [date] and that to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and records

of the provider in accordance with applicable
instructions, except as noted. I further certify that
I am familiar with the laws and regulations regarding
the provision of the health care services, and that
the services identified in this cost report were
provided in compliance with such laws and regulations.

*Id.*

The Hospitals contend that even if the disproportionate
share adjustments they claimed in their cost reports were false
because they inflated their Medicaid fraction by including
Clinic patients, that false representation cannot form the basis
of a False Claims Act claim because the Hospitals did not
violate the cost report's express certification.  The Hospitals
argue that the anti-kickback portion of the certification only
references "services" identified in the report, and the
disproportionate share adjustment simply counts how many
patients were eligible for Medicaid and does not identify any
services provided to those patients.  The Court is unpersuaded.
Plaintiffs allege that submission of a cost report is a
condition of the disproportionate share supplemental payments.
Plaintiffs further allege that the cost reports were false
because the disproportionate share adjustment inappropriately
included Medicaid patients whose referral was bought with an
illegal kickback.  It follows that when the hospitals certified
that the report was "a true, correct and complete statement,"
that was an express false certification.  Whether Plaintiffs

will produce sufficient evidence on this claim to prevail at trial or to survive summary judgment is not before the Court today. Plaintiffs have sufficiently alleged the claim.

Finally, Defendants contend that Plaintiffs did not sufficiently allege a basis for holding the parent corporations, Tenet and HMA, liable under the False Claims Act. Plaintiffs allege that Tenet and HMA executives were involved in the decisions to enter the pay-for-referral Clinic agreements and were responsible for approving the deals. At this stage of the litigation, the Court is satisfied that the Complaints state claims against Tenet and HMA.

As explained in the foregoing discussion, Plaintiffs have adequately alleged claims under the False Claims Act against Defendants. Therefore, Defendants' motions to dismiss those claims must be denied. [9]

---

[9] Before the United States intervened in this action, HMA sought dismissal of Williams's False Claims Act claims under the Act's "first-to-file" rule, contending that Williams's Complaint alleges the same essential facts as *United States ex rel. Dennis v. Health Management Associates, Inc.*, an earlier-filed Tennessee action. Under the first-to-file rule, when a person brings a False Claims Act case, "no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5). HMA seems to acknowledge that now that the United States has intervened in this action, the first-to-file rule does not apply. However, even if HMA has not abandoned its first-to-file lack of subject matter jurisdiction defense and pretermitting whether the Government's intervention moots that defense, the Court finds that the essential facts of *Dennis* do not sufficiently overlap with the essential facts here to divest this Court of jurisdiction. In *Dennis,* the plaintiff alleged that HMA offered free or below-market office space leases and equipment rentals, as well as free personnel, to doctors at the University Medical Center in Lebanon Tennessee to

**III. Are the Remaining Counts Sufficiently Stated?**

A.   Plaintiffs' Conspiracy Claims

In addition to their False Claims Act claims, Plaintiffs allege that the Hospitals and the Clinics conspired to defraud the government.  Defendants seek dismissal of these claims, arguing that the Clinics and the Hospitals had a legitimate business agreement, so Plaintiffs cannot prove a conspiracy to defraud the government.  As thoroughly discussed above, Plaintiffs have adequately alleged that the services agreements were a sham designed to conceal the underlying purpose of the agreement: a pay-for-referrals scheme.  Accepting these allegations as true, as this Court must at this stage of the litigation, the Court denies Defendants' motion to dismiss Plaintiffs' conspiracy to defraud claims.

B.   Georgia's Medical Assistance Act Claim

In addition to its other claims, Georgia asserts a claim under the Georgia Medical Assistance Act, which makes it unlawful for "any person or provider to obtain . . . payments . . . under a managed care program operated, funded, or reimbursed by the Georgia Medicaid program, to which the person

---

induce referrals of Medicare, Medicaid, and Tri-Care patients. *Dennis* Compl. ¶ 16, ECF No. 1 in M.D. Tenn. Case No. 3:09-cv-00484. Here, Plaintiffs allege that HMA's Monroe, Georgia facility paid the Clinics to refer Medicaid patients to that facility under a sham services agreement for Spanish interpreter services. Accordingly, the first-to-file rule does not deprive this Court of subject matter jurisdiction.

or provider is not entitled." O.C.G.A. § 49-4-146.1(b)(1). The statute provides for criminal and civil penalties. *Id.* ¶ 49-4-146.1(c)-(d). HMA Monroe contends that Georgia may not bring a civil action under the Medical Assistance Act because the Act sets forth two avenues for relief: (1) criminal prosecution or (2) a civil penalty, which may be recovered by the Georgia Department of Community Health pursuant to an administrative procedure.

In support of this argument, HMA Monroe cites cases that stand for the general proposition that "the violation of a penal statute does not automatically give rise to a civil cause of action on the part of" a private citizen who was injured by the violation. *See Murphy v. Bajjani*, 282 Ga. 197, 201, 647 S.E.2d 54, 58 (2007) (finding that statute requiring report of criminal activity by students did not create private right of action for individual injured by students); *see also United States* ex rel. *Dennis v. Health Mgmt. Assocs., Inc.*, No. 3:09-cv-00484, 2013 WL 146048, at *10 (M.D. Tenn. Jan. 14, 2013) (noting that Anti-Kickback Statute does not provide a private right of action). HMA Monroe did not cite any cases standing for the proposition that these private right of action cases apply to a state government seeking a civil penalty authorized by law, and the

Court declines to extend those holdings to this case at this time.[10]

### C.   Remaining State Law Claims

Defendants seek dismissal of Plaintiffs' remaining state law claims, contending that they do not adequately allege that Defendants' arrangements with the Clinics were anything other than legitimate business ventures.  The Court's ruling to the contrary today puts this argument to rest.  Accordingly, Defendants' motions to dismiss the remaining claims are denied.

CONCLUSION

For the reasons described in this Order, the Motions to Dismiss (ECF Nos. 111, 113, 155, 156 & 157) are denied.[11]


IT IS SO ORDERED, this 24th day of June, 2014.

                              S/Clay D. Land
                              _____
                              CLAY D. LAND
                              UNITED STATES DISTRICT JUDGE


---

[10] Georgia points out that state law gives the Georgia Attorney General authority "to file and prosecute civil recovery actions in the name of the state against any person, firm, or corporation which violates any statute while dealing with the state."  O.C.G.A. § 45-15-12.

[11] The parties shall now proceed with discovery expeditiously and provide the Court with a jointly proposed scheduling order as contemplated by the Court's previously issued order on this subject. *See* February 7, 2014 Order, ECF No. 142.